DAY PITNEY LLP
C. John DeSimone, III
Attorney I.D. No. 035101997
Stephen R. Catanzaro
Attorney I.D. No. 073402013
ONE JEFFERSON ROAD
PARSIPPANY, NJ 07054
(973) 966-6300
Attorneys for Plaintiff
Wharton LH LP

---

|  |  |  |
|---|---|---|
| WHARTON LH LP, | : | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: MORRIS COUNTY DOCKET NO. MRS-L-2373-20 |
| Plaintiff, | : |  |
| v. | : | Civil Action |
| TRI-COASTAL DESIGN SERVICES, LLC, TRI-COASTAL DESIGN GROUP, INC., TRI-COASTAL DESIGN-CHARACTER LICENSE, LLC, POSH AND POP ONLINE, LLC, LOOP DESIGN CO., INC., LOOP LICENSING CO., MARVIN STUTZ, MICHAEL MASTRANGELO, DENNIS MASTRANGELO, TODD SOLOMON, JOHN/JANE DOES 1-10 (fictitious persons), and ABC CORP. 1-10 (fictitious entities), | : : : : | **FIRST AMENDED COMPLAINT** |
| Defendants. | | |

---

Plaintiff Wharton LH LP ("Wharton" or "Plaintiff"), by way of this First Amended

Complaint against defendants Tri-Coastal Design Services, LLC, Tri-Coastal Design Group, Inc.,

Tri-Coastal Design-Character License, LLC, Posh and Pop Online, LLC, Loop Design Co., Inc.,

Loop Licensing Co., Marvin Stutz, Michael Mastrangelo, Dennis Mastrangelo, Todd Solomon,

106671912

John/Jane Does 1-10 (fictitious persons), and ABC Corp. 1-10 (fictitious entities) (collectively, "Defendants"), says:

**PARTIES**

1.      Wharton LH LP is a Limited Partnership of the State of New Delaware qualified to do business in New Jersey, maintaining its principal place of business at 145 Adelaide St. West, Suite 500, Toronto, Ontario M5H 4E5.

2.      Upon information and belief, Tri-Coastal Design Services, LLC ("Tri-Coastal Services") is a limited liability company of the State of New Jersey, with a principal place of business formerly located at 40 Harry Shupe Boulevard, Wharton, New Jersey 07885, and now located at 121 Old Chester Road, Essex Fells, New Jersey 07021.

3.      Upon information and belief, Tri-Coastal Design Group, Inc. ("Tri-Coastal Group") is a for-profit corporation of the State of New Jersey, with a principal place of business formerly located at 40 Harry Shupe Boulevard, Wharton, New Jersey 07885, and now located at 121 Old Chester Road, Essex Fells, New Jersey 07021.

4.      Upon information and belief, Tri-Coastal Design-Character License , LLC ("Tri-Coastal License") is a limited liability company of the State of New Jersey, with a principal place of business formerly located at 40 Harry Shupe Boulevard, Wharton, New Jersey 07885, and now located at 121 Old Chester Road, Essex Fells, New Jersey 07021.

5.      Upon information and belief, Posh and Pop Online, LLC ("Posh and Pop") is a limited liability company of the State of New Jersey, with a principal place of business formerly located at 40 Harry Shupe Boulevard, Wharton, New Jersey 07885, and now located at 121 Old Chester Road, Essex Fells, New Jersey 07021.

6.      Upon information and belief, Loop Design Co., Inc. ("Loop Design") is a for-profit corporation of the State of New Jersey, with a principal place of business formerly located

at 40 Harry Shupe Boulevard, Wharton, New Jersey 07885, and now located at 121 Old Chester Road, Essex Fells, New Jersey 07021.

7.      Upon information and belief, Loop Licensing Co., Inc. ("Loop Licensing") is a for-profit corporation of the State of New Jersey, with a principal place of business formerly located at 40 Harry Shupe Boulevard, Wharton, New Jersey 07885, and now located at 121 Old Chester Road, Essex Fells, New Jersey 07021.  Tri-Coastal Services, Tri-Coastal Group, Tri-Coastal License, Posh and Pop, Loop Design, and Loop Licensing shall sometimes be collectively referred to as the "Company Defendants."

8.      Upon information and belief, Marvin Stutz ("Stutz") is an individual that resides at 27605 Pacific Coast Highway, Malibu, CA 90265.  Stutz is the owner and/or Vice President of Tri-Coastal Services.  From time to time Stutz is believed to have worked at 40 Harry Shupe Boulevard Unit 2 aka 40 Harry Shupe Boulevard, Wharton, New Jersey 07885.  To the extent Stutz was not physically located at the Property (defined below), he reached and continues to reach into the State of New Jersey and Morris County to conduct business.  Stutz is also the registered Vice President of Tri-Coastal Group, Loop Design, and Loop Licensing.  Stutz is also a registered Chief Executive Officer of Tri-Coastal License.  Stutz is believed to have various other titles with the Company Defendants.  Stutz is also believed to have various ownership interests in the Company Defendants.

9.      Stutz's ownership interests in, and operation of, the Company Defendants, shows that he avails himself of, and consented to, New Jersey for purposes of personal jurisdictional.

10.     Upon information and belief, Michael Mastrangelo ("M. Mastrangelo") is an individual that resides at 121 Old Chester Road, Essex Fells, NJ 07021.  M. Mastrangelo is the registered Chief Executive Officer of Tri-Coastal Services, Tri-Coastal Group, and Tri-Coastal License.  He is also a registered agent of and has held himself out as a Principal of Posh and Pop

Online.  He is also the registered President of Loop Design.  He is also the registered Chief Executive Officer of Loop Licensing.  M. Mastrangelo is also believed to have various ownership interests in the Company Defendants.

11.     Upon information and belief, Dennis Mastrangelo ("D. Mastrangelo") is an individual that resides at 70 Beverly Drive, Bernardsville, NJ 07924.  D. Mastrangelo holds himself out as the Chief Operations Officer of Tri-Coastal Services.  D. Mastrangelo is believed to have various other titles with each of the Company Defendants.  D. Mastrangelo is also believed to have various ownership interests in the Company Defendants

12.     Upon information and belief, Todd Solomon ("Solomon") is an individual that resides at 258 Woodfield Rd, Township of Washington, New Jersey 07676.  Solomon holds himself out as the Chief Financial Officer of Tri-Coastal Services.  Stutz, M. Mastrangelo, D. Mastrangelo, and Solomon shall sometimes be referred to collectively as the "Individual Defendants."

13.     JOHN/JANE DOES 1-10 are presently unknown fictitious persons that are believed to have conspired with Defendants with respect to the allegations contained herein.

14.     ABC CORP. 1-10 are presently unknown fictitious entities that are believed to have conspired with Defendant with respect to the allegations contained herein.  ABC CORP. 1-10 are also believed to be the successor entities to the Company Defendants, permitting the Company Defendants to continue to conduct business.   JOHN/JANE DOES 1-10 and ABC CORP. 1-10 are sometimes collectively referred to as the "Fictitious Defendants."

15.     Wharton is the leasehold owner of certain commercial property described as 20 Harry Shupe Boulevard, which includes Unit 2 aka 40 Harry Shupe Boulevard, Wharton, New Jersey 07885 (the "Property").  Between January 2010 and October 1, 2020, Tri-Coastal Services

operated its business at the Leasehold (defined below) on the Property. Each of the other Company Defendants hold the Property out as their principal business address.

## **NATURE OF THE CASE**

16.     This case is about the systematic dissipation and transfer of assets by, through, and among Defendants in an effort to evade the debt owed by Tri-Coastal Services to Plaintiff stemming from a commercial real property lease and the breach of that lease, which is now the subject of the September 23, 2020 Consent Judgment (the "Judgment") entered against Tri-Coastal in the amount of $723,459.46 in the matter known as *Wharton LH LP v. Tri-Coastal Design Services, LLC, et al.* in the Superior Court of New Jersey, Law Division, Morris County, under Docket No. MRS-L-978-20 (the "Breach Litigation").[1]

17.     In August 2020, with the Breach Litigation pending for months, the Company Defendants apparently sold off some of their assets to the Israel Discount Bank of New York. Tri-Coastal Services and Stutz surreptitiously hid the sale from Wharton, waiting until weeks after the sale to disclose that the sale took place.

18.     Defendants have engaged, and are still engaged in, a complex scheme to prevent Wharton from collecting on the debt owed by Tri-Coastal Services that is now the subject of the Judgment.

19.     Frauds by their very nature are not conspicuous. It is, therefore, telling that Wharton has already uncovered (without any discovery) these transparently fraudulent efforts by Defendants to judgment-proof Tri-Coastal Services. Discovery in this case will undoubtedly uncover the full story of Defendants' efforts, and pave the path for Wharton to put an end to Defendants' scheme, so that it can collect on the Judgment that Tri-Coastal Services has gone to great efforts to avoid.

---

[1]  The Judgment has been docketed as Judgment No. J-091530-20.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction pursuant to *R.* 4:3-1.

21.     Venue is appropriate pursuant to *R.* 4:3-2 as this is the County where the subject real estate is laid, where the cause of action arose, and where each of the entity defendants maintained their principal place of business.  Furthermore, all parties to this suit are actually doing business in Morris County.

## FACTS COMMON TO ALL COUNTS

### The Lease Agreement Between Wharton and Tri-Coastal Services

22.     The Company Defendants and Fictitious Defendants are all closely held by one or more of the Individual Defendants.  In operating the Company Defendants and Fictitious Defendants, the Individual Defendants did and do not observe corporate formalities.  The Company Defendants and Fictitious Defendants are the alter ego of one or more of the Individual Defendants.

23.     Upon information and belief, the Individual Defendants have paid themselves compensation, salary, benefits, distributions, and/or other things of value from the Company Defendants and the Fictitious Defendants.

24.     Wharton is the successor in interest to The Realty Associates Fund VIII, L.P. ("Realty Associates").

25.     The Property is improved with, *inter alia.*, an industrial warehouse.

26.     On January 19, 2010, Tri-Coastal Services and Realty Associates entered into a Standard Industrial Lease Agreement (the "Original Lease"), whereby Tri-Coastal Services agreed to lease from Realty Associates 180,000 square feet of commercial space at the Property, namely Unit 2 at the Property, to be used by Tri-Coastal Services for commercial (non-

residential) purposes (the "Leasehold").  A true copy of the Original Lease is attached hereto as **Exhibit A**.

27.     The term of the Original Lease was one-hundred twenty two (122) months following the Rent Commencement Date, which was October 1, 2010.  (Ex. A §§ 1.8-1.9).

28.     Under the Original Lease, Tri-Coastal Services agreed to pay Base Rent, Operating Expenses, and Real Property Taxes, as well as utilities, maintenance, and repairs, and maintaining commercial general liability insurance.  (*Id.* §§ 1.8-1.12, 6).  These payments were generally due to Wharton on a monthly basis.

29.     Wharton acquired Realty Associate's interest in the Original Lease, including as Landlord of the Property and as beneficiary of the Line of Credit.

30.     In late 2019, Tri-Coastal Services, Stutz, and D. Mastrangelo, with the approval and participation of all Defendants, advised Wharton that Tri-Coastal Services was experiencing business difficulties and wanted to renegotiate some of the terms of the Original Lease.

31.     Tri-Coastal Services, Stutz, and D. Mastrangelo, with the approval and participation of all Defendants, represented to Wharton that if Wharton agreed to modify the terms of the Lease, that Tri-Coastal Services would timely remit rent and its other financial obligations to Wharton.

32.     Relying on the representations from Tri-Coastal Services, Stutz, and D. Mastrangelo, Wharton agreed to modify the Original Lease.

33.     On January 3, 2020, Wharton and Tri-Coastal Services executed a Lease Amending Agreement ("Amended Lease"), whereby the Original Lease was amended (the Original Lease and Amended Lease are referred to collectively as the "Lease").  A true copy of the Amended Lease is attached hereto as **Exhibit B**.

34.     Under the Amended Lease, Tri-Coastal Services remained bound by the terms of the Original Lease, including its payment obligations through the operable November 30, 2020 Termination Date. (*See* Ex. A § 1.9-1.10; Ex. B § 3(a), § 5).

35.     On or about February 1, 2020, even though less than one (1) month had elapsed since the Amended Lease was signed, Tri-Coastal Services defaulted on its rent obligations, failing to pay the February 2020 Base Rent, Operating Expenses, and Real Property Taxes.  This commenced a pattern of serial defaults under the terms of the Lease, which continued every month until Tri-Coastal Services vacated the Leasehold October 1, 2020.

36.     In late March 2020, the COVID-19 pandemic hit the state of New Jersey, resulting in, among other things, the suspension of commercial evictions.  Tri-Coastal Services, with the approval and participation of all Defendants, capitalized on this mandate, remaining in the Property, operating its business, and benefiting from the Lease, without paying rent and other charges it owed to Wharton pursuant to the Lease.  Defendants knew that Wharton had no true recourse, so Tri-Coastal Services, with the approval and participation of all Defendants, continued to run its business out of the Leasehold, the revenue from which operations it did not use to pay Wharton.  Instead, Tri-Coastal Services, with the approval and participation of all Defendants, collected the revenue and then transferred the revenue outside of the company to insiders such as the Individual Defendants, Company Defendants, Fictitious Defendants, and/or to others, all in an attempt to render Tri-Coastal Services judgment-proof vis-à-vis Wharton.

37.     Such transfers were done before, immediately after and during the time period that Tri-Coastal Services was incurring a substantial debt obligation to Wharton, and such transfers were concealed from Wharton.

38.     Tri-Coastal Services, with the approval and participation of all Defendants, made the concealed transfer of capital and other things of value with knowledge that a collection and/or

eviction lawsuit was likely to be filed against it and/or had been filed against it, as a result of its systemic failure to meet its payment obligations under the Lease.

39.      Despite continuing to operate and earn revenue, Tri-Coastal Services and Stutz, with the approval and participation of all Defendants, represented to Wharton in the Breach Litigation that Tri-Coastal Services was effectively defunct and insolvent.

**Tri-Coastal Services Improperly Permits the Balance of the Company Defendants to Use the Property**

40.      Under the Lease, Tri-Coastal Services was not permitted to sub-lease the Property without advance written consent from Wharton.  (Ex. A § 16).

41.      Defendants hid from Wharton that the other Company Defendants were utilizing the Property for business, generating income from their use of the Property.

42.      Upon information and belief, beginning no earlier than January 2010, and continuing to October 1, 2020, Tri-Coastal Services, with the approval and participation of all Defendants, permitted Tri-Coastal Group, Tri-Coastal License, Posh and Pop, Loop Design, and Loop Licensing to utilize the Property without paying rent or other things of value to Tri-Coastal Services for the other Company Defendants' use of the Property.

43.      Upon information and belief, beginning no earlier than January 2010, and continuing to October 1, 2020, while Tri-Coastal Services was permitting Tri-Coastal Group, Tri-Coastal License,  Posh and Pop, Loop Design, and Loop Licensing to utilize the Property without paying rent or other things of value, the Individual Defendants profited from such use without paying anything of value to Tri-Coastal Services.

**Fraudulent Misrepresentations Made by Tri-Coastal Services, Stutz, and D. Mastrangelo on Behalf of All Defendants to Wharton About Tri-Coastal Services' Repayment Intentions**

44.      During the fall of 2019 through to and including the present, Defendants escalated their efforts at causing Tri-Coastal Services to be judgment proof, working together and

separately but with a shared goal and purpose, to maximize the transfers of assets and other things of value from Tri-Coastal Services to the other Defendants.

45.     While Tri-Coastal Services was in default during February 2020 through June 2020 (but still operating and deriving profits without paying rent), Tri-Coastal Services, Stutz and D. Mastrangelo, with the approval and participation of all Defendants, repeatedly contacted representatives of Wharton, both verbally and in writing, seeking to cause Wharton to show restraint in (i) not seeking the eviction of Tri-Coastal Services and (ii) causing Wharton to forebear commencing suit.

46.     As part of such communications during February 2020 through June 2020, Tri-Coastal Services, Stutz and D. Mastrangelo, with the approval and participation of all Defendants, made various statements, including but not limited to acknowledging that Tri-Coastal was in default under the Lease and that it owed the rent and other charges being sought by Wharton pursuant to the Lease.

47.     Tri-Coastal Services, Stutz and D. Mastrangelo, with the approval and participation of all Defendants, also made various promises during February 2020 through June 2020, promising that they would ensure Wharton was paid for the rent and other charges Tri-Coastal owes under the Lease.  By way of additional example and not of limitation:

a.)  They individually and/or collectively repeatedly represented that Tri-Coastal Services' business difficulties were being caused by government to government trade disputes with China, and that therefore these business difficulties were only temporary in nature;

b.)  They individually and/or collectively represented that Defendants had arranged for outside investors to provide financing to help Tri-Coastal Services pay rent and its other obligations to Wharton; and,

c.)  They individually and/or collectively repeatedly represented that Tri-Coastal Services had applied for a government loan to provide financing to help Tri-Coastal Services pay rent and its other obligations to Wharton.

48.     Tri-Coastal Design Services, Stutz and D. Mastrangelo, with the approval and participation of all Defendants, repeatedly made the above statements and promises, and similar statements and promises, during February 2020 through June 2020, in an attempt to reassure Wharton that Wharton would be paid in full and to get Wharton to show restraint in (i) not seeking the eviction of Tri-Coastal and (ii) causing Wharton to forebear commencing suit.  Tri-Coastal Services, Stutz and D. Mastrangelo, with the approval and participation of Defendants, made such statements and promises in their capacity as principals of the Company Defendants and in their personal capacity as private individuals looking to safeguard the individual financial interests of each of the Defendants.

49.     It is clear that Tri-Coastal Services, Stutz, and D. Mastrangelo made these false statements and promises for several reasons, all of which are part of an overall scheme and plan by Defendants to defraud Wharton.

50.     Defendants desired that Wharton refrain from commencing suit so that, among other reasons (a) Defendants could continue to operate and derive revenue during the COVID-19 pandemic – revenue of which Defendants had no intention of using to repay Wharton; and (b) Defendants would have additional time to sell off and/or transfer Tri-Coastal Services' assets, and otherwise work to render Tri-Coastal Services judgment-proof.

51.     By acting in concert as they did, Defendants disregarded the corporate forms of each of the Company Defendants.  The Individual Defendants also personally participated in the Company Defendants' actions, rendering themselves individually liable.

**The Breach Litigation Commences in May 2020, Resulting in the Judgment**

52.     On May 1, 2020, Wharton commenced the Breach Litigation against Tri-Coastal Services, asserting causes of action for Breach of Contract and other contract-based claimed stemming from Tri-Coastal Services' breach of the Lease.

53.     On July 27, 2020, Wharton filed an Amended Complaint, naming Stutz as a defendant and asserting various causes of action against him, including fraud.

54.     On August 30, 2020, Stutz filed a motion to dismiss the Amended Complaint, asserting lack of personal jurisdiction.  That motion was heard and denied.

55.     On September 23, 2020, recognizing that it was in clear breach of the Lease and lacked viable defenses to Wharton's claims in the Breach Litigation, Tri-Coastal Services executed a Consent Judgment in the Breach Litigation, agreeing to entry of the Judgment in the amount of $723,459.46 in Wharton's favor.  A true copy of the Judgment is attached hereto as **Exhibit C**.

56.     The Breach Litigation against Stutz is ongoing.

**The Eviction Action and Vacating of the Property by Tri-Coastal Services**

57.     On July 1, 2020, Wharton filed a Complaint for Possession against Tri-Coastal Services in the Superior Court of New Jersey, Law Division, Special Civil Part (Landlord/Tenant) under docket number MRS-LT-001050-20 (the "Eviction Action").

58.     On September 16, 2020, M. Mastrangelo on behalf of Tri-Coastal Services executed a Consent Judgment For Possession (Tenant to Vacate), whereby Tri-Coastal Services consented to the entry of judgment, and to vacate the Property by September 30, 2020.  A true copy of the Consent Judgment in the Eviction Action is attached hereto as **Exhibit D**.

59.     In violation of the Eviction Action Consent Judgment, Tri-Coastal Design Services remained in possession of the Leasehold until October 1, 2020.

**Tri-Coastal Services Transfers its Revenue, Assets, and Other Things of Value Without Notifying Wharton**

60.     Upon information and belief, sometime after the commencement of the Lease, the Company Defendants entered into a lender/borrower relationship with the Israel Discount Bank of New York ("IDBNY").

61.     The lender/borrower relationship between the Company Defendants and the IDBNY was restated on or about August 24, 2017 (the "Loan Agreement").

62.     Defendants hid the Loan Agreement from Wharton.

63.     At the time of the Loan Agreement Tri-Coastal Services was already subject to the Lease and the financial obligations contained therein.

64.     Upon information and belief, Defendants structured the Loan Agreement in such a way to:  (a) subject Tri-Coastal Services to the debts of the other Company Defendants and (b) subject the other Company Defendants to the revenue, assets, and other things of value belonging to Tri-Coastal Services.  In so doing, Defendants structured the Loan Agreement in such a way as to frustrate Tri-Coastal Services' ability to pay its obligations pursuant to the Lease with Wharton.

65.     On September 11, 2020 (twelve (12) days before Tri-Coastal Services executed the Consent Judgment in the Breach Litigation), Tri-Coastal Services and Stutz disclosed for the first time that the IDBNY supposedly took ownership of all of Tri-Coastal Services' assets and, through a private sale, sold them to a third party incorporating and existing under the laws of Italy.

66.     Wharton had no knowledge of the sale before the September 11, 2020 letter.

67.     Tri-Coastal Services and Stutz provided additional contradictory statements about what allegedly occurred with the IDBNY.

68.     On or about September 15, 2020, Tri-Coastal Services' and Stutz provided for the first time a document titled "Secured Party Bill of Sale," dated August 24, 2020 (the "Bill of Sale"), which purported to memorialize what occurred with the IDBNY.  Tri-Coastal Services and Stutz refused to provide any additional documents concerning the same.

69.     The Bill of Sale evidences that on August 24, 2020 (after the Breach Litigation had commenced, and a matter of weeks before Tri-Coastal signed the Judgment), the Company Defendants sold their assets to the IDBNY.

70.     According to the Bill of Sale, and accompanying Peaceful Possession Agreement, the Company Defendants had apparently obtained a Loan from the IDBNY, and were collectively indebted to the IDBNY in the amount of $10,164,401.49.

71.     The identified purchased assets from the Bill of Sale purportedly totals $1,787,413.35.  Among the list of "Surrendered Collateral" is inventory, open purchase orders, URLs, domain names, and other intangible intellectual property, business records, trademarks and tradenames, and computers and other equipment.

72.     The Bill of Sale does not delineate the individual assets of Tri-Coastal Services.

73.     The Bill of Sale does not delineate the individual liabilities of Tri-Coastal Services, if any.

74.     The Bill of Sale also contains a list of "Excluded Assets," i.e., assets not sold to the IDBNY.  This list includes:  accounts receivable, customs reclamation claims and refunds, cash on hand with each of the Company Defendants, including proceeds of an SBA Loan apparently received by one or more of the Company Defendants pursuant to the CARES Act, and $1,200,000 of one or more of the Company Defendants' cash collateral allegedly held by Avalon Risk Management.

75.     Following the Bill of Sale, Tri-Coastal Services and Stutz, with the approval and participation of Defendants, misrepresented to Wharton in the Breach Litigation that Tri-Coastal Services was no longer operating and was, effectively, a defunct and insolvent business.

76.     Tri-Coastal Services and Stutz, with the approval and participation of Defendants, failed to disclose that Tri-Coastal Services had retained the Excluded Assets.

106671912                                                    14

77.     Tri-Coastal Services and Stutz, with the approval and participation of Defendants, failed to disclose that Tri-Coastal Services had also retained certain valuable Soft Assets (defined below), which it subsequently transferred to the other Defendants for no value.

**Additional Fraudulent Activity Discovered by Wharton Following it Being Notified of the Surreptitious Bill of Sale After the Sale Was Completed**

78.     After receiving notice of the Bill of Sale after it was completed, Wharton suspected that Defendants had engaged in a scheme to defraud Wharton and its prospect of ever collecting on the debt owed to Wharton.  The nature and circumstances surrounding the Bill of Sale alone, i.e. hiding it from Wharton and providing no advance notice, is evidence alone of an effort to remove its assets from the grasp of Wharton.  But, as would be learned by Wharton through further investigation, the scheme to defraud Wharton ran much deeper, and included various players all doing their part to transfer, hide, and otherwise place out of reach assets that could satisfy the debt owed to Wharton, including the Judgment.

A.     Tri-Coastal Transferred or Dissipated the Revenue it Earned From Operating

79.     As noted above, Tri-Coastal Services, with the approval and participation of Defendants, and without receiving value in return, transferred assets, revenue, and other things of value, to Defendants, thereby minimizing the assets of Tri-Coastal Services from Wharton's ability to collect.

80.     Upon information and belief, Tri-Coastal Services began, at least as early as the fall of 2019, with the approval and participation of Defendants, to accelerate the shift in revenue, assets, and other things of value to the rest of the Defendants, without receiving value in return. Such transfers were done in a concealed manner, and with knowledge that Tri-Coastal Services was experiencing financial hardship such that it could be subject to suit and judgment in favor of Wharton.

81.    Tri-Coastal Services, with the approval and participation of Defendants, undertook the foregoing in an attempt to minimize Tri-Coastal Services' assets that would be available to Wharton for the planned and actual unpaid rental obligations referenced in the Breach Litigation.

82.    Tri-Coastal Services stopped paying rent in February 2020, yet continued to operate at the Leasehold and earn revenue through and including October 1, 2020.

83.    None of the revenue earned by Tri-Coastal Services from February 2020 through October 1, 2020, was paid to Wharton.  Instead, upon information and belief Tri-Coastal Services with the approval and participation of Defendants, used the revenue for Defendants without receiving anything of value.

84.    Upon information and belief, Tri-Coastal Services, with the approval and participation of Defendants, (a) transferred revenue, assets, and other things of value to the Company Defendants and Individual Defendants (or for their benefit) and/or (b) transferred revenue, assets, and other things of value to the Fictitious Defendants (or for their benefit).  Tri-Coastal Services did not receive value for such transfers.

85.    At the time of such transfers, Defendants were aware of Tri-Coastal Services' unmet financial obligation to Wharton.

86.    At the time of such transfers, Defendants were aware that Tri-Coastal Services' conduct was for the purpose of defrauding Wharton.

87.    Defendants, working together and separately for a shared goal and purpose, engaged in, directed, and/or implemented, a series of financial and other transactions designed to divert, transfer, and assign revenue, assets and other things of value away from Tri-Coastal Services for the benefit of the remaining Company Defendants, the Individual Defendants and their families, the Fictitious Defendants, and others presently unknown.  Tri-Coastal Services did not receive reasonably equivalent value for such diversions, transfers, and/or assigns.

88.     The diverted, transferred, and assigned assets and other things of value from Tri-Coastal Services that benefit(ed) Defendants are rightfully the property of Wharton, and Wharton is entitled to a disgorgement of the same from Defendants.

B.     The Company Defendants Have Been Commingling Assets to Create the Illusion That Tri-Coastal Services is Insolvent and/or Defunct

89.     Tri-Coastal Services has, upon information and belief, been operated with the Defendants to obscure and dissipate the assets of Tri-Coastal Services.

90.     Upon information and belief, Tri-Coastal Services transferred its assets to the other Defendants.  Such transfers were done before and during the time period that Tri-Coastal Services was incurring a substantial debt obligation to Wharton, and such transfers were concealed from Wharton.

91.     Tri-Coastal Services and Stutz, with the approval and participation of Defendants, has repeatedly misrepresented that Tri-Coastal is "defunct" and possesses no assets.

C.     Tri-Coastal Services (Through M. Mastrangelo) Fails to Identify Assets in Response to an Information Subpoena Served Related to Collection on the Judgment

92.     After the entry of the Judgment, Wharton began its collection efforts, which included serving upon Tri-Coastal Services an Information Subpoena pursuant to *R.* 4:59 and *R.* 6:7 of the New Jersey Court Rules.  The Information Subpoena was served upon M. Mastrangelo, as a principal of Tri-Coastal Services.

93.     On October 6, 2020, M. Mastrangelo, with the approval and participation of Defendants, served Tri-Coastal Services' response to the Information Subpoena.  A true copy of the response is attached hereto as **Exhibit E**.

94.     In the response, Tri-Coastal Services, with the approval and participation of Defendants, claims that all of its assets were foreclosed on by the IDBNY and seized pursuant to the Bill of Sale.

106671912

95.     Absent from the Information Subpoena response is any mention of any of the "Excluded Assets" from the Bill of Sale, including accounts receivable, any cash on hand (including SBA loan), or the $1.2 million collateral alleged being held by Avalon Risk Management.

96.     Also absent from the Information Subpoena response is any mention of the assets and revenue transferred by Tri-Coastal Services to Defendants.

97.     The Information Subpoena response is false and misleading, designed to further Defendants' scheme to hide the assets and revenue of Tri-Coastal Services.

D.     Other Tri-Coastal Services Assets

98.     The business of Tri-Coastal Services is the sourcing, importation, distribution, and sale of merchandise and other products.

99.     Tri-Coastal Services possesses numerous manufacturing, importation, distribution, marketing, and sales assets related to the conduct of its business.  Tri-Coastal Services also possesses the identities of numerous vendors, suppliers, and others, which facilitate its business.  Tri-Coastal Services also possesses various other information and data which it used to operate its business.  Collectively, these shall be referred to as "Soft Assets."

100.     In brief, the Soft Assets permit Tri-Coastal Services to know where and what to source, and whom to sell it to, and for how much.

101.     The Soft Assets are a valuable asset and thing of value.

102.     Upon information and belief, Tri-Coastal Services has provided the Soft Assets to Defendants for no value.  Tri-Coastal Services has done so with knowledge that it is indebted to Wharton.

103.     Upon information and belief, the Fictitious Defendants are in business utilizing the Soft Assets and substantially carrying on the business of Tri-Coastal Services.

104.    Defendants have conspired to transfer the Soft Assets from Tri-Coastal Services to Defendants as part of attempting to frustrate Wharton's collection of debts owed under the Lease and Judgment.

105.    Some or all of the Individual Defendants have retained control of, and benefit from, the transferred Soft Assets.

106.    Defendants have concealed the transfer of the Soft Assets.

E.    Stutz Transfers Personal Assets (Real Estate) to a Trust to Attempt to Avoid Personal Liability to Wharton

107.    On January 18, 2020, fifteen (15) days after Tri-Coastal Services entered into the Amended Lease and after numerous misrepresentations made by Stutz to Wharton, Stutz executed a Trust Transfer Deed and other real estate documents which were recorded in title (the "Stutz Property Transfer").

108.    In the Stutz Property Transfer, Stutz transferred his interest in real property to the Marvin A. Stutz Declaration of Trust dated January 18, 2020, for no consideration.

109.    The real property that is the subject of the Stutz Property Transfer is a multi-million dollar parcel of land located in Malibu, California, which is upon information and belief one of Stutz's main assets.

110.    The Stutz Property Transfer occurred thirteen (13) days before Tri-Coastal Services defaulted on its obligations under the Lease.

111.    The Stutz Property Transfer was undertaken to attempt to protect the real property that was the subject of the transfer from attachment/seizure stemming from any collection efforts by Wharton.  Stutz did so because he had just engaged in numerous fraudulent misrepresentations to Wharton regarding Tri-Coastal Services' ability and intention to meet payment obligations owed to Wharton.  Aware that such misrepresentations could result in personal liability, Stutz completed the Stutz Property Transfer as a measure to protect what is presumably one of his

largest personal assets (the property was purchased by Stutz in August 2009 for $2,850,000 and, upon information and belief, the property is worth more today).

F.     Personal Mortgages Given to the IDBNY

112.   M. Mastrangelo, who is the signatory to the Bill of Sale and a Principal of nearly all of the Company Defendants, resides at 121 Old Chester Road, Essex Fells, NJ 07021 ("M. Mastrangelo Property").

113.   The M. Mastrangelo Property is owned by Beth A. Mastrangelo, who is upon information and belief the wife of M. Mastrangelo.

114.   On or about June 28, 2019, Beth A. Mastrangelo provided a mortgage for the M. Mastrangelo Property to the IDBNY, in part secure the debt of the Company Defendants (the "M. Mortgage").

115.   On or about September 10, 2020, IDBNY provided a discharge of the M. Mortgage ("Discharge").  The Discharge was recorded in the title of the M. Mastrangelo Property on October 16, 2020.

116.   The funds used to payoff the M. Mortgage and obtain the Discharge were improperly diverted away from Plaintiff in order to protect the M. Mastrangelo Property.

117.   M. Mastrangelo's actions with respect to the Company Defendants and with respect to the Bill of Sale were designed, in part, to protect the M. Mastrangelo Property from foreclosure by the IDBNY.

118.   Upon information and belief, Stutz and D. Mastrangelo have also given mortgages to real properties which they individually own (or which are owned by their family members), to the IDBNY.

119.    Stutz and D. Mastrangelo's actions with respect to the Company Defendants and with respect to the Bill of Sale were designed, in part, to protect their respective mortgaged real properties from foreclosure by the IDBNY.

### FIRST COUNT
(New Jersey Uniform Fraudulent Transfer Act)

120.    Wharton hereby repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein at length.

121.    At all relevant times, Tri-Coastal Services is and was a debtor to Plaintiff within the meaning of the Uniform Fraudulent Transfer Act (the "UFT"), *N.J.S.A.* 25:2-20 et seq., and other applicable laws, and Plaintiff was and is a creditor of Tri-Coastal Services within the meaning of the UFT and other applicable laws.

122.    By engaging in the conduct aforesaid, Tri-Coastal Group, Tri-Coastal License, Posh and Pop, Loop Design, Loop Licensing, the Individual Defendants, and the Fictitious Defendants (collectively, the "Others"), are and were debtors to Plaintiff within the meaning of the UFT, and other applicable laws, and Plaintiff was and is a creditor of the Others within the meaning of the UFT and other applicable laws

123.    It was known to each of the Defendants that Tri-Coastal Services had entered into a Lease with Wharton in 2010 and pursuant to the Lease, was obligated to provide various monies to Wharton.

124.    It was known to each of the Defendants that Tri-Coastal Services was a defendant in the Breach Litigation.

125.    It was known to each of the Defendants that Tri-Coastal Services had no defense to the financial obligations it was incurring pursuant to the Lease.

126.    It was known to each of the Defendants that Tri-Coastal Services had no defense to the allegations in the Breach Litigation, which ultimately caused Tri-Coastal Services to give the Judgment to Wharton.

127.    Tri-Coastal Services, working in concert with Defendants, engaged in a pattern of transfers and other conduct designed to remove the revenue, assets and things of value belonging to Tri-Coastal Services from Wharton's ability to collect from Tri-Coastal Services the obligations arising from the Lease as well as the Judgment.

128.    But for Defendants' conduct and transfer of Tri-Coastal Services' revenue, assets and other things of value, the revenue, assets and other things of value of Tri-Coastal Services would have been available to Wharton to collect from.

129.    Defendants transferred Tri-Coastal Services' revenue, assets and other things of value with an intent to defraud, delay, or hinder Wharton's ability to collect on the obligations arising from the Lease as well as the Judgment from Tri-Coastal Services.

130.    Tri-Coastal Services did not receive reasonably equivalent value for the transfers of its revenue, assets and other things of value.

131.    The value of Tri-Coastal Services' revenue, assets and things of value specifically benefitted the other Defendants, including but not limited to:  (a) assisting the Company Defendants by paying down their debts; (b) providing revenue, assets, and other things of value to the Company Defendants and Fictitious Defendants; (c) providing compensation, salary, benefits, distributions, and/or other things of value to the Individual Defendants; (d) protecting the Individual Defendants from real property foreclosures or other adverse personal legal consequences; and (e) enabling the Fictitious Defendants to substantially operate the business of Tri-Coastal Services and, among other things, derive revenue from the Soft Assets.

132.    Defendants intended to withdraw Tri-Coastal Services' assets from the reach of process.

133.    The conduct aforesaid on the part of Defendants constitutes "badges of fraud" within the meaning of applicable law.

134.    Defendants are all "insiders" with respect to Tri-Coastal Services within the meaning of applicable law.

135.    The transfers of assets were and are also fraudulent as Tri-Coastal Services was insolvent at the time the transfers were made, in light of its then-existing debt to Plaintiff.

136.    Defendants did not make any good faith payment or provide any reasonably equivalent value to Tri-Coastal Services in exchange for the transfers made directly to them and for their benefit.

137.    Pursuant to the UFT and other applicable laws, Plaintiff is entitled to a judgment against Defendants for the value of the assets transferred and/or being transferred.

138.    Defendants have damaged Wharton.

WHEREFORE, plaintiff Wharton LH LP demands judgment in its favor and against Defendants as follows:

A.    Awarding compensatory damages;

B.    Awarding punitive damages;

C.    Awarding interest;

D.    Awarding attorneys' fees and other costs of suit;

E.    For an accounting of all of Defendants' books, records, business papers, assets, income, and transfers; and

F.    Awarding Plaintiff any such other and further relief as the Court deems appropriate and just.

106671912

23

## SECOND COUNT
### (Fraud - Defendants)

139.    Wharton hereby repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein at length.

140.    Defendants, individually and through other Defendants, knowingly made false or misleading statements, or failed to make statements necessary to prevent Plaintiff from being misled, as to material facts about the Lease, Lease Amendment, rent owed, intention to repay Plaintiff, their occupancy of the Property, assets, transfers of assets, solvency of Tri-Coastal Services, and other issues, intending that Plaintiff would rely thereon and be harmed.

141.    Plaintiff relied to its detriment on such intentionally misleading statements and omissions.

142.    Defendants have damaged Wharton.

WHEREFORE, plaintiff Wharton LH LP demands judgment in its favor and against Defendants as follows:

        A.    Awarding compensatory damages;

        B.    Awarding punitive damages;

        C.    Awarding interest;

        D.    Awarding attorneys' fees and other costs of suit;

        E.    For an accounting of all of Defendants' books, records, business papers, assets, income, and transfers; and

        F.    Awarding Plaintiff any such other and further relief as the Court deems appropriate and just.

## THIRD COUNT
### (Unjust Enrichment – Defendants)

143.     Wharton hereby repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein at length.

144.     Plaintiff provided valuable services to Defendants, which services have been wrongfully retained by Defendants.  By way of example and not one of limitation, Defendants continued in possession of the Property without compensating Plaintiff and otherwise benefitted from the services which Plaintiff supplied to the Property while Defendants were in possession of it.

145.     Defendants failed and refused to reimburse Plaintiff for those valuable services that have been wrongfully retained by Defendants.

146.     By Defendants' actions or inactions, Defendants have been and will continue to be unjustly enriched to Plaintiff's detriment.

147.     As a consequence, Plaintiff has sustained damage and injury.

WHEREFORE, plaintiff Wharton LH LP demands judgment in its favor and against Defendants, as follows.

A.     Causing Defendants to disgorge to Plaintiff that which they have been unjustly enriched;

B.     Awarding compensatory damages;

C.     Awarding punitive damages;

D.     Awarding interest;

E.     Awarding attorneys' fees and costs and other costs of suit;

F.     For an accounting of all of Defendants' books, records, business papers, assets, income, and transfers; and

G.     Awarding Plaintiff such other and further relief as the Court may deem appropriate and just.

**FOURTH COUNT**
(Consumer Fraud Act – Defendants)

148.    Wharton hereby repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein at length.

149.    As a Limited Partnership, Wharton is afforded protection the protections of the New Jersey Consumer Fraud Act, *N.J.S.A.* 56:8-2 et seq. (the "CFA").

150.    The Individual Defendants and Company Defendants are considered "persons" as that term is described under the CFA and, therefore, are subject to the requirements of the CFA.

151.    Defendants engaged in unconscionable commercial practices, deception, fraud, false promises, misrepresentations, and the knowing, concealment, suppression, and/or omission of material facts in connection with the negotiation of the Amended Lease for the rental of the Property, the financial obligations inherent in the Lease relating to the rental of the Property, Tri-Coastal's ability to pay rent, various financial transactions, and the use and occupancy of the Property, with the intention to mislead and deceive Wharton.

152.    As a result of Defendants' unlawful practices, Wharton has suffered an ascertainable loss and damages.

WHEREFORE, plaintiff Wharton LH LP demands judgment in its favor and against Defendants, as follows:

A.    Awarding compensatory damages;

B.    Awarding punitive damages;

C.    Awarding statutory treble damages;

D.    Awarding interest;

E.    Awarding attorneys' fees and other costs of suit;

F.    For an accounting of all of Defendants' books, records, business papers, assets, income, and transfers; and

G.      Awarding Plaintiff any such other and further relief as the Court deems appropriate and just.

### FIFTH COUNT
(Civil Conspiracy – Defendants)

153.    Wharton hereby repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein at length.

154.    Defendants, through their aforesaid acts and omissions, conspired, combined, confederated and agreed to a common design and with a purpose to injure Plaintiff for their own gain or benefit.

155.    Defendants acted overtly and in furtherance of the common design, interest or joint enterprise as shown by their words and deeds, including, but not limited to, those described above.  Further, at all times relevant hereto, each acted as the agent of the other in accomplishing their common goal.

156.    Defendants have damaged Wharton.

WHEREFORE, plaintiff Wharton LH LP demands judgment in its favor and against Defendants, as follows:

A.      Awarding compensatory damages;

B.      Awarding punitive damages;

C.      Awarding interest;

D.      Awarding attorneys' fees and other costs of suit;

E.      For an accounting of all of Defendants' books, records, business papers, assets, income, and transfers; and

F.      Awarding Plaintiff any such other and further relief as the Court deems appropriate and just.

**DAY PITNEY LLP**
Attorneys for Plaintiff
Wharton LH LP

By: _____
C. John DeSimone III
A Member of the Firm

DATED:  November 25, 2020

## <u>CERTIFICATION PURSUANT TO *R*. 4:5-1</u>

I hereby certify, pursuant to *R*. 4:5-1, that the above matter is not the subject of any other action pending in any Court or any pending arbitration proceeding, except that (1) presently pending is a summary eviction action filed by Wharton against Tri-Coastal Services in the Superior Court of New Jersey, Law Division, Special Civil Part (Landlord/Tenant) under Docket No. MRS-LT-001050-20; and (2) presently pending is an action filed by Wharton against Tri-Coastal Services and Stutz in the Superior Court of New Jersey, Law Division, Morris County, under Docket No. MRS-L-978-20, wherein Final Judgment has been entered against Tri-Coastal Services, and the claims against Stutz are still pending.  No other party should presently be joined in this action to the best of Plaintiff's information and belief.

<div align="right">

**DAY PITNEY LLP**
Attorneys for Plaintiff
Wharton LH LP

By:  _____
C. John DeSimone III
A Member of the Firm

</div>

DATED:  November 25, 2020

# EXHIBIT A

## *STANDARD INDUSTRIAL LEASE*

1.     *BASIC LEASE PROVISIONS.*

    1.1    *DATE:*   January 19, 2010

    1.2    *LANDLORD:*   **THE REALTY ASSOCIATES FUND VIII, L.P.,**
        a Delaware limited partnership

    1.3    *TENANT:*   **TRI-COASTAL DESIGN SERVICES, LLC,**
        a New Jersey limited liability company
        Tax Identification Number: 26-4218627

    1.4    *BUILDING ADDRESS:*     20 Harry Shupe Boulevard
                      Wharton, New Jersey 07885

    1.5    *PREMISES ADDRESS:*     20 Harry Shupe Boulevard, Unit 2
                      Wharton, New Jersey 07885

    1.6    *APPROXIMATE LEASABLE AREA*
        *OF PREMISES:*    180,000 square feet.

    1.7    *USE:*    General office and warehouse use, subject to the restrictions contained in Section 4 below.

    1.8    *TERM:*    The Term of the Lease shall commence on the Commencement Date (defined below) and shall be for a period of one hundred twenty-two (122) full calendar months following the Rent Commencement Date (defined below).

    1.9    *COMMENCEMENT DATE AND RENT COMMENCEMENT DATE:* The "Commencement Date" shall be April 1, 2010. The "Rent Commencement Date" shall be October 1, 2010. For purposes of clarification, Tenant shall not be obligated to pay Base Rent, Operating Expenses and Real Property Taxes until the Rent Commencement Date.

    1.10   *BASE RENT:*

The Base Rent shall be payable during the Term of the Lease as follows:

| Lease Period (following the Rent Commencement Date) | Annual Base Rent Per Square Foot | Annual Base Rent (annualized amount) | Monthly Base Rent |
|---|---|---|---|
| 10/01/10 – 09/30/12 | $3.25 | $585,000.00 | $48,750.00 |
| 10/01/12 – 09/30/14 | $3.50 | $630,000.00 | $52,500.00 |
| 10/01/14 – 09/30/16 | $3.75 | $675,000.00 | $56,250.00 |
| 10/01/16 – 09/30/17 | $4.00 | $720,000.00 | $60,000.00 |
| 10/01/17 – 09/30/19 | $4.25 | $765,000.00 | $63,750.00 |
| 10/01/19 – 11/30/20 | $4.50 | $810,000.00 | $67,500.00 |

    1.11   *ESTIMATED MONTHLY OPERATING EXPENSE AND REAL PROPERTY TAX PAYMENT:* $27,900.00 per month.

    1.12   *BASE RENT AND ESTIMATED MONTHLY OPERATING EXPENSE AND REAL PROPERTY TAX PAYMENT PAID UPON EXECUTION:* $76,650.00

    1.13   *TENANT'S PERCENTAGE SHARE (See also Section 6.4):* 29.54% (determined by dividing 180,000 (the approximate number of rentable square feet in the Premises), by 609,426 (the approximate number of rentable square feet in the Building) and multiplying the resulting quotient by 100).

    1.14   *SECURITY DEPOSIT:* $97,500.00, in the form of an unconditional, irrevocable letter of credit, subject to the provisions of Section 7 of the Lease, as modified by Paragraph 2 of the Addendum

    1.15   *NUMBER OF PARKING SPACES:* Tenant shall be permitted to use sixty (60) of parking spaces in the parking areas of the Project on an unreserved basis, in common with other tenants of the Project.

    1.16   *REAL ESTATE BROKER:*

        Landlord:    Resource Realty Northern NJ

        Tenant:    Studley, Inc.

    1.17   **Exhibits Attached to Lease:**   Addendum; Exhibit A – "Site Plan Showing Location of Premises"; Exhibit A-1 – "Expansion Space"; Exhibit A-2 – "Warehouse Parking Area"; Exhibit B – "Verification Letter"; Exhibit C – "Rules and Regulations"; Exhibit D – "Form of Letter of Credit"; Exhibit E – "Form of License Agreement for Satellite Dish"; Exhibit F – "Tenant's Removable Alterations"; Schedule 1 –"Work Letter Agreement".

    1.18   *Addresses for Notices:*

        *LANDLORD:*     The Realty Associates Fund VIII, L.P.
                    c/o Kwartler Associates
                    2 North Street
                    Waldwick, New Jersey 07463

<div align="center">1</div>

WITH COPY TO: TA Associates Realty
28 State Street
Boston, Massachusetts 02109
Attention:  Asset Manager – New Jersey

TENANT: Tri-Coastal Design Services, LLC
49 West 37th Street
New York, NY 10018
Attention:  Michael Mastrangelo

1.19 *Agent for Service of Process:* If Tenant is a corporation, the name and address of Tenant's registered agent for service of process is:

Tri-Coastal Design Services, LLC
905 Murray Road
East Hanover, NJ 07936

1.20 **Tenant's Standard Industrial Classification (herein "SIC") Numbers:** 315991, 325620, 322231, and 316991, determined by reference to the SIC or NAICS Manual and its operations shall consist of the Use described in Section 1.7.

2. *Premises.*

2.1 *Acceptance.* The "Project" consists of one building (the "Building"), the Common Areas (as defined below), the land upon which the same are located, along with all other buildings and improvements thereon or thereunder, including all parking facilities.  Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, upon all of the conditions set forth herein the Premises, together with the non-exclusive right to use the Common Areas as hereinafter specified.  The Premises shall not include an easement for light, air or view.  Tenant accepts the Premises in its condition as of the Commencement Date, subject to all applicable laws, ordinances, regulations, covenants, conditions, restrictions and easements, and except as may be otherwise expressly provided herein (including the Work Letter Agreement attached to the Lease as Schedule 1), Landlord shall not be obligated to make any repairs or alterations to the Premises.  Tenant acknowledges that, except as expressly provided below, Landlord has made no representation or warranty as to the suitability of the Premises for the conduct of Tenant's business, and Tenant waives any implied warranty that the Premises are suitable for Tenant's intended purposes.  The number of square feet set forth in Section 1.6 is an approximation, and the Base Rent shall not be changed if the actual number of square feet in the Premises is different than the number of square feet set forth in Section 1.6.  The Project is currently zoned I-1 Planned Industrial District as of the date hereof.  Landlord hereby represents and warrants that Landlord has not taken any actions nor has Landlord received any notices or otherwise obtained any knowledge (actual or constructive) of any actions pending to change the zoning classification for the Project from the current zoning classification set forth in the immediately preceding sentence.

*See Addendum Paragraph 1*

2.2 *Common Areas.*  Landlord hereby grants to Tenant for the benefit of Tenant and its employees, suppliers, shippers, customers and invitees during the Term of this Lease, the nonexclusive right to use, in common with others entitled to such use (including Landlord), the Common Areas (as hereinafter defined) as they exist from time to time, subject to all rights reserved by Landlord hereunder and under the terms of all rules and regulations promulgated by Landlord from time to time with respect thereto.  Landlord reserves the right from time to time to (a) make changes in the Common Areas, including, without limitation, changes in location, size, shape and number of driveways, entrances, parking spaces, parking areas, loading and unloading areas, ingress, egress, direction of traffic, landscaped areas and walkways; (b) close temporarily any of the Common Areas for maintenance purposes so long as reasonable access to the Premises remains available; (c) construct additional buildings, parking areas, loading dock facilities and other improvements within the Common Areas; and (d) do and perform such other acts and make such other changes in, to or with respect to the Common Areas as Landlord may deem appropriate so long as Landlord's actions in connection with such rights set forth in clauses (a) through (d) above do not have a permanent materially adverse effect on Tenant's use or occupancy of the Premises.  Landlord shall use reasonable efforts to minimize interference with Tenant's use and occupancy of and access to the Premises during Landlord's actions in connection with this Section and shall diligently pursue completion of any work performed pursuant to this provision, and, in the event access to the Premises is prevented by any such actions, Landlord shall use commercially reasonable efforts to provide alternative access, to the extent feasible.  As used herein, the term **"Common Areas"** means all areas and facilities outside the Premises and within the exterior boundary lines of the land owned by Landlord that are provided and designated by Landlord as such from time to time for general nonexclusive use of Tenant and others, including, if designated by Landlord as Common Areas, parking areas, loading and unloading areas, trash areas, roadways, sidewalks, walkways, parkways and landscaped areas.  The Premises, the Building, the Common Areas, the land upon which the same are located, along with all other buildings and improvements thereon, are herein collectively referred to as the **"Project."**  Under no circumstances shall the right herein granted to use the Common Areas be deemed to include the right to store any property, temporarily or permanently, in the Common Areas, including, without limitation, the storage of trucks or other vehicles. Any such storage shall be permitted only by the prior written consent of Landlord, which consent may be revoked at any time.  In the event that any unauthorized storage shall occur then Landlord shall have the right, without notice, in addition to such other rights and remedies that it may have, to remove the property and charge the cost to Tenant, which cost shall be immediately payable upon demand by Landlord.  Notwithstanding anything to the contrary contained herein, Landlord acknowledges that Tenant will receive shipments from trucks and tractor trailers as part of Tenant's operations at the Premises, and subject to all applicable laws, codes, ordinances and restrictions, parking of such trucks and tractor trailers shall be permitted provided such trucks and tractor trailers are parked directly behind the loading dock(s) for the Premises (and such other location(s) within the Warehouse Parking Area (shown on Exhibit A-2 attached hereto) designated by Landlord for truck and tractor trailer parking, which such parking shall be in common with other tenants of the Project) and do not interfere with the loading areas of other tenants of the Building nor impede the flow of traffic through the parking areas of the Project and provided the same is in compliance with all applicable laws, codes, ordinances, restrictions and covenants.

2

2.3 **Tenant's Access.** Subject to the other terms and conditions of the Lease, Landlord shall provide Tenant with reasonable access to the Common Areas of the Building and to the Premises, twenty-four (24) hours a day, three hundred sixty-five (365) days per year. Notwithstanding the foregoing, Tenant acknowledges and agrees that repairs, hazardous conditions and other circumstances beyond Landlord's reasonable control may prevent access to the Common Areas of the Building and to the Premises from time to time.

3. **Term.**

3.1 **Term and Commencement Date.** The Term, the Commencement Date and the Rent Commencement Date of this Lease are as specified in Sections 1.8 and 1.9. Following the Commencement Date, Tenant shall, within five (5) days after Landlord's request, complete and execute the letter attached hereto as Exhibit "B" (the "Verification Letter") and deliver it to Landlord. Tenant's failure to execute the letter attached hereto as Exhibit "B" within said five (5) day period shall be a material default hereunder and shall constitute Tenant's acknowledgment of the truth of the facts contained in the letter delivered by Landlord to Tenant.

3.2 **Planning Board Approval.** As used in this Section 3.2 "Approvals" shall mean the approval of the Planning Board of the Borough Wharton (the "Planning Board") for the use specified in Section 1.7 hereinabove. Tenant covenants that Tenant, at Tenant's sole cost and expense, shall make application to the Planning Board requesting such Approvals within three (3) business days following the date on which this Lease has been executed by Landlord and Tenant, and Tenant shall proceed with such applications in good faith and due diligence. Tenant shall send to Landlord a copy of any such documents sent to or received from the Planning Board in connection with the Approvals. In the event the Planning Board objects to any of the documents submitted by or on behalf of Tenant in connection with the Approvals, Tenant shall use commercially reasonable efforts to resolve any such objections. Upon Tenant's written request, Landlord or Landlord's agent will, at no cost to Landlord, furnish Tenant with such assistance and cooperation as Tenant may reasonably require in connection with such application (including, without limitation, signing the applications and attending any meetings which Tenant is required to attend by the Planning Board if required in connection with obtaining the Approvals). If Tenant is unable to obtain the Approvals from the Planning Board on or before June 1, 2010 (the "Outside Approval Date"), then, in the event the inability to obtain the Approvals is due to a Landlord Defect (defined hereinafter), the Rent Commencement Date shall be extended by one (1) day for each day until such time as Landlord corrects the Landlord Defect in the manner required by the Planning Board. If Tenant is unable to obtain the Approvals from the Planning Board for any reason other than a Landlord Defect, the Rent Commencement Date shall not be extended and Tenant's obligation to pay rent under the Lease shall be the date set forth in Section 1.9 above. Notwithstanding anything the contrary contained hereinabove, Landlord shall have the right, but not the obligation, to attempt to obtain the Approvals on Tenant's behalf. For purposes of this Section 3.2 only, a "Landlord Defect" shall mean the discovery by the Planning Board that the Premises, the Common Areas of the Building or the Project (except with regard to alterations or improvements to be made by Tenant or the use for which Tenant will occupy the Premises) are in violation of any Laws (defined in Section 4.2 below) in effect as of the date of this Lease which results in the Planning Board withholding the issuance of the Approvals due to such Landlord Defect.

4. **Use.**

4.1 **Permitted Use.** The Premises shall be used only for the purpose described in Section 1.7 and for no other purpose. Except as expressly stated otherwise in this Lease, Landlord makes no representation or warranty that Tenant's use is permitted by applicable zoning laws or other laws and regulations. In no event shall any portion of the Premises be used for retail sales. Tenant shall not initiate, submit an application for, or otherwise request, any land use approvals or entitlements with respect to the Premises or any other portion of the Project, including, without limitation, any variance, conditional use permit or rezoning, without first obtaining Landlord's prior written consent, which may be given or withheld in Landlord's sole but reasonable discretion. Except as expressly stated in this Lease (including all Exhibits, Schedules and attachments hereto), Tenant shall not (a) permit any animals or pets to be brought to or kept in the Premises, (b) install any antenna, dish or other device on the roof of the Building or outside of the Premises, (c) make any penetrations into the roof of the Building, (d) place loads upon floors, walls or ceilings in excess of the load such items were designed to carry, (e) place or store, nor permit any other person or entity to place or store, any property, equipment, materials, supplies or other items outside of the Building in which the Premises is located or (f) change the exterior of the Premises or the Building in which the Premises is located.

4.2 **Compliance With Laws.** Except as otherwise expressly provided in this Section 4.2, Tenant shall, at Tenant's sole expense, promptly comply with all applicable laws, including without limitation the Americans with Disabilities Act (the "ADA"), ordinances, rules, regulations, orders, certificates of occupancy, conditional use or other permits, variances, covenants, conditions, restrictions, easements (collectively, "Laws" or individually "Law"), and the recommendations of Landlord's engineers or other consultants, and requirements of any fire insurance underwriters, rating bureaus or government agencies, now in effect or which may hereafter come into effect, whether or not they reflect a change in policy from that now existing, during the term or any part of the Term hereof, relating in any manner to the Premises or the occupation and use by Tenant of the Premises. Tenant shall not permit any objectionable or unpleasant odors, smoke, dust, gas, noise or vibrations to emanate from the Premises, or take any other action that would constitute a nuisance or would disturb, unreasonably interfere with or endanger Landlord or any other tenants of the Project. Tenant shall obtain, at its sole expense, any permit or other governmental authorization required to operate its business from the Premises. Upon the written request of Tenant, Landlord shall use commercially reasonable efforts to cooperate with Tenant in obtaining any permits or certificates necessary for Tenant to occupy the Premises for its permitted use. Landlord shall not be liable for the failure of any other tenant or person to abide by the requirements of this Section or to otherwise comply with applicable laws and regulations, and Tenant shall not be excused from the performance of its obligations under this Lease due to such a failure. Landlord warrants to Tenant that, to the best of Landlord's knowledge, the Premises, the Common Areas of the Building and the Project, in the state existing on the date this Lease is executed by Landlord and Tenant, but without regard to alterations or improvements to be made by Tenant or the use for which Tenant will occupy the Premises, do not violate any applicable Laws in effect on such date. To the extent that Landlord receives any notice from a governmental entity that the Common Areas of the Building or the Project are in violation of any Law and Landlord is obligated pursuant to a final determination to undertake action in order to comply with such Law, then in such event Landlord agrees to undertake such remedial action. If such Law was in effect as of the date hereof and such violation existed as of the date hereof, Landlord shall be responsible for the cost of curing such violation. If such Law was not in effect as of the date hereof or such violation did not exist as of the date hereof, then the cost of curing such violation shall be included

3

in Operating Expenses (to the extent not excluded pursuant to Section 6 below, including without limitation, Section 6.1(f) below as it applies to those obligations of Landlord which are payable solely by Landlord pursuant to Section 11 hereof). To the extent that any notice requires action with regard to Tenant's particular use of the Premises (including, without limitation, in connection with any alterations, improvements or additions made to the Premises by or on behalf of Tenant), Tenant shall be obligated to undertake such action at Tenant's sole cost and expense. Except as provided hereinabove, Tenant shall be solely responsible, at Tenant's sole cost and expense, for complying with all Laws which relate to the interior of the Premises.

5.      **Base Rent.** Tenant shall pay to Landlord the Base Rent for the Premises set forth in Section 1.10 above. The first month's Base Rent, the Security Deposit, and the first monthly installment of estimated Operating Expenses (as hereafter defined) shall be due and payable on the date this Lease is executed by Tenant, and Tenant promises to pay to Landlord in advance, without demand, deduction or set-off, monthly installments of Base Rent on or before the first day of each calendar month succeeding the Rent Commencement Date.   Payments of Base Rent for any fractional calendar month shall be prorated.  All payments required to be made by Tenant to Landlord hereunder shall be payable at such address as Landlord may specify from time to time by written notice delivered in accordance herewith.  Tenant shall have no right at any time to abate, reduce, or set off any rent due hereunder except where expressly provided in this Lease.

6.      **Operating Expense Payments.**

6.1      **Operating Expenses.** Commencing on the Rent Commencement Date and thereafter throughout the Term, Tenant shall pay Tenant's Percentage Share (as defined below) of the Operating Expenses for the Project. For the purposes of this Lease, the term "**Operating Expenses**" shall mean all expenses and disbursements of every kind (subject to the limitations set forth below) which Landlord incurs, pays or becomes obligated to pay in connection with the ownership, operation, and maintenance of the Project (including the associated Common Areas), including, but not limited to, the following:

(a)      wages and salaries of all employees, agents, consultants and other individuals or entities engaged in the operation, repair, replacement, maintenance, and security of the Project, including taxes, insurance and benefits relating thereto;

(b)      all supplies and materials used in the operation, maintenance, repair, replacement, and security of the Project;

(c)      annual cost of all Capital Improvements (as defined below) made to the Project which although capital in nature are made with the primary purpose of reducing the normal operating costs of the Project (except to the extent that in any given calendar year the line item(s) cost for which such Capital Improvement was made to reduce actually increases costs as a result of such Capital Improvement), as well as all Capital Improvements made in order to comply with any Laws (which are amended, become effective, or are interpreted or enforced differently after the date of this Lease), as amortized over the useful economic life of such improvements as determined by Landlord in its reasonable discretion (without regard to the period over which such improvements may be depreciated or amortized for federal income tax purposes);

(d)      cost of all utilities paid by Landlord;

(e)      cost of any insurance or insurance related expense applicable to the Project and Landlord's personal property used in connection therewith, including, but not limited to, the insurance costs described in Section 10.2;

(f)      cost of repairs, replacements and general maintenance of the Project (including all truck court areas, paving and parking areas, Common Area lighting facilities, fences, gates, signage, water lines, sewer lines, and any other item Landlord is obligated to repair or maintain), other than costs necessary to assure the structural soundness of the roof, foundation and exterior walls of the Project which are payable solely by Landlord under Section 11;

(g)      cost of service or maintenance contracts with independent contractors for the operation, maintenance, repair, replacement or security of the Project (including, without limitation, alarm service, exterior painting, trash collection, snow, ice, debris and waste removal and landscape maintenance);

(h)      the cost of all accounting fees, management fees, legal fees and consulting fees attributable to the operation, management, maintenance or repair of the Project;

(i)      payments made by Landlord under any easement, license, operating agreement, declaration, restrictive covenant or other agreement relating to the sharing of costs among property owners;

(j)      [intentionally omitted]

(k)      the cost of all business licenses, permits or similar fees relating to the operation, ownership, repair or maintenance of the Project; and

(l)      the cost of any other item the cost of which is stated in this Lease to be an Operating Expense.

For purposes of this Lease, a "**Capital Improvement**" shall be an improvement to the Project that Landlord is obligated to make pursuant to this Lease, the cost of which is not fully deductible in the year incurred in accordance with generally accepted accounting principles; provided, however, that, at Landlord's option, the cost of painting all or part of the Project and resurfacing and restriping roadways and parking areas shall be treated as an expense and not as a Capital Improvement.  Real Property Taxes (as defined below) shall be reimbursed to Landlord as provided below and shall not be treated as an Operating Expense.  References to facilities, services, utilities or other items in this Section shall not impose an obligation on Landlord to have said facilities or to provide said services unless such facilities and services already exist at the Project.

6.2      **OPERATING EXPENSE EXCLUSIONS.** For purposes of this Lease, the term "**Operating Expenses**" shall not include the following: (i) costs (including permit, license and inspection fees) incurred for tenant improvements for

4

other tenants within the Project; (ii) legal and auditing fees (other than those fees reasonably incurred in connection with the maintenance and operation of all or any portion of the Project), leasing commissions, advertising expenses and similar costs incurred in connection with the leasing of the Project; (iii) depreciation of the Building or any other improvements situated within the Project; (iv) any items for which Landlord is actually reimbursed by insurance or by direct reimbursement by any other tenant of the Project or for which Landlord has received reimbursement from any other person or entity; (v) costs of repairs or other work necessitated by fire, windstorm or other casualty (excluding any deductibles subject to Section 6.1(e) above) and/or costs of repair or other work necessitated by the exercise of the right of eminent domain to the extent insurance proceeds or a condemnation award, as applicable, is actually received by Landlord for such purposes; provided, such costs of repairs or other work shall be paid by the parties in accordance with the provisions of Sections 11 and 12, below; (vi) other than any interest charges for Capital Improvements referred to in Section 6.1(c) hereinabove, any interest or payments on any financing for the Building or the Project and interest and penalties incurred as a result of Landlord's late payment of any invoice; (vii) costs associated with the investigation and/or remediation of Hazardous Materials (hereafter defined) present in, on or about any portion of the Project, unless such costs and expenses are the responsibility of Tenant as provided in Section 27 hereof, in which event such costs and expenses shall be paid solely by Tenant in accordance with the provisions of Section 27 hereof; (viii) overhead and profit increment paid to Landlord or to subsidiaries or affiliates of Landlord for goods and/or services in the Project to the extent the same exceeds the costs of such by unaffiliated third parties on a competitive basis; (ix) any payments under a ground lease or master lease; (x) except as provided in Section 6.1(c) above, the cost of Capital Improvements, (xi) any expense for which Landlord is reimbursed from any tenant; (xii) costs of any special service to the tenants or service in excess of that furnished to Tenant whether or not Landlord receives reimbursement from such tenants as an additional charge; (xiii) costs of renovating or otherwise improving space for new tenants or in renovating space vacated by any tenant; (xiv) legal expenses for disputes with tenants (other than enforcement of the rules and regulations); legal and auditing fees, other than those legal and auditing fees necessarily and reasonably incurred in connection with the maintenance and operation of the Building; and legal or accounting fees incurred in connection with any debt or equity financing of the Building or Project or in connection with any reports performed for the benefit of investors, partners, or affiliates of Landlord; (xv) costs incurred to correct violations by Landlord of any law, rule, order or regulation which was in effect as of the Commencement Date; (xvi) salaries, wages and benefits of any employee above the level of senior property manager or any salary, wages, or other compensation or benefits for off-site employees applicable to the time spent working at other buildings, other than the Project manager (provided that with respect to each employee that services the Project and other buildings, a pro rata portion of such employee's salary shall be included in Operating Expenses); (xvii) costs directly resulting from the negligence or willful misconduct of Landlord or its agents, contractors or employees; and (xviii) depreciation and amortization of the Building or any equipment, machinery, tools, fixtures or improvements therein except for amortization of capital improvements specifically permitted in the Lease; (xix) Landlord's general overhead and administrative expenses except as it relates specifically to the actual management of the Project (but in no event shall such costs be duplicative if covered by management fees); (xx) any otherwise includible costs of correcting defects in the Building and/or equipment or replacing defective equipment to the extent such costs are covered by warranties of manufactures, suppliers or contractors, (xxi) rentals and other related expenses, if any, incurred in leasing capital items, but only to the extent that such expenses would be excluded hereunder if Landlord had purchased such capital items, (xxii) Real Property Taxes; (xxiii) costs that are Landlord's responsibility and payable solely by Landlord under Section 11; (xxiv) the cost of any work (including without limitation the cost of permits, licenses and inspections) performed (such as preparing space for occupancy, including without limitation painting and decorating) or services provided (such as separately metered electricity) for any tenant at the Building at such tenant's cost, or provided by Landlord without charge (such as free rent, decorations, painting, or improvement allowances as an inducement to rent); (xxv) the cost of constructing, installing, operating and maintaining any specialty service or facility, such as an observatory, broadcasting facility, restaurant, luncheon club, retail space, sundry shop, newsstand, concession, or athletic or recreational club, or the costs associated with services or benefits not offered or available to Tenant; (xxvi) the cost of latent defects and the cost of correcting defects in construction or after renovation of the Building (or any space therein) or the building systems to the extent Landlord is reimbursed by a warranty; (xxvii) the cost of any work performed for or service provided to any tenant of the Building exclusively or to a materially greater extent or in a materially more favorable manner than that provided generally to the other tenants and occupants (such as electricity and cleaning services provided to retail tenants); (xxviii) the cost of any work performed or service provided (such as electricity) for any facility other than the Building (such as a garage facility or shuttle service) for which fees are charged or other compensation received; (xxix) the cost of any material changes or additions to the Project (such as the addition of a garage, tower, or floor) or Operating Expenses generated by such changes or additions, made after the date of this Lease; (xxx) insurance premiums to the extent any tenant causes Landlord's existing insurance premiums to increase or requires Landlord to purchase additional insurance; (xxxi) advertising, promotional and marketing expenses; (xxxii) any reserves for repairs, maintenance or replacement; (xxxiii) costs incurred to satisfy any of the representations and warranties made by Landlord in this Lease; (xxxiv) costs of overtime or other costs incurred by Landlord to cure its default hereunder or the default of a tenant, or incurred by reason of the misconduct or negligence of Landlord or a tenant or their respective agents, invitees, employees or contractors; (xxxv) costs resulting from charitable or political contributions and the cost to acquire sculptures, paintings or other art objects; (xxxvi) any bad debt loss, rent loss or reserves therefore, and the costs of collecting rent or other debts from any other tenant or other party.

6.3     **Payment.** Tenant's Percentage Share of Operating Expenses shall be payable by Tenant within ten (10) days after a reasonably detailed statement of actual expenses is presented to Tenant by Landlord. At Landlord's option, however, Landlord may, from time to time, estimate what Tenant's Percentage Share of Operating Expenses will be, and the same shall be payable by Tenant monthly during each calendar year of the Lease Term, on the same day as the Base Rent is due hereunder. In the event that Tenant pays Landlord's estimate of Tenant's Percentage Share of Operating Expenses, Landlord shall use its best efforts to deliver to Tenant within one hundred twenty (120) days after the expiration of each calendar year a reasonably detailed statement (the "**Statement**") showing Tenant's Percentage Share of the actual Operating Expenses incurred during such year. Landlord's failure to deliver the Statement to Tenant within said period shall not constitute Landlord's waiver of its right to collect said amounts or otherwise prejudice Landlord's rights hereunder. If Tenant's payments under this Section during said calendar year exceed Tenant's Percentage Share as indicated on the Statement, Tenant shall be entitled to credit the amount of such overpayment against Tenant's Percentage Share of Operating Expenses next falling due. If Tenant's payments under this Section during said calendar year were less than Tenant's Percentage Share as indicated on the Statement, Tenant shall pay to Landlord the amount of the deficiency within thirty (30) days after delivery by Landlord to Tenant of the Statement. Landlord and Tenant shall forthwith adjust between them by cash payment any balance determined to exist with respect to that portion of the last calendar year for which Tenant is responsible for Operating Expenses, notwithstanding that the Lease Term may have terminated before the end of such calendar year; and this provision shall survive the expiration or earlier termination of the Lease.

5

6.4    **Tenant's Percentage Share.** "Tenant's Percentage Share" as used in this Lease shall mean the percentage of the cost of Operating Expenses and Real Property Taxes (as defined below) for which Tenant is obligated to reimburse Landlord pursuant to this Lease. Notwithstanding anything to the contrary contained in Section 1.13, Landlord shall have the right to determine Tenant's Percentage Share of the cost of Operating Expenses and Real Property Taxes using any one or more of the following three methods, and Tenant hereby agrees that any one of the following three methods of allocation is reasonable: (a) by multiplying the cost of all Operating Expenses or Real Property Taxes by a fraction, the numerator of which is the number of square feet of leasable space in the Premises and the denominator of which is the number of square feet of leasable space in all buildings in the Project; or (b) (i) with respect to an Operating Expense or Real Property Taxes attributable solely to the Building, requiring Tenant to pay that portion of the cost of the Operating Expense or Real Property Taxes that is obtained by multiplying such cost by a fraction, the numerator of which is the number of square feet of leasable space in the Premises and the denominator of which is the number of square feet of leasable space in the entire Building and (ii) with respect to an Operating Expense or Real Property Taxes attributable to the Common Areas of the Project, but not any particular building in the Project, requiring Tenant to pay that portion of the cost of the Operating Expense or Real Property Taxes that is obtained by multiplying such cost by a fraction, the numerator of which is the number of square feet of leasable space in the Premises and the denominator of which is the number of square feet of leasable space in all buildings in the Project or (c) by allocating an Operating Expense or Real Property Taxes in any other reasonable manner, provided, any such allocations shall be made in a manner consistent with industry standards for other similar buildings located in Morris County, New Jersey.

6.5    **Audits.** If Tenant disputes the amount set forth in the Statement, Tenant shall have the right, at Tenant's sole expense, upon written notice to Landlord received not later than one hundred twenty (120) days following receipt of such Statement, to cause Landlord's books and records with respect to the calendar year which is the subject of the Statement to be audited by a certified public accountant selected by Tenant and reasonably acceptable to Landlord. The audit shall take place at the offices of Landlord where its books and records are located at a mutually convenient time during Landlord's regular business hours. Tenant's Percentage Share of Operating Expenses shall be appropriately adjusted based upon the results of such audit, and the results of such audit shall be final and binding upon Landlord and Tenant. Tenant shall have no right to conduct an audit or to give Landlord notice that it desires to conduct an audit at any time Tenant is in default under the Lease beyond the expiration of any applicable notice and cure period set forth in Section 17.1 below. The accountant conducting the audit shall be compensated on an hourly basis and shall not be compensated based upon a percentage of overcharges it discovers. No subtenant shall have any right to conduct an audit, and no assignee shall conduct an audit for any period during which such assignee was not in possession of the Premises. Tenant's right to undertake an audit with respect to any calendar year shall expire if Tenant's written notice to Landlord of its intent to audit the Operating Expenses for such Statement is not received within one hundred twenty (120) days after Tenant's receipt of the Statement for such calendar year, and such Statement shall be final and binding upon Tenant and shall, as between the parties, be conclusively deemed correct, at the end of such one hundred twenty (120) day period. If Tenant gives Landlord notice of its intention to audit Operating Expenses, it must commence such audit within sixty (60) days after such notice is delivered to Landlord, and the audit must be completed within one hundred twenty (120) days after such notice is delivered to Landlord. If Tenant does not commence and complete the audit within such periods for any reason other than Tenant's inability to conduct such audit because of Landlord's failure to make such books and records reasonably available, the Statement which Tenant elected to audit shall be deemed final and binding upon Tenant and shall, as between the parties, be conclusively deemed correct. Tenant agrees that the results of any Operating Expense audit shall be kept strictly confidential by Tenant and shall not be disclosed to any other person or entity, except as required by Law.

7.    **Security Deposit.** Tenant shall deliver to Landlord at the time it executes this Lease the security deposit set forth in Section 1.14 as security for Tenant's faithful performance of Tenant's obligations hereunder. If Tenant fails to pay Base Rent or other charges due hereunder, or otherwise defaults with respect to any provision of this Lease, which default continues beyond the expiration of any applicable notice and cure period, Landlord may use all or any portion of said deposit for the payment of any Base Rent or other charge due hereunder, to pay any other sum to which Landlord may become obligated by reason of Tenant's default, or to compensate Landlord for any loss or damage which Landlord may suffer thereby. If Landlord so uses or applies all or any portion of said deposit, Tenant shall within ten (10) days after written demand therefor deposit cash with Landlord in an amount sufficient to restore said deposit to its full amount. Landlord shall not be required to keep said security deposit separate from its general accounts. If Tenant performs all of Tenant's obligations hereunder, said deposit, or so much thereof as has not heretofore been applied by Landlord, shall be returned, without payment of interest or other amount for its use, to Tenant (or, at Landlord's option, to the last assignee, if any, of Tenant's interest hereunder) at the expiration of the Term hereof, and after Tenant has vacated the Premises. No trust relationship is created herein between Landlord and Tenant with respect to said security deposit. Tenant acknowledges that the security deposit is not an advance payment of any kind or a measure of Landlord's damages in the event of Tenant's default.

*See Addendum Paragraph 2*

8.    **Utilities.**

8.1    **Payment.** Tenant shall pay for all water, gas, electricity, telephone, sewer, sprinkler services, refuse and trash collection, janitorial service and other utilities and services used on the Premises, together with any taxes, penalties, surcharges or the like pertaining thereto. Tenant shall contract directly with the applicable public utility for such services. Tenant shall pay its share of all charges for jointly metered utilities based upon consumption, as reasonably determined by Landlord. Tenant agrees to limit use of water and sewer for normal restroom use, and nothing herein contained shall impose upon Landlord any duty to provide sewer or water usage for other than normal restroom usage.

8.2    **Interruptions.** Tenant agrees that Landlord shall not be liable to Tenant for its failure to furnish water, gas, electricity, telephone, sewer, refuse and trash collection or any other utility services or building services when such failure is occasioned, in whole or in part, by repairs, replacements or improvements, by any strike, lockout or other labor trouble, by inability to secure electricity, gas, water, telephone service or other utility at the Project, by any accident, casualty or event arising from any cause whatsoever, including the negligence of Landlord, its employees, agents and contractors, by act, negligence or default of Tenant or any other person or entity, or by any other cause, and such failures shall never be deemed to constitute an eviction or disturbance of Tenant's use and possession of the Premises or relieve Tenant from the obligation of paying rent or performing any of its obligations under this Lease. Furthermore, Landlord shall not be liable under any circumstances for loss of property or for injury to, or interference with, Tenant's business, including, without limitation, loss of profits, however occurring, through or in

6

connection with or incidental to a failure to furnish any such services or utilities. Landlord may comply with voluntary controls or guidelines promulgated by any governmental entity relating to the use or conservation of energy, water, gas, light or electricity or the reduction of automobile or other emissions without creating any liability of Landlord to Tenant under this Lease. Notwithstanding anything contained herein to the contrary, if any interruption of utilities or services caused by Landlord's gross negligence or willful misconduct shall continue for more than ten (10) consecutive business days or a total of ten (10) business days in any thirty (30) day period and shall render all or any portion of the Premises unusable for the normal conduct of Tenant's business, and if Tenant does not in fact use or occupy such portion of the Premises, then all Base Rent and additional rent payable hereunder with respect to such portion of the Premises which Tenant does not occupy shall be abated from and after such eleventh (11th) business day until full use of such portion of the Premises is restored to Tenant.

8.3     **Alternative Utility Providers.** If permitted by applicable laws, Landlord shall have the right at any time and from time to time during the Term of this Lease to either contract for service from a different company or companies (each such company referred to as an "**Alternate Service Provider**") other than the company or companies presently providing electrical service for the Project (the "**Electric Service Provider**") or continue to contract for service from the Electric Service Provider, at Landlord's sole but reasonable discretion. Tenant agrees to cooperate with Landlord, the Electric Service Provider, and an Alternate Service Provider at all times and, as reasonably necessary, shall allow Landlord, the Electric Service Provider, and any Alternate Service Provider reasonable access to the Building's electric lines, feeders, risers, wiring and any other machinery within the Premises.

9.     *Real and Personal Property Taxes.*

9.1     **Payment of Taxes.** Tenant shall pay to Landlord during the Term of this Lease, in addition to Base Rent and Tenant's Percentage Share of Operating Expenses, Tenant's Percentage Share of all Real Property Taxes. Tenant's Percentage Share of Real Property Taxes shall be payable by Tenant at the same time, in the same manner and under the same terms and conditions as Tenant pays Tenant's Percentage Share of Operating Expenses.

*See Addendum Paragraph 3*

9.2     **Definition of Real Property Tax.** As used herein, the term "**Real Property Taxes**" shall include any form of real estate tax or assessment, general, special, ordinary or extraordinary, improvement bond or bonds imposed on the Project or any portion thereof by any authority having the direct or indirect power to tax, including any city, county, state or federal government, or any school, agricultural, sanitary, fire, street, drainage or other improvement district thereof, as against any legal or equitable interest of Landlord in the Project or in any portion thereof. Real Property Taxes shall not include income, inheritance and gift taxes.

9.3     **Personal Property Taxes.** Tenant shall pay prior to delinquency all taxes assessed against and levied upon trade fixtures, furnishings, equipment and all other personal property of Tenant contained in the Premises or related to Tenant's use of the Premises. If any of Tenant's personal property shall be assessed with Landlord's real or personal property, Tenant shall pay to Landlord the taxes attributable to Tenant within ten (10) days after receipt of a written statement from Landlord setting forth the taxes applicable to Tenant's property.

9.4     **REASSESSMENTS.** From time to time Landlord may challenge the assessed value of the Project as determined by applicable taxing authorities and/or Landlord may attempt to cause the Real Property Taxes to be reduced on other grounds. If Landlord is successful in causing the Real Property Taxes to be reduced or in obtaining a refund, rebate, credit or similar benefit (hereinafter collectively referred to as a "**reduction**"), Landlord shall credit the reduction(s) to Real Property Taxes for the calendar year to which a reduction applies and recalculate the Real Property Taxes owed by Tenant for the years in which the reduction applies based on the reduced Real Property Taxes. All costs incurred by Landlord in obtaining the Real Property Tax reductions shall be considered an Operating Expense and Landlord shall determine, in its sole reasonable discretion, to which years any reductions will be applied. In addition, all accounting and related costs incurred by Landlord in making the adjustments shall be an Operating Expense. Landlord shall have the right to compensate a person or entity it employs to obtain a reduction in Real Property Taxes by giving such person or entity a percentage of any reduction or credit obtained, and in this event the reduction or credit obtained by Landlord shall be deemed to be the reduction or credit given by the taxing authority less the compensation paid to such person or entity. For any calendar year during the Term hereof, Tenant may request in good faith that Landlord challenge the assessed value of the property or otherwise attempt to cause Real Property Taxes to be reduced. Such request shall be made in writing and set forth with specificity the grounds for Tenant's request. Landlord shall consider Tenant's request in good faith and determine, in Landlord's commercially reasonable business judgment, whether or not to proceed with such a challenge.

10.     *INSURANCE.*

10.1     *INSURANCE-TENANT.*

(a)     Tenant shall obtain and keep in force during the Term of this Lease a commercial general liability policy of insurance with coverages reasonably acceptable to Landlord, which, by way of example and not limitation, protects Tenant and Landlord (as an additional insured) against claims for bodily injury, personal injury and property damage based upon, involving or arising out of the ownership, use, occupancy or maintenance of the Premises and all areas appurtenant thereto. Such insurance shall be on an occurrence basis providing single-limit coverage in an amount not less than $5,000,000 per occurrence with an "Additional Insured-Managers and Landlords of Premises Endorsement" and contain the "Amendment of the Pollution Exclusion" for damage caused by heat, smoke or fumes from a hostile fire. A combination of a general liability policy and an umbrella policy or excess liability policy may be used to satisfy this limit. The policy shall not contain any intra-insured exclusions as between insured persons or organizations, but shall include coverage for liability assumed under this Lease as an "insured contract" for the performance of Tenant's indemnity obligations under this Lease.

(b)     Tenant shall obtain and keep in force during the Term of this Lease "all-risk" extended coverage property insurance with coverages reasonably acceptable to Landlord. Said insurance shall be written on a one hundred percent (100%) replacement cost basis on Tenant's personal property, all tenant improvements installed at the Premises by Landlord or Tenant, Tenant's trade fixtures and other property, which, such policies shall provide protection against any peril included within the classification "fire and extended coverage," against vandalism and malicious mischief, theft, sprinkler leakage, and flood damage (unless the Project is located in a high hazard flood zone).

7

Tri-Coastal-LEASE-Wharton-FINAL-1-20-10.doc

(c)    Tenant shall, at all times during the Term hereof, maintain in effect workers' compensation insurance as required by applicable law (together with employer's liability insurance of not less than $1,000,000) and business interruption and extra expense insurance in commercially reasonable amounts.  In addition, Tenant shall maintain in effect during the Term hereof a policy of pollution liability insurance, including clean up costs, of not less than $1,000,000 and automobile liability insurance with bodily injury limits of $250,000 per person, $500,000 per accident, and $50,000 per accident for property damage.

    10.2    *Insurance-Landlord.*

(a)    Landlord shall obtain and keep in force a policy of general liability insurance with coverage against such risks and in such amounts as Landlord reasonably deems advisable (but in any event comparable to the amounts typically carried by other comparable landlords with comparable property in the same geographic area as the Project) insuring Landlord against liability arising out of the ownership, operation and management of the Project.

(b)    Landlord shall also obtain and keep in force during the Term of this Lease a policy or policies of insurance covering loss or damage to the Project in the amount of not less than the full replacement cost thereof, as reasonably determined by Landlord from time to time (but in any event comparable to the insurance typically carried by other comparable landlords with comparable property in the same geographic area as the Project).  The terms and conditions of said policies and the perils and risks covered thereby shall be determined by Landlord, from time to time, in Landlord's sole reasonable discretion.  In addition, at Landlord's option, Landlord shall obtain and keep in force, during the Term of this Lease, a policy of rental interruption insurance, with loss payable to Landlord, which insurance shall, at Landlord's option, also cover all Operating Expenses and Real Property Taxes.  Tenant will not be named as an additional insured in any insurance policies carried by Landlord and shall have no right to any proceeds therefrom.  The policies purchased by Landlord shall contain such deductibles as Landlord may determine.  Tenant shall pay at Tenant's sole expense any increase in the property insurance premiums for the Project over what was payable immediately prior to the increase to the extent the increase is specified by Landlord's insurance carrier as being caused by the nature of Tenant's occupancy or any act or omission of Tenant.

    10.3    *Insurance Policies.*  Tenant shall deliver to Landlord copies of the insurance policies required under Section 10.1 within ten (10) days prior to the Commencement Date of this Lease.  Tenant's insurance policies shall not be cancelable or subject to reduction of coverage or other modification except after thirty (30) days prior written notice to Landlord.  Tenant shall, at least thirty (30) days prior to the expiration of such policies, furnish Landlord with renewals thereof.  If Tenant provides certificates of insurance to evidence the insurance required under this Lease, all such certificates shall be in form and substance reasonably satisfactory to Landlord, shall affirmatively demonstrate all coverage and requirements set forth in this Lease, shall contain no disclaimers of coverage, and shall include a firm and unconditional obligation to give to Landlord at least 30 days' prior written notice prior to cancellation or change in any coverage.  Tenant's insurance policies shall be issued by insurance companies authorized to do business in the state in which the Project is located, and said companies shall maintain during the policy term a "General Policyholder's Rating" of at least A and a financial rating of at least "Class X" (or such other rating as may be required by any lender having a lien on the Project) as set forth in the most recent edition of "Best Insurance Reports."  All insurance obtained by Tenant shall be primary to and not contributory with any similar insurance carried by Landlord, whose insurance shall be considered excess insurance only.  Landlord and, at Landlord's option, the holder of any mortgage or deed of trust encumbering the Project and any person or entity managing the Project on behalf of Landlord, shall be named as an additional insured on all insurance policies Tenant is obligated to obtain by Section 10.1 above.  Tenant's insurance policies shall not include deductibles in excess of Five Thousand Dollars ($5,000).  If any of the insurance coverage which Tenant is obligated to carry pursuant to this Lease is under a blanket insurance policy, then such blanket insurance policy shall expressly afford coverage for the Premises and Landlord as required hereunder.  Any umbrella liability policy or excess liability policy shall provide that, if the underlying aggregate is exhausted, the excess coverage will drop down as primary insurance.

    10.4    *Waiver of Subrogation.*  Landlord waives any and all rights of recovery against Tenant for or arising out of damage to, or destruction of, the Project to the extent that Landlord's insurance policies then in force insure against such damage or destruction and permit such waiver, and only to the extent of the insurance proceeds actually received by Landlord for such damage or destruction.  Landlord's waiver shall not relieve Tenant from liability under Section 19 below except to the extent Landlord's insurance company actually satisfies Tenant's obligations under Section 19 in accordance with the requirements of Section 19.  Tenant waives any and all rights of recovery against Landlord, Landlord's employees, agents and contractors for liability or damages if such liability or damage is covered by Tenant's insurance policies then in force or the insurance policies Tenant is required to obtain by Section 10.1 (whether or not the insurance Tenant is required to obtain by Section 10.1 is then in force and effect), whichever is broader.  Tenant's waiver shall not be limited by the amount of insurance then carried by Tenant or the deductibles applicable thereto.  Tenant shall cause the insurance policies it obtains in accordance with this Section 10 to provide that the insurance company waives all right of recovery by subrogation against Landlord in connection with any liability or damage covered by Tenant's insurance policies.

    10.5    *Coverage.*  Landlord makes no representation to Tenant that the limits or forms of coverage specified above or approved by Landlord are adequate to insure Tenant's property or Tenant's obligations under this Lease, and the limits of any insurance carried by Tenant shall not limit Tenant's obligations or liability under any indemnity provision included in this Lease or under any other provision of this Lease.

11.    *Landlord's Repairs.*  Landlord shall maintain in good condition and repair, (i) at Landlord's expense, only the structural elements of the roof of the Building, the structural soundness of the foundation of the Building and the structural elements of the exterior walls of the Building, and (ii) the Common Areas, including the non-structural elements of the roof (including the roof membrane), all life-safety, sprinkler, fire detection, plumbing, electrical and mechanical systems serving the Common Areas or the Building (as opposed to any equipment or systems serving the Premises solely) as well as landscaping and snow and ice removal from sidewalks, parking lots and access roads within the Project), all subject to reimbursement in accordance with Section 6 hereinabove; however, Tenant shall reimburse Landlord for the cost of any maintenance, repair or replacement of the foregoing necessitated by Tenant's misuse, negligence, alterations to the Premises or any breach of its obligations under this Lease.  By way of example, and not limitation, the term "exterior walls" as used in this Section shall not include windows, glass or plate glass, doors or overhead doors, special store fronts, dock bumpers, dock plates or levelers, or office entries.  Tenant shall immediately give Landlord written notice of any repair required by Landlord pursuant to this Section, after which Landlord shall have a reasonable time in which to complete the repair.  Nothing contained in this Section shall be construed to obligate Landlord to seal or otherwise maintain the surface of any foundation, floor or slab.  Tenant expressly waives the benefits of any statute now or hereafter in effect which would otherwise afford Tenant the right to

make repairs at Landlord's expense or to terminate this Lease because of Landlord's failure to keep the Premises in good order, condition and repair to the extent the terms and provisions of any such statutes are inconsistent with the terms and provisions of this Lease.

12.   **Tenant's Repairs.**

12.1   *Obligations of Tenant.*  Subject to Section 11 above, Tenant shall, at its sole cost and expense, keep and maintain all parts of the Premises in good and sanitary condition, promptly making all necessary repairs and replacements, including but not limited to, windows, glass and plate glass, doors, skylights, any special store front or office entry, walls and finish work, floors and floor coverings, heating and air conditioning systems, dock boards, bumpers, plates, seals, levelers and lights, plumbing fixtures and pipes from the point of entry into the Premises, lighting facilities and bulbs, termite and pest extermination, tenant signage, fire extinguishers and regular removal of trash and debris, as well as any other equipment or systems which are located solely within the Premises or serving the Premises exclusively. Tenant shall notify Landlord in writing prior to making any repair or performing any maintenance pursuant to this Section, and Landlord shall have the right to designate the contractor Tenant shall use to make any repair or to perform any maintenance on the heating, ventilation and air conditioning systems ("HVAC"), plumbing systems, electrical systems, sprinkler systems, fire alarm systems or fire detection systems located within the Premises. Tenant shall enter into a periodic maintenance agreement (the "HVAC Maintenance Contract") with an HVAC contractor reasonably approved by Landlord, which contract shall provide for a minimum of two (2) inspections per year. The HVAC Maintenance Contract must include all services suggested by the equipment manufacturer in the operation/maintenance manual. Should Tenant fail to obtain and/or maintain the HVAC Maintenance Contract, Landlord may, upon notice to Tenant, enter into such service contract on behalf of Tenant or perform the work and in either case, charge Tenant the cost thereof along with a reasonable amount for Landlord's overhead. A copy of said contract shall be forwarded to the Landlord on an annual basis, and copies of inspection reports shall be delivered to the Landlord within ten (10) days of receipt thereof by Tenant. Tenant shall not paint or otherwise change the exterior appearance of the Premises without Landlord's prior written consent, which may be given or withheld in Landlord's sole discretion. The cost of maintenance and repair of any common party wall (any wall, divider, partition or any other structure separating the Premises from any adjacent premises occupied by other tenants) shall be shared equally by Tenant and the tenant occupying the adjacent premises; provided, however, if Tenant damages a party wall the entire cost of the repair shall be paid by Tenant, at Tenant's sole expense. Tenant shall not be obligated to pay the cost of any repairs to a party wall if the need for such repair was caused solely by the tenant occupying the adjacent Premises. Tenant shall not damage any party wall or disturb the integrity and support provided by any party wall. If Tenant fails to keep the Premises in good condition and repair as is required herein, Landlord may, but shall not be obligated to, make any necessary repairs. If Landlord makes such repairs, Landlord may bill Tenant for the cost of the repairs as additional rent, and said additional rent shall be payable by Tenant within ten (10) days after demand by Landlord.

*See Addendum Paragraphs 4 and 5*

12.2   [Intentionally omitted]

12.3   *MAINTENANCE CONTRACTS.*  Tenant shall enter into the HVAC Maintenance Contract as more particularly provided in Section 12.1 above. Landlord shall enter into regularly scheduled preventative maintenance/service contracts for some or all of the following: the sprinkler, fire alarm and fire detection systems servicing the Premises, backflow testing for the plumbing servicing the Premises and for the roof membrane of the Premises (the "**Maintenance Contracts**"). The Maintenance Contracts shall include maintenance services satisfactory to Landlord, in Landlord's sole discretion. Tenant shall reimburse Landlord for the cost of the Maintenance Contracts within ten (10) days after written demand by Landlord; provided, however, Landlord shall have the right to estimate the monthly cost of the Maintenance Contracts, and Tenant shall pay such amount to Landlord as additional rent each month at the same time Tenant pays Base Rent. Landlord shall have the right, but not the obligation, to include the cost of Maintenance Contracts in Operating Expenses, and Tenant shall then pay Tenant's Percentage Share of such costs as determined by Landlord. Landlord shall have the right at any time, and from time to time, to elect upon written notice to Tenant to have Tenant purchase some or all of the Maintenance Contracts, in which event Tenant shall purchase such contracts from persons designated or approved by Landlord and shall pay for such Maintenance Contracts at Tenant's sole cost and expense.

13.   **Alterations and Surrender.**

13.1   *Consent of Landlord.*  Tenant shall not, without Landlord's prior written consent, which may be given or withheld in Landlord's sole discretion, make any alterations, improvements, additions, utility installations or repairs (hereinafter collectively referred to as "**Alterations**") in, on or about the Premises or the Project. The foregoing to the contrary notwithstanding, Landlord will not unreasonably withhold, condition or delay its consent to any non-structural Alteration provided that Tenant otherwise complies with the provisions of this Section 13 and that (i) such Alterations are not visible from the exterior of the Premises, and (ii) such Alterations do not effect any of the Building systems or structure. Alterations shall include, but shall not be limited to, the installation or alteration of security or fire protection systems, communication systems, millwork, shelving, retrieval or storage systems, carpeting or other floor covering, painting, window and wall coverings, electrical distribution systems, lighting fixtures, telephone or computer system wiring, HVAC and plumbing. At the expiration of the term, Landlord may require the removal of any Alterations installed by Tenant and the restoration of the Premises and the Project to their prior condition, at Tenant's expense; provided, however, to the extent Landlord's consent is required pursuant to this Section, at the written request of Tenant, Landlord agrees to notify Tenant concurrently with Landlord's approval of such Alteration whether or not Landlord will require Tenant to remove such Alteration at the end of the Term. If, as a result of any Alteration made by Tenant, Landlord is obligated to comply with the Americans With Disabilities Act or any other law or regulation, and such compliance requires Landlord to make any improvement or Alteration to any portion of the Project, as a condition to Landlord's consent, Landlord shall have the right to require Tenant to pay to Landlord prior to the construction of any Alteration by Tenant the entire cost of any improvement or alteration Landlord is obligated to complete by such law or regulation. Should Landlord permit Tenant to make its own Alterations, Tenant shall use only such architect and contractor as has been expressly approved by Landlord, and Landlord may require Tenant to provide to Landlord, at Tenant's sole cost and expense, a lien and completion bond in an amount equal to one and one-half times the estimated cost of such Alterations, to insure Landlord against any liability for mechanic's and materialmen's liens and to insure completion of the work. In addition, except in connection with the Improvements (for which Tenant shall pay a construction supervisory fee pursuant to Section 3.6 of Schedule 1), Tenant shall pay to Landlord a fee equal to three percent (3%) of the cost of the Alterations to compensate Landlord for the overhead and other costs it incurs in reviewing the plans for the Alterations and in monitoring the construction of the Alterations. Should Tenant make any

9

Alterations without the prior approval of Landlord, or use a contractor not expressly approved by Landlord, Landlord may, at any time during the Term of this Lease, require that Tenant remove all or part of the Alterations and return the Premises to the condition it was in prior to the making of the Alternations. In the event Tenant makes any Alterations, Tenant agrees to obtain or cause its contractor to obtain, prior to the commencement of any work, "builders all risk" insurance in an amount approved by Landlord, workers compensation insurance and any other insurance requested by Landlord, in Landlord's sole but reasonable discretion. The foregoing to the contrary notwithstanding, Landlord will not unreasonably withhold, condition or delay its consent to any non-structural Alteration provided that Tenant otherwise complies with the provisions of this Section 13.1 and that such Alterations (i) are not visible from the exterior of the Premises, and (ii) do not affect any of the Building systems or structure. Furthermore, Tenant shall have the right to make cosmetic, non-structural Alterations (i.e., painting, carpeting, wall papering) to the Premises without obtaining Landlord's prior written consent, provided that Tenant provides Landlord with prior written notice of its intention to make such Alterations. For purposes of the Lease, it shall be deemed reasonable for Landlord: (x) to require Tenant to perform Alterations during non-business hours if such Alterations will create unreasonable noise, noxious fumes or otherwise interfere with the quiet enjoyment of the other tenants in the Building, and (y) to require Tenant to perform Alterations in accordance with a reasonable schedule approved by the manager of the Building.

13.2    *Permits.*  Any Alterations in or about the Premises that Tenant shall desire to make shall be presented to Landlord in written form, with plans and specifications which are sufficiently detailed to obtain a building permit.  If Landlord consents to an Alteration, the consent shall be deemed conditioned upon Tenant acquiring a building permit from the applicable governmental agencies, furnishing a copy thereof to Landlord prior to the commencement of the work, and compliance by Tenant with all conditions of said permit in a prompt and expeditious manner.  Tenant shall provide Landlord with as-built plans and specifications for any Alterations made to the Premises.  At the written request of Tenant, Landlord shall use commercially reasonable efforts, at no cost to Landlord, to reasonably cooperate with Tenant in all reasonable respects in acquiring a building permit from the applicable governmental agencies.

13.3    *Mechanics Liens.*  Tenant shall pay, when due, all claims for labor or materials furnished or alleged to have been furnished to or for Tenant at or for use in the Premises, which claims are or may be secured by any mechanic's or materialmen's lien against the Premises or the Project, or any interest therein. If any lien is filed, Tenant shall within thirty (30) days remove such lien or, if Tenant shall, in good faith, contest the validity of any such lien, then during such thirty (30) day period, Tenant shall furnish to Landlord a surety bond reasonably satisfactory to Landlord in an amount equal to not less than the amount of such contested lien claim indemnifying Landlord against liability arising out of such lien or claim.  Such bond shall be sufficient in form and amount to free the Project from the effect of such lien.  In addition, Landlord may require Tenant to pay Landlord's reasonable attorneys' fees and costs in participating in such action.

13.4    *Notice.*  Tenant shall give Landlord not less than five (5) days' advance written notice prior to the commencement of any work in the Premises by Tenant, and Landlord shall have the right to post notices of non-responsibility in or on the Premises or the Project.

13.5    *Surrender.*  Subject to Landlord's right to require removal or to elect ownership as hereinafter provided, all Alterations made by Tenant to the Premises shall be the property of Tenant, but shall be considered to be a part of the Premises.  Unless Landlord gives Tenant written notice of its election not to become the owner of the Alterations at the end of the Term of this Lease, the Alterations shall become the property of Landlord at the end of the Term of this Lease.  The foregoing to the contrary notwithstanding, Tenant shall be permitted to remove the trade fixtures and equipment listed on Exhibit F attached hereto ("Tenant's Removable Alterations"), provided any such Tenant's Removable Alterations were not paid for by Landlord and Tenant repairs and restores any damage caused by the removal of Tenant's Removable Alterations, and provided further, that nothing herein shall be construed to modify Landlord's right to require the removal of any of Tenant's Removable Alterations at the expiration or earlier termination of the Lease as otherwise provided herein.  Landlord may require, on notice to Tenant, that some or all Alterations be removed prior to the end of the Term of this Lease and that any damages caused by such removal be repaired at Tenant's sole expense.  On the last day of the Term hereof, or on any sooner termination, Tenant shall surrender the Premises (including, but not limited to, all doors, windows, floors and floor coverings, skylights, heating and air conditioning systems, dock boards, truck doors, dock bumpers, plumbing work and fixtures, electrical systems, lighting facilities, sprinkler systems, fire detection systems and nonstructural elements of the exterior walls, foundation and roof (collectively the "**Elements of the Premises**")) to Landlord in the same condition as received, ordinary wear and tear and casualty damage excepted, clean and free of debris and Tenant's personal property, trade fixtures, and equipment.  Tenant's personal property shall include all computer wiring and cabling installed by Tenant.  Provided, however, if Landlord has not elected to have Tenant remove the Alterations, Tenant shall leave the Alterations at the Premises in good condition and repair, ordinary wear and tear excepted.  Tenant shall repair any damage to the Premises occasioned by the installation or removal of Tenant's trade fixtures, furnishings and equipment. Damage to or deterioration of any Element of the Premises or any other item Tenant is required to repair or maintain at the Premises shall not be deemed ordinary wear and tear if the same could have been prevented by good maintenance practices.

13.6    *Failure of Tenant to Remove Property.*  If this Lease is terminated due to the expiration of its term or otherwise, and Tenant fails to remove its property, in addition to any other remedies available to Landlord under this Lease, and subject to any other right or remedy Landlord may have under applicable law, Landlord may remove any property of Tenant from the Premises and store the same elsewhere at the expense and risk of Tenant.

14.    *Damage and Destruction.*

14.1    *Effect of Damage or Destruction.*  If all or part of the Project is damaged by fire, earthquake, flood, explosion, the elements, riot, the release or existence of Hazardous Materials (as defined below) or by any other cause whatsoever (hereinafter collectively referred to as "**damages**"), but the damages are not material (as defined in Section 14.2 below), Landlord shall repair the damages to the Project as soon as is reasonably possible, and this Lease shall remain in full force and effect. If all or part of the Project is destroyed or materially damaged (as defined in Section 14.2 below), Landlord shall have the right, in its sole and complete discretion, to repair or to rebuild the Project or to terminate this Lease. Landlord shall use commercially reasonable efforts to within sixty (60) days but in no event later than ninety (90) days after the discovery of such material damage or destruction notify Tenant in writing of Landlord's intention to repair or to rebuild or to terminate this Lease.  Tenant shall in no event be entitled to compensation or damages on account of annoyance or inconvenience in making any repairs, or on account of construction, or on account of Landlord's election to terminate this Lease.  Notwithstanding the foregoing, if Landlord shall elect to rebuild or repair the Project after material damage or destruction, but in good faith determines that the

10

Premises cannot be substantially repaired within two hundred ten (210) days after the date of the discovery of the material damage or destruction, without payment of overtime or other premiums, and the damage to the Project will render the entire Premises unusable during said two hundred ten (210) day period, Landlord shall notify Tenant thereof in writing at the time of Landlord's election to rebuild or repair, and Tenant shall thereafter have a period of fifteen (15) days within which Tenant may elect to terminate this Lease, upon thirty (30) days' advance written notice to Landlord. Tenant's termination right described in the preceding sentence shall not apply if the damage was caused by the gross negligence or willful misconduct of Tenant or its employees, agents, contractors or invitees. Failure of Tenant to exercise said election within said fifteen (15) day period shall constitute Tenant's agreement to accept delivery of the Premises under this Lease whenever Landlord or its successor pursues reconstruction or restoration diligently to completion, subject to delays caused by Force Majeure Events. If Landlord is unable to repair the damage to the Premises or the Project during such two hundred ten (210) day period due to Force Majeure Events, the two hundred ten (210) day period shall be extended by the period of delay caused by the Force Majeure Events, said extension period not to exceed ninety (90) days. A "Force Majeure Event" shall mean fire, earthquake, weather delays or other acts of God, strikes, boycotts, war, riot, insurrection, acts of terror, embargoes, shortages of equipment, labor or materials, delays in issuance of governmental permits or approvals, or any other cause beyond the reasonable control of Landlord. Subject to abatement pursuant to Section 14.3 below, if Landlord or Tenant terminates this Lease in accordance with this Section 14.1, Tenant shall continue to pay all Base Rent, Operating Expenses and other amounts due hereunder which arise prior to the date of termination.

      14.2    **Definition of Material Damage.**  Damage to the Project shall be deemed material if, in Landlord's reasonable judgment, the uninsured cost of repairing the damage will exceed One Hundred Thousand Dollars ($100,000).  If insurance proceeds are available to Landlord in an amount which is sufficient to pay the entire cost of repairing all of the damage to the Project, the damage shall be deemed material if the cost of repairing the damage exceeds Two Hundred Fifty Thousand Dollars ($250,000).  Damage to the Project shall also be deemed material if (a) the Project cannot be rebuilt or repaired to substantially the same condition it was in prior to the damage due to laws or regulations in effect at the time the repairs will be made, (b) the holder of any mortgage or deed of trust encumbering the Project requires that insurance proceeds available to repair the damage in excess of One Hundred Thousand Dollars ($100,000) be applied to the repayment of the indebtedness secured by the mortgage or the deed of trust, or (c) the damage occurs during the last twelve (12) months of the initial Lease Term or any renewal thereof.

      14.3    **Abatement of Rent.**  If all or part of the Premises will be unusable or inaccessible to Tenant in the ordinary conduct of its business until the damage is repaired or the Lease is terminated pursuant to Section 14.1 above, and the damage was not caused by the gross negligence or willful misconduct of Tenant or its employees, agents, contractors or invitees, Tenant's Base Rent and Tenant's Share of Operating Expenses shall be abated until the repairs are completed or the Lease is terminated, as the case may be, in proportion to the amount of the Premises which is unusable or inaccessible to Tenant in the ordinary conduct of its business.  Notwithstanding the foregoing, there shall be no abatement of Base Rent or Tenant's Share of Operating Expenses by reason of any portion of the Premises being unusable or inaccessible for a period equal to five (5) consecutive business days or less or any renewal.

      14.4    **Tenant's Acts.**  If such damage or destruction occurs as a result of the gross negligence or willful misconduct of Tenant or Tenant's employees, agents, contractors or invitees, and the proceeds of insurance which are actually received by Landlord are not sufficient to pay for the repair of all of the damage, Tenant shall pay, at Tenant's sole cost and expense, to Landlord upon demand, the difference between the cost of repairing the damage and the insurance proceeds received by Landlord.

      14.5    **Tenant's Property.**  Unless due solely to the gross negligence or willful misconduct of Landlord, its employees or agents and subject to Section 10.4 above, Landlord shall not be liable to Tenant or its employees, agents, contractors, invitees or customers for loss or damage to merchandise, tenant improvements, fixtures, automobiles, furniture, equipment, computers, files or other property (hereinafter collectively "**Tenant's property**") located at the Project.  Except as expressly provided herein, Tenant shall repair or replace all of Tenant's property at Tenant's sole cost and expense.  Tenant acknowledges that it is Tenant's sole responsibility to obtain adequate insurance coverage to compensate Tenant for damage to Tenant's property.

      14.6    [Intentionally omitted]

15.    **Condemnation.**  If any portion of the Premises or the Project are taken under the power of eminent domain, or sold under the threat of the exercise of said power (all of which are herein called "**condemnation**"), this Lease shall terminate as to the part so taken as of the date the condemning authority takes title or possession, whichever first occurs; provided that if so much of the Premises or Project are taken by such condemnation as would substantially and adversely affect the operation and profitability of Tenant's business conducted from the Premises, and said taking lasts for ninety (90) days or more, Tenant shall have the option, to be exercised only in writing within thirty (30) days after Landlord shall have given Tenant written notice of such taking (or in the absence of such notice, within thirty (30) days after the condemning authority shall have taken possession), to terminate this Lease as of the date the condemning authority takes such possession.  If a taking lasts for less than ninety (90) days, Tenant's rent shall be abated during said period but Tenant shall not have the right to terminate this Lease.  If Tenant does not terminate this Lease in accordance with the foregoing, this Lease shall remain in full force and effect as to the portion of the Premises remaining, except that the Base Rent and Operating Expenses shall be reduced in the proportion that the usable floor area of the Premises taken bears to the total usable floor area of the Premises.  Common Areas taken shall be excluded from the Common Areas usable by Tenant and no reduction of rent shall occur with respect thereto or by reason thereof.  Landlord shall have the option in its sole discretion to terminate this Lease as of the taking of possession by the condemning authority, by giving written notice to Tenant of such election within thirty (30) days after receipt of notice of a taking by condemnation of any part of the Premises or the Project provided that if such taking does not involve the Premises all leases for spaces similarly affected are also terminated.  Any award for the taking of all or any part of the Premises or the Project under the power of eminent domain or any payment made under threat of the exercise of such power shall be the property of Landlord, whether such award shall be made as compensation for diminution in value of the leasehold, for good will, for the taking of the fee, as severance damages, or as damages for tenant improvements; provided, however, that Tenant shall be entitled to any separate award for loss of or damage to Tenant's removable personal property and for moving expenses.  In the event that this Lease is not terminated by reason of such condemnation, and subject to the requirements of any lender that has made a loan to Landlord encumbering the Project, Landlord shall to the extent of severance damages received by Landlord in connection with such condemnation, repair any damage to the Project caused by such condemnation except to the extent that Tenant has been reimbursed therefor by the condemning authority.  This Section, not general principles of law, shall govern the rights and obligations of Landlord and Tenant with respect to the condemnation of all or any portion of the Project.

11

To the best of Landlord's actual knowledge as of the date hereof, Landlord has received no actual notice of any condemnation or eminent domain proceedings or negotiations which would result in a taking of the Building or the Premises.

16.  *Assignment and Subletting.*

16.1  *Landlord's Consent Required.*  Except as provided in Section 12.9 below, Tenant shall not voluntarily or by operation of law assign, transfer, hypothecate, mortgage, sublet, or otherwise transfer or encumber all or any part of Tenant's interest in this Lease or in the Premises (hereinafter collectively a "**Transfer**"), without Landlord's prior written consent, which shall not be unreasonably withheld or delayed.  Landlord shall respond to Tenant's written request for consent hereunder within thirty (30) days after Landlord's receipt of the written request from Tenant.  Any attempted Transfer without such consent shall be void and shall constitute a material default and breach of this Lease.  Tenant's written request for Landlord's consent shall include, and Landlord's thirty (30) day response period referred to above shall not commence, unless and until Landlord has received from Tenant, all of the following information: (a) financial statements for the proposed assignee or subtenant for the past three (3) years prepared in accordance with generally accepted accounting principles, (b) federal tax returns for the proposed assignee or subtenant for the past three (3) years, (c) a TRW credit report or similar report on the proposed assignee or subtenant, (d) a detailed description of the business the assignee or subtenant intends to operate at the Premises, (e) the proposed effective date of the assignment or sublease, (f) a copy of the proposed sublease or assignment agreement which includes all of the terms and conditions of the proposed assignment or sublease, (g) a detailed description of any ownership or commercial relationship between Tenant and the proposed assignee or subtenant, and (h) a detailed description of any Alterations the proposed assignee or subtenant desires to make to the Premises.  If the obligations of the proposed assignee or subtenant will be guaranteed by any person or entity, Tenant's written request shall not be considered complete until the information described in (a), (b) and (c) of the previous sentence has been provided with respect to each proposed guarantor. "**Transfer**" shall also include the transfer (a) if Tenant is a corporation, and Tenant's stock is not publicly traded over a recognized securities exchange, of more than forty-nine percent (49%) (or such lesser percentage which constitutes a controlling interest in Tenant) of the voting stock of such corporation during the Term of this Lease (whether or not in one or more transfers) or the dissolution, merger or liquidation of the corporation, or (b) if Tenant is a partnership, limited liability company, limited liability partnership or other entity, of more than forty-nine percent (49%) (or such lesser percentage which constitutes a controlling interest in Tenant) of the profit and loss participation in such partnership or entity  during the Term of this Lease (whether or not in one or more transfers) or the dissolution, merger or liquidation of the partnership, limited liability company, limited liability partnership or other entity.  If Tenant is a limited or general partnership (or is comprised of two or more persons, individually or as co-partners), Tenant shall not be entitled to change or convert to (i) a limited liability company, (ii) a limited liability partnership or (iii) any other entity which possesses the characteristics of limited liability without the prior written consent of Landlord, which consent may be given or withheld in Landlord's sole discretion.  Tenant's sole remedy in the event that Landlord shall wrongfully withhold consent to or disapprove any assignment or sublease shall be to obtain an order by a court of competent jurisdiction that Landlord grant such consent; in no event (provided Landlord has acted in good faith) shall Landlord be liable for damages with respect to its granting or withholding consent to any proposed assignment or sublease.  If Landlord shall exercise any option to recapture the Premises, or shall deny a request for consent to a proposed assignment or sublease, Tenant shall indemnify, defend and hold Landlord harmless from and against any and all losses, liabilities, damages, costs and claims that may be made against Landlord by the proposed assignee or subtenant, or by any brokers or other persons claiming a commission or similar compensation in connection with the proposed assignment or sublease.

16.2  *Leveraged Buy-out.*  The involvement by Tenant or its assets in any transaction, or series of transactions (by way of merger, sale, acquisition, financing, refinancing, transfer, leveraged buy-out or otherwise) whether or not a formal assignment or hypothecation of this Lease or Tenant's assets occurs, shall be considered to be an assignment of this Lease by Tenant to which Landlord may reasonably withhold its consent unless after such transaction or series of transactions the surviving entity will have a net worth at least equal to the net worth of the Tenant immediately preceding the date of this Lease. "**Net Worth**" of Tenant for purposes of this Section shall be the net worth of Tenant (excluding any guarantors) established under generally accepted accounting principles consistently applied.

16.3  *Standard for Approval.*  Landlord shall not unreasonably withhold its consent to a Transfer provided that Tenant has complied with each and every requirement, term and condition of this Section 16.  It shall be deemed reasonable for Landlord to withhold its consent to a Transfer if any requirement, term or condition of this Section 16 is not complied with or: (a) the Transfer would cause Landlord to be in violation of its obligations under another lease or agreement to which Landlord is a party;  (b) in Landlord's reasonable judgment, a proposed assignee or subtenant has a smaller net worth than Tenant had on the date this Lease was entered into with Tenant or is less able financially to pay the rents due under this Lease as and when they are due and payable; (c) a proposed assignee's or subtenant's business will impose a burden on the Project's parking facilities, Common Areas or utilities that is materially greater than the burden imposed by Tenant, in Landlord's reasonable judgment; (d) the terms of a proposed assignment or subletting will allow the proposed assignee or subtenant to exercise a right of renewal, right of expansion, right of first offer, right of first refusal or similar right held by Tenant; (e) a proposed assignee or subtenant refuses to enter into a written assignment agreement or sublease, reasonably satisfactory to Landlord, which provides that it will abide by and assume all of the terms and conditions of this Lease for the term of any assignment or sublease and containing such other terms and conditions as Landlord reasonably deems necessary; (f) the use of the Premises by the proposed assignee or subtenant will not be a use permitted by this Lease;  (g) any guarantor of this Lease refuses to consent to the Transfer or to execute a written agreement reaffirming the guaranty; (h) Tenant is in default as defined in Section 17 at the time of the request; (i) if requested by Landlord, the assignee or subtenant refuses to sign a non-disturbance and attornment agreement in favor of Landlord's lender; (j) Landlord has sued or been sued by the proposed assignee or subtenant or has otherwise been involved in a legal dispute with the proposed assignee or subtenant; (k) the assignee or subtenant is involved in a business which is not in keeping with the then-current standards of the Project; (l) the proposed assignee or subtenant is an existing tenant of the Project or is a person or entity then negotiating with Landlord for the lease of space in the Project; (m) the assignment or sublease will result in there being more than one subtenant of the Premises; (n) the assignee or subtenant is a governmental or quasi-governmental entity or an agency, department or instrumentality of a governmental or quasi-governmental agency; or (o) the assignee or subtenant will use, store or handle Hazardous Materials in or about the Premises of a type, nature, quantity not acceptable to Landlord, in Landlord's sole but reasonable discretion.

16.4     ***Additional Terms and Conditions.***  The following terms and conditions shall be applicable to any Transfer:

(a)     Regardless of Landlord's consent, no Transfer shall release Tenant from Tenant's obligations hereunder or alter the primary liability of Tenant to pay the rent and other sums due Landlord hereunder and to perform all other obligations to be performed by Tenant hereunder or release any guarantor from its obligations under its guaranty.

(b)     Landlord may accept rent from any person other than Tenant pending approval or disapproval of an assignment or subletting.

(c)     Neither a delay in the approval or disapproval of a Transfer, nor the acceptance of rent, shall constitute a waiver or estoppel of Landlord's right to exercise its rights and remedies for the breach of any of the terms or conditions of this Section 16.

(d)     The consent by Landlord to any Transfer shall not constitute a consent to any subsequent Transfer by Tenant or to any subsequent or successive Transfer by an assignee or subtenant.  However, Landlord may consent to subsequent Transfers or any amendments or modifications thereto without notifying Tenant or anyone else liable on the Lease and without obtaining their consent, and such action shall not relieve such persons from liability under this Lease; provided, however, Tenant shall not be bound by any increased obligations under the Lease in connection with any subsequent Transfers, amendments or modifications of which Tenant was not notified.

(e)     In the event of any default under this Lease, Landlord may proceed directly against Tenant, any guarantors or anyone else responsible for the performance of this Lease, including any subtenant or assignee, without first exhausting Landlord's remedies against any other person or entity responsible therefor to Landlord, or any security held by Landlord.

(f)     Landlord's written consent to any Transfer by Tenant shall not constitute an acknowledgment that no default then exists under this Lease nor shall such consent be deemed a waiver of any then-existing default.

(g)     The discovery of the fact that any financial statement relied upon by Landlord in giving its consent to an assignment or subletting was known by Tenant or its assignee or subtenant to be materially false when made shall, at Landlord's election, render Landlord's consent null and void.

(h)     Landlord shall not be liable under this Lease or under any sublease to any subtenant.

(i)     No assignment or sublease may be modified or amended without Landlord's prior written consent.

(j)     The occurrence of a transaction described in Section 16.2 shall give Landlord the right (but not the obligation) to require that Tenant immediately provide Landlord with an additional security deposit equal to four (4) times the monthly Base Rent payable under the Lease, and Landlord may make its receipt of such amount a condition to Landlord's consent to such transaction.

(k)     Any assignee of, or subtenant under, this Lease shall, by reason of accepting such assignment or entering into such sublease, be deemed, for the benefit of Landlord, to have assumed and agreed to conform and comply with each and every term, covenant, condition and obligation herein to be observed or performed by Tenant during the term of said assignment or sublease, other than such obligations as are contrary or inconsistent with provisions of an assignment or sublease to which Landlord has specifically consented in writing.

(l)     At Landlord's request, Tenant shall deliver to Landlord, Landlord's standard consent to assignment or consent to sublease agreement, as applicable, executed by Tenant, the assignee and the subtenant, as applicable.

16.5     ***Additional Terms and Conditions Applicable to Subletting.***  The following terms and conditions shall apply to any subletting by Tenant of all or any part of the Premises and shall be deemed included in all subleases under this Lease whether or not expressly incorporated therein:

(a)     Tenant hereby absolutely and unconditionally assigns and transfers to Landlord all of Tenant's interest in all rentals and income arising from any sublease entered into by Tenant, and Landlord may collect such rent and income and apply same toward Tenant's obligations under this Lease; provided, however, that until a default shall occur in the performance of Tenant's obligations under this Lease, Tenant may receive, collect and enjoy the rents accruing under such sublease.  Landlord shall not, by reason of this or any other assignment of such rents to Landlord nor by reason of the collection of the rents from a subtenant, be deemed to have assumed or recognized any sublease or to be liable to the subtenant for any failure of Tenant to perform and comply with any of Tenant's obligations to such subtenant under such sublease, including, but not limited to, Tenant's obligation to return any security deposit.  Tenant hereby irrevocably authorizes and directs any such subtenant, upon receipt of a written notice from Landlord stating that a default exists in the performance of Tenant's obligations under this Lease, to pay to Landlord the rents due as they become due under the sublease.  Tenant agrees that such subtenant shall have the right to rely upon any such statement and request from Landlord, and that such subtenant shall pay such rents to Landlord without any obligation or right to inquire as to whether such default exists and notwithstanding any notice or claim from Tenant to the contrary.

(b)     In the event Tenant shall default in the performance of its obligations under this Lease and Landlord is exercising its right to terminate this Lease, Landlord, at its option and without any obligation to do so, may require any subtenant to attorn to Landlord, in which event Landlord shall undertake the obligations of Tenant under such sublease from the time of the exercise of said option to the termination of such sublease; provided, however, Landlord shall not be liable for any prepaid rents or security deposit paid by such subtenant to Tenant or for any other prior defaults of Tenant under such sublease.

16.6     ***Transfer Premium from Assignment or Subletting.***  Landlord shall be entitled to receive from Tenant (as and when received by Tenant) as an item of additional rent one-half  of all amounts received by Tenant from the subtenant or assignee in excess of the amounts payable by Tenant to Landlord hereunder (hereinafter the

13

Transfer Premium"). The Transfer Premium shall be reduced by the reasonable brokerage commissions, advertising expenses, and legal fees actually paid or incurred by Tenant in order to assign the Lease or to sublet a portion of the Premises. "**Transfer Premium**" shall mean all Base Rent, additional rent or other consideration of any type whatsoever payable by the assignee or subtenant in excess of the Base Rent and additional rent payable by Tenant under this Lease. If less than all of the Premises is transferred, the Base Rent and the additional rent shall be determined on a per-leasable-square-foot basis. "**Transfer Premium**" shall also include, but not be limited to, key money and bonus money paid by the assignee or subtenant to Tenant in connection with such Transfer, and any payment in excess of fair-market value for services rendered by Tenant to the assignee or subtenant or for assets, fixtures, inventory, equipment or furniture transferred by Tenant to the assignee or subtenant in connection with such Transfer.

16.7  *Landlord's Option to Recapture Space.*  Notwithstanding anything to the contrary contained in this Section 16, Landlord shall have the option, by giving written notice to Tenant within thirty (30) days after receipt of any request by Tenant (i) to assign the Lease, or (ii) to sublease space in the Premises if (x) upon the commencement of any such sublease, the aggregate amount of space in the Premises that is subject to a sublease (or subleases) would be greater than fifty percent (50%) of the square footage of the Premises in the aggregate, or (y) the term of such sublease will expire during the last twelve (12) months of the Term, or (z) the sublease is with another tenant or occupant of the Project, to terminate this Lease with respect to said space as of the date thirty (30) days after Landlord's election. In the event of a recapture by Landlord, if this Lease shall be canceled with respect to less than the entire Premises, the Base Rent, Operating Expenses and the number of parking spaces Tenant may use shall be adjusted on the basis of the number of rentable square feet retained by Tenant in proportion to the number of rentable square feet contained in the original Premises, and this Lease as so amended shall continue thereafter in full force and effect, and upon request of either party, the parties shall execute written confirmation of same. If Landlord recaptures only a portion of the Premises, it shall construct and erect at its sole cost such partitions as may be required to sever the space to be retained by Tenant from the space recaptured by Landlord. Landlord may, at its option, lease any recaptured portion of the Premises to the proposed subtenant or assignee or to any other person or entity without liability to Tenant. Tenant shall not be entitled to any portion of the profit, if any, Landlord may realize on account of such termination and reletting. Tenant acknowledges that the purpose of this Section is to enable Landlord to receive profit in the form of higher rent or other consideration to be received from an assignee or subtenant, to give Landlord the ability to meet additional space requirements of other tenants of the Project and to permit Landlord to control the leasing of space in the Project. Tenant acknowledges and agrees that the requirements of this Section are commercially reasonable and are consistent with the intentions of Landlord and Tenant. The provisions of this Section 16.7 shall not apply in connection with a Permitted Transfer (defined in Section 16.9 below).

16.8  *Landlord's Expenses.*  In the event Tenant shall assign this Lease or sublet the Premises or request the consent of Landlord to any Transfer, then Tenant shall pay Landlord's reasonable costs and expenses incurred in connection therewith, including, but not limited to, attorneys', architects', accountants', engineers' or other consultants' fees not to exceed Two Thousand Five Hundred Dollars ($2,500.00) per Transfer or request to Transfer.

16.9  *Permitted Transfers.*  Notwithstanding anything to the contrary contained in this Section 16, provided Tenant is not in default after expiration of all applicable notice and cure periods, Tenant shall have the right, without Landlord's consent, upon thirty (30) days advance written notice to Landlord, to assign the Lease or sublet the whole or any part of the Premises to (i) to any entity or entities which are owned by Tenant, or which owns Tenant or any entity that controls, is controlled by or is under common control with Tenant (which for purposes hereof, "control" shall be deemed to be ownership of more than fifty percent (50%) of the stock or other voting interest of the controlled corporation or other business entity), (ii) in connection with the sale or transfer of substantially all of the assets of the Tenant or the sale or transfer of substantially all of the outstanding ownership interests in Tenant, or (iii) in connection with a merger, consolidation or other corporate reorganization of Tenant (each of the transactions referenced in the above subparagraphs (i), (ii), and (iii) are hereinafter referred to as a "Permitted Transfer," and each surviving entity shall hereinafter be referred to as a "Permitted Transferee"); provided, that such assignment or sublease is subject to the following conditions:

(i)  Tenant shall remain fully liable under the terms of the Lease;

(ii)  such Permitted Transfer shall be subject to all of the terms, covenants and conditions of the Lease;

(iii)  such Permitted Transferee has a net worth at least equal to the net worth of Tenant as of the date of this Lease, and

(iv)  such Permitted Transferee shall expressly assume the obligations of Tenant under the Lease by a document reasonably satisfactory to Landlord.

17.  *Default; Remedies.*

17.1  *Default by Tenant.*  Landlord and Tenant hereby agree that the occurrence of any one or more of the following events is a material default by Tenant under this Lease and that said default shall give Landlord the rights described in Section 17.2. Landlord or Landlord's authorized agent shall have the right to execute and to deliver any notice of default, notice to pay rent or quit or any other notice Landlord gives Tenant.

(a)  Tenant's failure to make any payment of Base Rent, Tenant's Percentage Share of Operating Expenses, Tenant's Percentage Share of Real Property Taxes or any other payment required to be made by Tenant hereunder, as and when due, where such failure shall continue for a period of five (5) business days after written notice thereof from Landlord to Tenant. In the event that Landlord serves Tenant with a notice to pay rent or quit pursuant to applicable unlawful detainer statutes, such notice shall also constitute the notice required by this Section 17.1(a).

(b)  The abandonment of the Premises by Tenant, in which event Landlord shall not be obligated to give any notice of default to Tenant.

(c)  The failure by Tenant to observe or perform any of the covenants, conditions or provisions of this Lease to be observed or performed by Tenant (other than those referenced in Sections 17.1(a) and (b), above),

14

where such failure shall continue for a period of twenty (20) days after written notice thereof from Landlord to Tenant; provided, however, that if the nature of Tenant's non-performance is such that more than twenty (20) days are reasonably required for its cure, then Tenant shall not be deemed to be in default if Tenant commences such cure within said twenty (20) day period and thereafter diligently pursues such cure to completion. The foregoing cure period shall in no event apply to any of the following: Tenant's (i) failure to provide an estoppel certificate when and as required under Section 25 of this Lease; (ii) failure to maintain insurance required under Section 10 of the Lease within ten (10) business days from written notice Landlord; (iii) failure to vacate the Premises upon the expiration or earlier termination of the Lease; (iv) failure to provide the Verification Letter as and when required under Section 3.1 of the Lease; or (v) failure to comply with any obligation under the Lease pertaining to Hazardous Materials within ten (10) business days from written notice from Landlord. In the event that Landlord serves Tenant with a notice to quit pursuant to applicable unlawful detainer statutes, said notice shall also constitute the notice required by this Section 17.1(c).

(d)   (i) The making by Tenant or any guarantor of Tenant's obligations hereunder of any general arrangement or general assignment for the benefit of creditors; (ii) Tenant or any guarantor becoming a "debtor" as defined in 11 U.S.C. 101 or any successor statute thereto (unless, in the case of a petition filed against Tenant or guarantor, the same is dismissed within sixty (60) days); (iii) the appointment of a trustee or receiver to take possession of substantially all of Tenant's assets located at the Premises or of Tenant's interest in this Lease, where possession is not restored to Tenant within thirty (30) days; (iv) the attachment, execution or other judicial seizure of substantially all of Tenant's assets located at the Premises or of Tenant's interest in this Lease, where such seizure is not discharged within thirty (30) days; or (v) the insolvency of Tenant. In the event that any provision of this Section 17.1(e) is unenforceable under applicable law, such provision shall be of no force or effect.

(e)   The discovery by Landlord that any financial statement, representation or warranty given to Landlord by Tenant, or by any guarantor of Tenant's obligations hereunder, was known to be materially false at the time given. Tenant acknowledges that Landlord has entered into this Lease in material reliance on such information.

(f)   Except as permitted by Section 16 above, if Tenant is a corporation, partnership, limited liability company or similar entity, the dissolution or liquidation of Tenant.

17.2   **Remedies.**

(a) In the event of any material default or breach of this Lease by Tenant unless cured as provided for herein, Landlord may, at any time thereafter, with or without notice or demand, and without limiting Landlord in the exercise of any right or remedy which Landlord may have by reason of such default:

(i) Terminate Tenant's right to possession of the Premises. Upon any such termination, Tenant shall immediately surrender possession of the Premises to Landlord. Landlord reserves all rights and remedies available to it pursuant to the terms and conditions of this Lease as well as under applicable law. Tenant also agrees that Landlord's right to re-lease or any other right given to Landlord as a consequence of Tenant's default hereunder or by operation of law is not relinquished. On termination of Tenant's right of possession, Landlord shall be entitled to recover from Tenant: (i) the unpaid rent which had been earned at the time of the termination; (ii) the amount by which the unpaid rent which would have been earned after termination until the time of the award exceeds the amount of any rental, if any, received for the Premises during such time period; (iii) the amount by which the unpaid rent for the balance of the Term of the Lease after the time of award exceeds the amount of any rent to be received (net of re-letting expenses as described below) from any replacement tenant occupying the Premises at the time of the award, or, if the Premises are not occupied at the time of the award by a rent-paying replacement tenant, the full amount of the rent to be earned hereunder for the balance of the Term of the Lease discounted to net present value assuming a discount rate of one percent (1%) above the discount rate of the Federal Reserve Bank of Richmond in effect at the time of the award; and provided further, however, that Landlord shall repay to Tenant the excess of the foregoing amount over any rent received for the Premises during the balance of the Term of the Lease (net of reletting expenses as described below) similarly discounted; and (iv) at the time of the award any other amount necessary to compensate Landlord for all the damage proximately caused by Tenant's failure to perform its obligations under this Lease or which in the ordinary course of events would likely result therefrom, including but not limited to, all reasonable costs and expenses attributable to recovering possession of the Premises, re-letting expenses (including the costs and expenses of any necessary repairs, renovations and alterations to the Premises), costs of carrying the Premises (including but not limited to, Landlord's payment of real property taxes and insurance premiums), reasonable and actual legal fees and associated costs and expenses, the unamortized portion of all brokerage commissions paid by Landlord in connection with this Lease and all costs of tenant improvements (amortized without interest on a straight line basis over the initial Term of the Lease), and reimbursement of any deferred rent or other Lease execution inducement.

(ii) maintain Tenant's right of possession in which event Landlord shall have the remedy which permits Landlord to continue this Lease in effect after Tenant's breach and abandonment and recover rent as it becomes due. Acts of maintenance or preservation, efforts to relet the Premises, or removal or storage of Tenant's personal property, shall not constitute a termination of Tenant's right to possession or act as an acceptance of any surrender of the Premises. Landlord shall not be required to relet any or all of the Premises prior to leasing other vacant space at the Project, nor shall Landlord be required to accept a tenant: (i) that does not otherwise meet Landlord's financial and other criteria, nor (ii) a tenant who intends to make a use other than the use permitted by the Lease.

(iii) collect sublease rents (or appoint a receiver to collect such rent) and otherwise perform Tenant's obligations at the Premises, it being agreed, however, that the appointment of a receiver for Tenant shall not constitute an election by Landlord to terminate this Lease.

(iv) pursue any other remedy now or hereafter available to Landlord under the laws or judicial decisions of the state in which the Premises are located.

(b) No remedy or election hereunder shall be deemed exclusive, but shall, wherever possible, be cumulative with all other remedies at law or in equity. The expiration or termination of this Lease and/or the termination of Tenant's right to possession of the Premises shall not relieve Tenant of liability under any

15

indemnity provisions of this Lease as to matters occurring or accruing during the Term hereof or by reason of Tenant's occupancy of the Premises.

(c)     If Tenant abandons or vacates the Premises, Landlord may re-enter the Premises and such re-entry shall not be deemed to constitute Landlord's election to accept a surrender of the Premises or to otherwise relieve Tenant from liability for its breach of this Lease.  No surrender of the Premises shall be effective against Landlord unless Landlord has entered into a written agreement with Tenant in which Landlord expressly agrees to (i) accept a surrender of the Premises and (ii) relieve Tenant of liability under the Lease.  The delivery by Tenant to Landlord of possession of the Premises shall not constitute the termination of the Lease or the surrender of the Premises.

(d)     Landlord shall be under no obligation to relet the Premises but shall use commercially reasonable efforts to do so.  The phrase "reasonable efforts" as it relates to Landlord's duty to attempt to relet the Premises, shall require Landlord to do only the following:  (i) notify Landlord's leasing agent in writing of the availability of the Premises for reletting, (ii) post Landlord's leasing contact telephone number in the Project management office, (iii) show the Premises to any prospective tenant who requests to see the Premises and to any prospective tenant specifically referred to Landlord by Tenant, and (iv) show the "vacant" status of the Premises in posters and information brochures used at leasing trade meetings and conventions.  Landlord shall not be required to relet the Premises before reletting any space in the Project not producing any income to Landlord.

(e)     Except with respect to Tenant's obligations under Sections 27 and 33 of the Lease, neither party shall be liable to the other for consequential (including, but not limited to, lost profits) or punitive damages.

17.3     **Default by Landlord.**  Landlord shall not be in default under this Lease unless Landlord fails to perform obligations required of Landlord within thirty (30) days after written notice by Tenant to Landlord and to the holder of any mortgage or deed of trust encumbering the Project whose name and address shall have theretofore been furnished to Tenant in writing, specifying wherein Landlord has failed to perform such obligation; provided, however, that if the nature of Landlord's obligation is such that more than thirty (30) days are required for its cure, then Landlord shall not be in default if Landlord commences performance within such thirty (30) day period and thereafter diligently pursues the same to completion.  In no event shall Tenant have the right to terminate this Lease as a result of Landlord's default (except in the event of a finding, by a court of competent jurisdiction, of a constructive eviction if such court permits a termination), and Tenant's remedies shall be limited to damages and/or an injunction.  Tenant hereby waives its right to recover consequential damages (including, but not limited to, lost profits) or punitive damages arising out of a Landlord default.  This Lease and the obligations of Tenant hereunder shall not be affected or impaired because Landlord is unable to fulfill any of its obligations hereunder or is delayed in doing so, if such inability or delay is caused by reason of a Force Majeure Event, and the time for Landlord's performance shall be extended for the period of any such delay.

If Landlord defaults in performing any of its repair and maintenance obligations to the Premises as expressly stated in this Lease and such default is not remedied by Landlord within thirty (30) days after Tenant shall have given Landlord written notice specifying such default (or such lesser reasonable period if such default creates a risk of imminent injury to person or substantial property damage), and in the case of any such default which cannot with due diligence and in good faith be cured within thirty (30) days, within such additional period as may be reasonably required to cure such default with due diligence and in good faith (it being intended that, in connection with any such default which is not susceptible of being cured with due diligence and in good faith within thirty (30) days, the time within which Landlord is required to cure such default shall be extended for such additional period as may be necessary for the curing thereof with due diligence and in good faith), then Tenant, shall have the right, but not the obligation, to perform the repair or maintenance obligation to the Premises which Landlord failed to perform.  Subject to the remaining terms and conditions of this paragraph, the full amount of the reasonable costs and expenses so incurred by Tenant (the "**Reimbursable Costs**") shall be paid by Landlord to Tenant, within thirty (30) days after written demand therefore (provided that such written demand is accompanied by reasonable documented evidence of the Reimbursable Costs).   If Landlord delivers to Tenant within thirty (30) days after receipt of Tenant's invoice of Reimbursable Costs, a written objection to the payment of such invoice, setting forth with reasonable particularity Landlord's reasons for its claim that such action did not have to be taken by Landlord pursuant to the terms of this Lease or that the charges are excessive (in which case Landlord shall pay the amount it contends would not have been excessive), then, as Tenant's sole remedy, Tenant may proceed to claim a default by Landlord and file an action in a court of competent jurisdiction in connection therewith.

17.4     **Late Charges.**  Tenant hereby acknowledges that late payment by Tenant to Landlord of Base Rent, Tenant's Percentage Share of Operating Expenses, Tenant's Percentage Share of Real Property Taxes or other sums due hereunder will cause Landlord to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain.  Such costs include, but are not limited to, processing and accounting charges and late charges which may be imposed on Landlord by the terms of any mortgage or trust deed encumbering the Project. Accordingly, if any installment of Base Rent, Tenant's Percentage Share of Operating Expenses, Tenant's Percentage Share of Real Property Taxes or any other sum due from Tenant shall not be received by Landlord when such amount shall be due, then, without any requirement for notice or demand to Tenant, Tenant shall immediately pay to Landlord a late charge equal to five percent (5%) of such overdue amount.  The parties hereby agree that such late charge represents a fair and reasonable estimate of the costs Landlord will incur by reason of late payment by Tenant. Acceptance of such late charge by Landlord shall in no event constitute a waiver of Tenant's default with respect to such overdue amount (in the event the underlying default is not also cured), nor prevent Landlord from exercising any of the other rights and remedies granted hereunder, including the assessment of interest under Section 17.5. Notwithstanding anything to the contrary contained in this Section 13.4 of the Lease, Landlord agrees to waive imposition of such late charge on the first occasion in any twelve (12) month period provided the overdue payment is made within five (5) business days after Landlord gives Tenant written notice that the payment was not made when due.

17.5     **Interest on Past-Due Obligations.**  Except as expressly herein provided, any amount due to Landlord that is not paid when due shall bear interest at the lesser of ten percent (10%) per annum or the maximum rate permitted by applicable law.  Payment of such interest shall not excuse or cure any default by Tenant under this Lease; provided, however, that interest shall not be payable on late charges incurred by Tenant nor on any amounts upon which late charges are paid by Tenant.

17.6     **Payment of Rent and Security Deposit after Default.**  If Tenant fails to pay Base Rent, Tenant's Percentage Share of Operating Expenses, Tenant's Percentage Share of Real Property Taxes or any other monetary obligation due hereunder on the date it is due, after Tenant's second failure in any twelve (12) month period to pay any

16

monetary obligation within five (5) business days after the date it is due, at Landlord's option, all monetary obligations of Tenant hereunder shall thereafter be paid by cashier's check, and Tenant shall, upon demand, provide Landlord with an additional security deposit equal to three (3) months' Base Rent. If Landlord has required Tenant to make said payments by cashier's check or to provide an additional security deposit, Tenant's failure to make a payment by cashier's check or to provide the additional security deposit shall be a material default hereunder.

18.    **Landlord's Right to Cure Default; Payments by Tenant.**  All covenants and agreements to be kept or performed by Tenant under this Lease shall be performed by Tenant at Tenant's sole cost and expense and without any reduction of rent. If Tenant shall fail to perform any of its obligations under this Lease, Landlord may, but shall not be obligated to, after five (5) business days' prior written notice to Tenant, make any such payment or perform any such act on Tenant's behalf without waiving its rights based upon any default of Tenant and without releasing Tenant from any obligations hereunder.  Tenant shall pay to Landlord, within ten (10) days after delivery by Landlord to Tenant of statements therefore, an amount equal to the expenditures reasonably made by Landlord in connection with the remedying by Landlord of Tenant's defaults pursuant to the provisions of this Section.

19.    *Indemnity.*

a.    Except to the extent caused by the negligence or willful misconduct of the Landlord Parties (defined hereinafter), Tenant hereby agrees to indemnify, defend and hold harmless Landlord and its employees, partners, agents, lenders and ground lessors (said persons and entities are hereinafter collectively referred to as the "Landlord Indemnified Parties") from and against any and all liability, loss, cost, damage, claims, loss of rents, liens, judgments, penalties, fines, settlement costs, investigation costs, the cost of consultants and experts, reasonable attorneys' fees, court costs and other legal expenses, and other expenses (hereinafter collectively referred to as "Damages") arising out of or related to a "Landlord Indemnified Matter," as defined below.  For purposes of this Section 19, a "Landlord Indemnified Matter" shall mean any matter for which one or more of the Landlord Indemnified Parties incurs liability or Damages if the liability or Damages arise out of or involve, (i) Tenant or its employees, agents, contractors, invitees, subtenants, assignees or licensees, (all of said persons or entities are hereinafter collectively referred to as a "Tenant Party" or "Tenant Parties") use of the Premises or the Project; (ii) any negligent act or omission of a Tenant Party; or (iii) Tenant's failure to perform any of its obligations under the Lease.

b.    Except to the extent caused by the negligence or willful misconduct of the Tenant Parties, Landlord hereby agrees to indemnify, defend and hold harmless Tenant and its shareholders, affiliated entities, employees, partners, agents, and lenders (said persons and entities are hereinafter collectively referred to as the "Tenant Indemnified Parties") from and against any and all Damages arising out of or related to "Tenant Indemnified Matters," as defined below.  For purposes of this Section 19, a "Tenant Indemnified Matter" shall mean any matter for which one or more of the Tenant Indemnified Parties incurs liability or Damages if the liability or Damages arise out of or involve, (i) Landlord or its employees, partners, agents, contractors, lenders and ground lessors (said persons are hereinafter collectively referred to as "Landlord Parties") negligent act or omission; or (ii) Landlord's failure to perform any of its obligations under the Lease.

c.    Landlord's and Tenant's obligations hereunder shall include, but shall not be limited to (a) compensating the Landlord Indemnified Parties or the Tenant Indemnified Parties, as the case may be, for damages arising out of Landlord Indemnified Matters or Tenant Indemnified Matters, as applicable, and (b) providing defense, with counsel reasonably satisfactory to such indemnified party, at the other party's sole expense, of any claims, actions or proceedings arising out of or relating to a Landlord Indemnified Matter or a Tenant Indemnified Matter, as the case may be, whether or not litigated or reduced to judgment.  The indemnified parties need not first pay any Damages to be indemnified hereunder.  Each party's indemnity obligations hereunder is intended to apply to the fullest extent permitted by applicable law.  The parties' obligations under this Section shall survive the expiration or termination of the Lease.  Each party's agreement to indemnify and hold the other harmless set forth above are not intended to, and shall not relieve any insurance carrier of its obligations under policies required to be carried by Landlord or Tenant pursuant to the provisions of the Lease to the extent that such policies cover the results of such acts or conduct.

20.    **Exemption of Landlord from Liability.**  Tenant hereby agrees that Landlord shall not be liable for injury to Tenant's business or any loss of income therefrom or for loss of or damage to the merchandise, tenant improvements, fixtures, furniture, equipment, computers, files, automobiles, or other property of Tenant, Tenant's employees, agents, contractors or invitees, or any other person in or about the Project, nor shall Landlord be liable for injury to the person of Tenant, Tenant's employees, agents, contractors or invitees, whether such damage or injury is caused by or results from any cause whatsoever including, but not limited to, theft, criminal activity at the Project, negligent security measures, bombings or bomb scares, Hazardous Materials, fire, steam, electricity, gas, water or rain, flooding, breakage of pipes, sprinklers, plumbing, air conditioning or lighting fixtures, or from any other cause, whether said damage or injury results from conditions arising upon the Premises or upon other portions of the Project, or from other sources or places, or from new construction or the repair, alteration or improvement of any part of the Project, and unless the cause of the damage or injury arises out of the gross negligence or willful misconduct of Landlord's or its employees, agents or contractors.  Landlord shall not be liable for any damages arising from any act or neglect of any employees, agents, contractors or invitees of any other tenant, occupant or user of the Project, nor from the failure of Landlord to enforce the provisions of the lease of any other tenant of the Project.  Tenant, as a material part of the consideration to Landlord hereunder, hereby assumes all risk of damage to Tenant's property or business or injury to persons, in, upon or about the Project arising from any cause, excluding Landlord's gross negligence or willful misconduct or the gross negligence or willful misconduct of its employees, agents or contractors, and Tenant hereby waives all claims in respect thereof against Landlord, its employees, agents and contractors.

21.    **Landlord's Liability.**  Tenant acknowledges that Landlord shall have the right to transfer all or any portion of its interest in the Project and to assign this Lease to the transferee.  Tenant agrees that in the event of such a transfer Landlord shall automatically be released from all liability under this Lease; and Tenant hereby agrees to look solely to Landlord's transferee for the performance of Landlord's obligations hereunder after the date of the transfer.  Upon such a transfer, Landlord shall, at its option, return Tenant's security deposit to Tenant or transfer Tenant's security deposit to Landlord's transferee and, in either event, Landlord shall have no further liability to Tenant for the return of its security deposit.  Subject to the rights of any lender holding a mortgage or deed of trust encumbering all or part of the Project, Tenant agrees to look solely to Landlord's equity interest in the Project for the collection of any judgment requiring the payment of money by Landlord arising out of (a) Landlord's failure to perform its obligations under this Lease or (b) the negligence or willful misconduct of Landlord, its partners, employees and agents.  No other property or assets of Landlord shall be subject to levy, execution or other enforcement procedure for the satisfaction of any judgment or writ obtained by Tenant against Landlord.  No partner, employee or agent of Landlord shall be personally liable for the performance of Landlord's obligations hereunder or be named as a party in any lawsuit arising out of or

17

related to, directly or indirectly, this Lease and the obligations of Landlord hereunder. The obligations under this Lease do not constitute personal obligations of the individual partners of Landlord, if any, and Tenant shall not seek recourse against the individual partners of Landlord or their assets.

Notwithstanding anything to the contrary contained in this Lease, it is agreed between the parties that in the event of any default by Tenant under this Lease, Landlord's sole recourse shall be against Tenant and the assets of Tenant (including any insurance proceeds) and none of the shareholders, directors or officers of Tenant shall have any personal liability under this Lease and no deficiency judgment shall be sought or obtained against any of said shareholders, directors or officers with respect to any such obligation under this Lease.

22.     *Signs.*  Tenant shall not make any changes to the exterior of the Premises, install any exterior lights, decorations, balloons, flags, pennants, banners or painting, or erect or install any signs, windows or door lettering, placards, decorations or advertising media of any type which can be viewed from the exterior of the Premises, without Landlord's prior written consent, which may be given or withheld in Landlord's sole discretion. Notwithstanding the foregoing, Tenant shall have the right to display holiday decorations in the interior of the Premises; provided, however, if any such displays are visible from the exterior of the Premises, such displays shall be tasteful.  Upon vacation of the Premises, Tenant shall remove all signs and repair, paint and/or replace the building facia surface to which its signs are attached.  Tenant shall obtain all applicable governmental permits and approvals for signs and exterior treatments. All signs, decorations, advertising media, blinds, draperies and other window treatment or bars or other security installations visible from outside the Premises shall be subject to Landlord's approval and conform in all respects to Landlord's requirements.

*See Addendum Paragraph 6*

23.     *Parking.*  During the term and subject to the rules and regulations attached hereto as Exhibit "C," as modified by Landlord from time to time (the "**Rules**"), Tenant shall be entitled to use the number of parking spaces set forth in Section 1.15 in the Common Area parking lot of the Project.  Tenant's parking rights are in common with the parking rights of any other tenants of the Project, and all of Tenant's parking spaces are unreserved parking spaces.  Landlord reserves the right at any time to reasonably designate areas in the Common Areas where Tenant may or may not park upon five (5) business days prior written notice (except in the event of an emergency).  If Tenant commits or allows in the parking lot any of the activities prohibited by the Lease or the Rules, then Landlord shall have the right, without notice, in addition to such other rights and remedies that it may have, to remove or tow away the vehicle involved and charge the cost to Tenant, which cost shall be immediately payable by Tenant upon demand by Landlord.  Tenant's parking rights are the parking rights of Tenant, and Tenant shall not transfer, assign or otherwise convey its parking rights separate and apart from this Lease.  Subject to Section 2.2 above with respect to tractor trailer and truck parking, all parking spaces may only be used for parking vehicles no larger than full-size passenger automobiles or pick-up trucks.  Landlord, in addition to its other remedies, shall have the right to remove or tow away any other vehicles.  Landlord shall not be responsible for enforcing Tenant's parking rights against any third parties.  Tenant shall not permit or allow any vehicles that belong to or are controlled by Tenant or Tenant's employees, suppliers, shippers, customers or invitees to be loaded, unloaded or parked in areas other than those designated by Landlord for such activities.

24.     *Broker's Fee.*  Tenant and Landlord each represent and warrant to the other that neither has had any dealings or entered into any agreements with any person, entity, broker or finder other than the persons, if any, listed in Section 1.16, in connection with the negotiation of this Lease, and no other broker, person, or entity is entitled to any commission or finder's fee in connection with the negotiation of this Lease, and Tenant and Landlord each agree to indemnify, defend and hold the other harmless from and against any claims, damages, costs, expenses, attorneys' fees or liability for compensation or charges which may be claimed by any such unnamed broker, finder or other similar party by reason of any dealings, actions or agreements of the indemnifying party.  Nothing in this Lease shall impose any obligation on Landlord to pay a commission or fee to any party other than Landlord's broker.

25.     *Estoppel Certificate.*

        25.1     *Delivery of Certificate.*  Tenant shall from time to time, upon not less than ten (10) business days' prior written notice from Landlord, execute, acknowledge and deliver to Landlord a statement in writing certifying such information (to the extent true) as Landlord may reasonably request including, but not limited to, the following: (a) that this Lease is unmodified and in full force and effect (or, if modified, stating the nature of such modification and certifying that this Lease, as so modified, is in full force and effect), (b) the date to which the Base Rent and other charges are paid in advance and the amounts so payable, (c) that there are not, to Tenant's knowledge, any uncured defaults or unfulfilled obligations on the part of Landlord, or specifying such defaults or unfulfilled obligations, if any are claimed, (d) that all tenant improvements to be constructed by Landlord, if any, have been completed in accordance with Landlord's obligations, and (e) that Tenant has taken possession of the Premises.  Any such statement may be conclusively relied upon by any prospective purchaser or encumbrancer of the Project.

        25.2     *Failure to Deliver Certificate.*  If Tenant shall fail to execute and deliver such statement within such ten (10) business day period, then Landlord shall send Tenant a second written request for such statement.  If Tenant shall fail to so execute and deliver such written statement within five (5) days after this second request then, at Landlord's option, the failure of Tenant to deliver such statement within such time shall constitute a material default of Tenant hereunder, or it shall be conclusive upon Tenant that  (a) this Lease is in full force and effect, without modification except as may be represented by Landlord, (b) there are no uncured defaults in Landlord's performance, (c) not more than one month's Base Rent has been paid in advance, (d) all tenant improvements to be constructed by Landlord, if any, have been completed in accordance with Landlord's obligations, and (e) Tenant has taken possession of the Premises.

26.     *Financial Information.*  From time to time at any time (i) in connection with a potential financing, refinancing or disposition of the Project by Landlord, or (ii) if there is monetary default under the Lease, at Landlord's request, Tenant shall cause the following financial information to be delivered to Landlord, at Tenant's sole cost and expense, upon not less than fifteen (15) business days' advance written notice from Landlord: (a) a current financial statement for Tenant and Tenant's financial statements for the previous two accounting years, (b) a current financial statement for any guarantor(s) of this Lease and the guarantor's(s') financial statements for the previous two accounting years and (c) such other financial information pertaining to Tenant or any guarantor as Landlord or any lender or purchaser of Landlord may reasonably request.  All financial statements shall be prepared in accordance with generally accepted accounting principals consistently applied and, if such is the normal practice of Tenant, shall be audited by an independent certified public accountant.  At the written request of Tenant, Landlord shall execute a commercially

18

reasonable confidentiality agreement concerning the release of Tenant's financial information pursuant to this Section 26, in a form substantially similar to that certain confidentiality agreement executed by Landlord and Tenant prior to entering into this Lease and satisfactory to Landlord in Landlord's sole but reasonable discretion.

27.     ***Environmental Provisions.***

(a)  For purposes of this lease, the following additional definitions shall apply:

(i)     "Hazardous Substances" shall include any pollutants, petroleum products, dangerous substances, toxic substances, hazardous wastes, hazardous materials, or hazardous substances as defined in or pursuant to the Industrial Site Recovery Act and all rules, regulations, orders, directives and opinions promulgated thereunder ("ISRA") N.J.S.A. 13:1K-6 et seq.; the Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 et seq. and all rules, regulations, orders, directives and opinions promulgated thereunder ("Spill Act"); the Solid Waste Management Act, N.J.S.A. 13:1E-1 et seq.; the Resource Conservation and Recovery Act, 42 U.S.C. i6901 et seq.; the Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C. i9601 et seq. and all rules, regulations, orders, directives and opinions promulgated thereunder ("CERCLA"); or any other Federal, State or Local environmental law or ordinance; and all rules, regulations, orders, directives and opinions promulgated under the foregoing, any amendments to any of the foregoing and any successor legislation to any of the foregoing (collectively "Environmental Laws");

(ii)    "Release" means releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, disposing or dumping;

(iii)   "Notice" means any summons, citation, directive, order, claim, litigation, investigation, proceeding, judgment, letter, submission or other communication, written or oral, actual or threatened, from the New Jersey Department of Environmental Protection ("DEP"), the United States Environmental Protection Agency ("EPA"), any other Federal, State or Local agency or authority or any other entity or any individual, concerning any act or omission resulting or which may result in the Release of Hazardous Substances into the waters or onto the lands of the State of New Jersey or into waters outside the jurisdiction of the State of New Jersey or into the "environment" as such terms are defined in CERCLA, or otherwise related to any Environmental Law or Tenant's obligations pursuant to this Section 27.  "Notice" shall include the imposition of any liens of any real or personal property or revenues of Tenant including, but not limited to, Tenant's interest in the Premises or any of Tenant's property located thereon, pursuant to or resulting from the violation of any Environmental Law, or any other governmental actions, orders or permits or any knowledge after due inquiry and investigation of any facts which could give rise to any of the above.

(b)     To the extent that Tenant may be permitted under applicable law to use the Premises and/or the Project for the generating, manufacturing, refining, transporting, treating, storing, handling, disposing, transferring or processing of Hazardous Substances, Tenant shall ensure that said use shall be conducted at all times strictly in accordance with applicable Environmental Law.  Tenant shall not cause nor permit as a result of any intentional or unintentional act or omission, a Release of Hazardous Substances.  If any intentional or unintentional act or omission results in any actual or alleged Release of Hazardous Substances, Tenant promptly shall conduct necessary sampling and cleanup and remediate such Release in accordance with applicable Environmental Laws.

(c)     Tenant shall not operate any business at the Premises which shall be subject to ISRA. **Tenant hereby represents that its Standard Industrial Classification (herein "SIC") Number is the SIC Number set forth in Section 1.20 above** as determined by reference to the SIC Manual and its operations shall consist of the Use described in Section 1.7.  Notwithstanding any provision of ISRA to the contrary, if the Tenant's operations become subject to ISRA, Tenant, at Tenant's own expense, shall do whatever is necessary to comply with ISRA whenever an obligation to do so arises.  At no expense to Landlord, Tenant promptly shall provide all information requested by Landlord regarding or in furtherance of ISRA compliance.  Tenant shall sign any affidavit concerning compliance with Environmental Laws submitted by Landlord which is true, accurate and complete; if an affidavit is not true, accurate and complete, Tenant shall provide the necessary information to make it true, accurate or complete and then shall sign same.

(d)     Tenant promptly shall furnish Landlord with true copies of any Notices of any nature made by Tenant to, or received by Tenant from DEP, EPA, or any local, state or federal authority.

(e)     Notwithstanding anything in this Lease to the contrary, and without limiting any other provisions of this Section 27, Tenant, at its sole cost and expense, shall observe, comply and fulfill all of the terms and provisions of all applicable Environmental Laws, as the same may be amended from time to time, as they relate to Tenant's use and occupancy of the Premises during the term of this Lease.

Without limiting the foregoing, Tenant agrees:

(i)     That it shall not do or omit to do nor suffer the commission or omission of any act, the commission or omission of which is prohibited by or may result in liability pursuant to any Environmental Law, including without limitation, the Release of Hazardous Substances;

(ii)    Whenever the provisions of any Environmental Law requires the "owner or operator" of the Premises to do any act, Tenant on behalf of Tenant and/or Landlord, as the case may be, shall do such act at its sole cost and expense, including the making of all submissions and the providing of all information, it being the intention of the parties hereto that Landlord shall be free of all expenses and obligations arising from or in connection with compliance with Environmental Laws relating to the Premises and that Tenant shall fulfill all such obligations and pay all such expenses.

(f)     In the event there shall be filed a lien against the Premises and/or the Project arising out of a claim(s) by DEP pursuant to the provisions of the Spill Act or by EPA pursuant to the provisions of CERCLA, Tenant immediately either shall: 1) pay the claim and remove the lien from the Premises and/or the Project; or, ii) furnish a bond, cash receipt or other security reasonably satisfactory to Landlord sufficient to discharge the claim out of which the lien arises.

(g)      (i)      Tenant promptly shall provide Landlord with all documentation and correspondence provided by Tenant to DEP pursuant to the Worker and Community Right to Know Act, N.J.S.A. 34:5A-1 et seq., and all rules, regulations, orders, directives and opinions promulgated thereunder.

(ii)      Tenant promptly shall supply Landlord all reports and notices made by Tenant pursuant to the Hazardous Substance Discharge Reports and Notices Act, N.J.S.A. 13:1K-15, et seq. and all rules, regulations, orders, directives and opinions promulgated thereunder.

(iii)      Tenant promptly shall provide Landlord with a copy of all permits obtained pursuant to any Environmental Law.

(h)      Tenant acknowledges that for Landlord to comply with the requirements of Environmental Laws, Landlord from time to time, may have to enter the Premises.  Landlord and/or its agents shall have an irrevocable license and right to enter the Premises for such purposes.  All such entry by Landlord and/or its agents shall be upon reasonable notice to Tenant.

(i)      Tenant agrees to cooperate with Landlord to provide any information necessary to Landlord in order to effect compliance with any Environmental Law and to execute any reasonable documents requested by Landlord in connection with compliance with any Environmental Law.

(j)      Tenant shall cooperate fully in allowing, from time to time, such examinations, tests, inspections and reviews of the Premises as Landlord, in its reasonable discretion, shall determine to be advisable in order to evaluate any potential environmental problems or Tenant's compliance with Environmental Laws.

(k)      Tenant shall indemnify, defend and hold Landlord harmless from any and all fines, suits, procedures, claims, liabilities, costs and actions of any kind, including reasonable counsel fees (including those incurred to enforce this indemnity or for any other purpose) arising out of or in any way related to (1) any spills or discharges of Hazardous Substances at the Premises and/or Project for which Tenant is responsible pursuant to this Lease or (2) Tenant's failure to comply with the provisions of this Section 27.  Tenant's obligations and liabilities pursuant to this Lease shall continue for so long as Landlord remains responsible or liable under Environmental Laws or otherwise for any spills or discharges of Hazardous Substances and/or for any violations of Environmental Laws which occur during Tenant's possession of the Premises.  Tenant's failure to abide by the terms of this Section shall be enforceable by injunction.

(l)      Notwithstanding anything to the contrary contained in this Lease, Tenant shall not be responsible for complying with any Environmental Law or otherwise be obligated for any expenses or costs in connection with any spill or Release of Hazardous Substances which shall have occurred prior to the Commencement Date of this Lease and not caused by Tenant nor shall Tenant have any liability arising from the existence or disposal of Hazardous Material brought into the Project by anyone other than Tenant and any one claiming by, through or under Tenant.

(m)      In the event Tenant shall fail to comply in full with this Section within ten (10) business days after written notice from Landlord, Landlord, at its option, may perform any and all of Tenant's obligations as aforesaid, and all costs and expenses so incurred by Landlord shall be deemed a claim against Tenant as Additional Rent payable on demand.

(n)      In no event shall Landlord be liable or responsible to Tenant or anyone claiming through or under Tenant for the failure of any other tenant or other person to comply with any Environmental Law and Tenant shall not be excused from the performance of any obligation hereunder due to such failure.

(o)      The provisions of this Section 27 shall survive the expiration or earlier termination of this Lease, regardless of the reason for such termination and compliance with the provisions of this Section 27 may require Tenant to expend funds or perform acts after the expiration or termination of this Lease.  Tenant agrees to expend such funds and/or perform such acts and shall not be excused therefrom notwithstanding any expiration or termination of this Lease, it being agreed and acknowledged that Landlord would not have entered into this Lease but for the provisions of this Section 27.

(p)      Landlord represents and warrants to Tenant that, as of the date of this Lease (i) to the best of Landlord's knowledge and belief, there are no Hazardous Substances on, in, or under the Premises or the Project in violation of any applicable Environmental Law, and (ii) Landlord has not received written notice from any governmental agency that the Project (or any part thereof) is in violation of any applicable Environmental Law.  Landlord shall indemnify, defend and hold harmless Tenant from and against any and all claims, judgments, damages, penalties, fines, costs, liabilities or losses which arise solely as a result of the existence or disposal of Hazardous Material brought into the Project by Landlord, its employees, contractors or agents in violation of any applicable Environmental Laws.  Notwithstanding the foregoing, both parties hereto recognize and acknowledge that the other party or their respective agents may use and store within the Building reasonable quantities of customary office and cleaning supplies; provided such items are stored, used and disposed of in accordance with applicable federal, state or local law.

Tri-Coastal-LEASE-Wharton-FINAL-1-20-10.doc

28.     *Subordination.*

28.1    ***Effect of Subordination.*** This Lease, and any Option (as defined below) granted hereby, upon Landlord's written election, shall be subject and subordinate to any ground lease, mortgage, deed of trust or any other hypothecation or security now or hereafter placed upon the Project and to any and all advances made on the security thereof and to all renewals, modifications, consolidations, replacements and extensions thereof. Notwithstanding such subordination, Tenant's right to quiet possession of the Premises shall not be disturbed if Tenant is not in default beyond any applicable notice and cure period and so long as Tenant shall pay the rent and observe and perform all of the provisions of this Lease, unless this Lease is otherwise terminated pursuant to its terms. At the request of any mortgagee, trustee or ground lessor, Tenant shall attorn to such person or entity. If any mortgagee, trustee or ground lessor shall elect to have this Lease and any Options granted hereby prior to the lien of its mortgage, deed of trust or ground lease, and shall give written notice thereof to Tenant, this Lease and such Options shall be deemed prior to such mortgage, deed of trust or ground lease, whether this Lease or such Options are dated prior or subsequent to the date of said mortgage, deed of trust or ground lease or the date of recording thereof. In the event of the foreclosure of a security device, the new owner shall not (a) be liable for any act or omission of any prior landlord or with respect to events occurring prior to its acquisition of title, (b) be liable for the breach of this Lease by any prior landlord, (c) be subject to any offsets or defenses which Tenant may have against the prior landlord or (d) be liable to Tenant for the return of its security deposit unless actually received by such new owner. As of the date hereof, the Project is not encumbered by any lien of any ground lease, mortgage, deed of trust or any other hypothecation or security. In the event that the Project shall become subject to any lien of any ground lease, mortgage, deed of trust or any other hypothecation or security after the Commencement Date, Landlord shall use commercially reasonable efforts to obtain on Tenant's behalf a subordination, non-disturbance and attornment agreement on such mortgagee's, trustee's or ground lessor's standard form.

28.2    ***Execution of Documents.*** Tenant agrees to execute and acknowledge any documents Landlord reasonably requests Tenant execute to effectuate an attornment, a subordination, or to make this Lease or any Option granted herein prior to the lien of any mortgage, deed of trust or ground lease, as the case may be so long as such document does not increase Tenant's obligations hereunder or decrease Tenant's rights hereunder except to a de minimis extent. Tenant's failure to execute such documents within ten (10) business days after written demand shall constitute a material default by Tenant hereunder.

29.     *Options.*

29.1    ***Definition.*** As used in this Lease, the word "**Option**" has the following meaning: (1) the right or option to extend the Term of this Lease or to renew this Lease, (2) the option or right of first refusal to lease the Premises or the right of first offer to lease the Premises or the right of first refusal to lease other space within the Project or the right of first offer to lease other space within the Project, and (3) the right or option to terminate this Lease prior to its expiration date or to reduce the size of the Premises. Any Option granted to Tenant by Landlord must be evidenced by a written option agreement attached to this Lease as a rider or addendum or said option shall be of no force or effect.

29.2    ***Options Personal.*** Each Option granted to Tenant in this Lease, if any, is personal to the original Tenant and may be exercised only by the original Tenant while occupying the entire Premises and may not be exercised or be assigned, voluntarily or involuntarily, by or to any person or entity other than Tenant, including, without limitation, any permitted transferee as defined in Section 16. The Options, if any, herein granted to Tenant are not assignable separate and apart from this Lease, nor may any Option be separated from this Lease in any manner, either by reservation or otherwise. If at any time an Option is exercisable by Tenant, the Lease has been assigned or a sublease (or subleases in the aggregate) exists as to more than fifty percent (50%) of the Premises, the Option shall be deemed null and void and neither Tenant nor any assignee or subtenant shall have the right to exercise the Option.

29.3    ***Multiple Options.*** In the event that Tenant has multiple Options to extend or renew this Lease, a later Option cannot be exercised unless the prior Option to extend or renew this Lease has been so exercised.

29.4    ***Effect of Default on Options.*** Tenant shall have no right to exercise an Option (i) during the time commencing from the date Landlord gives to Tenant a notice (properly given to Tenant pursuant to the terms of this Lease) of default pursuant to Section 17.1 and continuing until the noncompliance alleged in said notice of default is cured, or (ii) if Tenant is in default of any of the terms, covenants or conditions of this Lease beyond the expiration of any applicable notice and cure period. The period of time within which an Option may be exercised shall not be extended or enlarged by reason of Tenant's inability to exercise an Option because of the provisions of this Section.

29.5    ***Limitations on Options.*** Notwithstanding anything to the contrary contained in any rider or addendum to this Lease, any options, rights of first refusal or rights of first offer granted hereunder shall be subject and secondary to Landlord's right to first offer and lease any such space to any tenant who is then occupying or leasing such space at the time the space becomes available for leasing and shall be subject and subordinated to any other options, rights of first refusal or rights of first offer previously given to any other person or entity.

*See Addendum Paragraphs 7, 8 and 9*

30.     *Landlord Reservations.* Landlord shall have the right: (a) to change the name and address of the Project or Building upon not less than ninety (90) days prior written notice; (b) to permit any tenant the exclusive right to conduct any business as long as such exclusive right does not conflict with any rights expressly given herein; and (c) to place signs, notices or displays upon the roof, interior or exterior of the Building or Common Areas of the Project. Landlord reserves the right to use the exterior walls of the Premises, and the area beneath, adjacent to and above the Premises together with the right to install, use, maintain and replace equipment, machinery, pipes, conduits and wiring through the Premises, which serve other parts of the Project provided that Landlord's use does not unreasonably interfere with Tenant's use of the Premises.

31.     *Changes to Project.* Landlord shall have the right, in Landlord's sole discretion, from time to time, to make changes to the size, shape, location, number and extent of the improvements comprising the Project (hereinafter referred to as "**Changes**") including, but not limited to, the interior and exterior of buildings, the Common Areas, HVAC, electrical systems, communication systems, fire protection and detection systems, plumbing systems, security systems, parking control systems, driveways, entrances, parking spaces, parking areas and landscaped areas so long as such Changes do not have a permanent material adverse effect on Tenant's use and occupancy of the Premises.

21

In connection with the Changes, Landlord may, among other things, erect scaffolding or other necessary structures at the Project, limit or eliminate access to portions of the Project, including portions of the Common Areas, or perform work in the Building, which may create noise, dust or leave debris in the Building. Tenant hereby agrees that such Changes and Landlord's actions in connection with such Changes shall in no way constitute a constructive eviction of Tenant or entitle Tenant to any abatement of rent. Landlord shall have no responsibility or for any reason be liable to Tenant for any direct or indirect injury to or interference with Tenant's business arising from the Changes, nor shall Tenant be entitled to any compensation or damages from Landlord for any inconvenience or annoyance occasioned by such Changes or Landlord's actions in connection with such Changes. Notwithstanding the foregoing, Landlord shall use reasonable efforts to minimize interference with Tenant's use and occupancy of the Premises during Landlord's actions in connection with such Changes.

32.     [Intentionally omitted]

33.     **Holding Over.**  If Tenant remains in possession of the Premises or any part thereof after the expiration or earlier termination of the Term hereof with Landlord's consent, such occupancy shall be a tenancy from month to month upon all the terms and conditions of this Lease pertaining to the obligations of Tenant, except that the Base Rent payable shall be one hundred fifty percent (150%) of the Base Rent payable immediately preceding the termination date of this Lease, and all Options, if any, shall be deemed terminated and be of no further effect. If Tenant remains in possession of the Premises or any part thereof, after the expiration of the Term hereof without Landlord's consent, Tenant shall, at Landlord's option, be treated as a tenant at sufferance or a trespasser. Nothing contained herein shall be construed to constitute Landlord's consent to Tenant holding over at the expiration or earlier termination of the Lease Term or to give Tenant the right to hold over after the expiration or earlier termination of the Lease Term. If Tenant remains in the possession of the Premises or any part thereof for a period of ninety (90) days or more following the expiration or earlier termination of the Term hereof, Tenant hereby agrees to indemnify, hold harmless and defend Landlord from any cost, loss, claim or liability (including attorneys' fees) Landlord may incur as a result of Tenant's failure to surrender possession of the Premises to Landlord upon the termination of this Lease.

34.     **Landlord's Access.**

        34.1     **Access.**  Landlord and Landlord's agents, contractors and employees shall have the right to enter the Premises at reasonable times upon at least twenty-four (24) hours prior notice (except in the case of an emergency in which case no such notice shall be required) for the purpose of inspecting the Premises, performing any services required of Landlord, showing the Premises to prospective purchasers, lenders or tenants, undertaking safety measures and making alterations, repairs, improvements or additions to the Premises or to the Project. In the event of an emergency, Landlord may gain access to the Premises by any reasonable means, and Landlord shall not be liable to Tenant for damage to the Premises or to Tenant's property resulting from such access. Landlord may at any time place on or about the Building "for sale" or "for lease" signs and Landlord may at any time during the last one hundred twenty (120) days of the Term hereof place on or about the Premises "for lease" signs. Tenant shall have the right to have any employee, agent or contractor of Landlord accompanied by a Tenant escort during any such entry. In the event of an emergency involving the immediate threat of material injury to person or substantial damage to property, however, Landlord may enter the Premises without prior notice to Tenant and without a Tenant escort. For non-emergency access by Landlord, Tenant agrees to provide Landlord with access to the Premises, accompanied by a Tenant escort, at reasonable times upon twenty-four (24) hours prior notice.

        34.2     **Keys.**  Landlord shall have the right to retain keys to the locks on the entry doors to the Premises and all interior doors at the Premises.

35.     **Security Measures.**  Tenant hereby acknowledges that Landlord shall have no obligation whatsoever to provide guard service or other security measures for the benefit of the Premises or the Project, and Landlord shall have no liability to Tenant due to its failure to provide such services. Tenant assumes all responsibility for the protection of Tenant, its agents, employees, contractors and invitees and the property of Tenant and of Tenant's agents, employees, contractors and invitees from acts of third parties. Nothing herein contained shall prevent Landlord, at Landlord's sole option, from implementing security measures for the Project or any part thereof, in which event Tenant shall participate in such security measures and the cost thereof shall be included within the definition of Operating Expenses, and Landlord shall have no liability to Tenant and its agents, employees, contractors and invitees arising out of Landlord's negligent provision of security measures. Landlord shall have the right, but not the obligation, to require all persons entering or leaving the Project to identify themselves to a security guard and to reasonably establish that such person should be permitted access to the Project.

36.     **Easements.**  Landlord reserves to itself the right, from time to time, to grant such easements, rights and dedications that Landlord deems necessary or desirable, and to cause the recordation of parcel maps and restrictions, so long as such easements, rights, dedications, maps and restrictions do not unreasonably interfere with the use of the Premises by Tenant. Tenant shall sign any of the aforementioned reasonable documents within ten (10) business days after Landlord's request, and Tenant's failure to do so shall constitute a material default by Tenant. The obstruction of Tenant's view, air or light by any structure erected in the vicinity of the Project, whether by Landlord or third parties, shall in no way affect this Lease or impose any liability upon Landlord.

37.     **Transportation Management.**  Tenant shall fully comply at its sole expense with all present or future programs implemented or required by any governmental or quasi-governmental entity or Landlord to manage parking, transportation, air pollution or traffic in and around the Project or the metropolitan area in which the Project is located.

38.     **Severability.**  The invalidity of any provision of this Lease as determined by a court of competent jurisdiction shall in no way affect the validity of any other provision hereof.

39.     **Time of Essence.**  Time is of the essence with respect to each of the obligations to be performed by Tenant and Landlord under this Lease.

40.     **Definition of Additional Rent.**  All monetary obligations of Tenant to Landlord under the terms of this Lease, including, but not limited to, Base Rent, Tenant's Percentage Share of Operating Expenses, Tenant's Percentage Share of Real Property Taxes and late charges shall be deemed to be rent.

41.     **Incorporation of Prior Agreements.**  This Lease and the attachments listed in Section 1.17 contain all agreements of the parties with respect to the lease of the Premises and any other matter mentioned herein. No prior or contemporaneous agreement or understanding pertaining to any such matter shall be effective. Except as

22

otherwise stated in this Lease, Tenant hereby acknowledges that no real estate broker nor Landlord nor any employee or agents of any of said persons has made any oral or written warranties or representations to Tenant concerning the condition or use by Tenant of the Premises or the Project or concerning any other matter addressed by this Lease.

42.     **Amendments.**  This Lease may be modified in writing only, signed by the parties in interest at the time of modification.

43.     **Notices.**  All notices required or permitted by this Lease shall be in writing and may be delivered (a) in person (by hand, by messenger or by courier service), (b) by U.S. Postal Service regular mail, (c) by U.S. Postal Service certified mail, return receipt requested, (d) by U.S. Postal Service Express Mail, Federal Express or other overnight courier, or (e) by facsimile transmission, and shall be deemed sufficiently given if served in a manner specified in this Section. Any notice permitted or required hereunder, and any notice to pay rent or quit or similar notice, shall be deemed personally delivered to Tenant on the date the notice is personally delivered to any employee of Tenant at the Premises. The addresses set forth in Section 1.18 of this Lease shall be the address of each party for notice purposes. Landlord or Tenant may by written notice to the other specify a different address for notice purposes, except that upon Tenant's taking possession of the Premises, the Premises shall constitute Tenant's address for the purpose of mailing or delivering notices to Tenant. A copy of all notices required or permitted to be given to Landlord hereunder shall be concurrently transmitted to such party or parties at such addresses as Landlord may from time to time hereinafter designate by written notice to Tenant. Any notice sent by regular mail or by certified mail, return receipt requested, shall be deemed given three (3) days after deposited with the U.S. Postal Service. Notices delivered by U.S. Express Mail, Federal Express or other courier shall be deemed given on the date delivered by the carrier to the appropriate party's address for notice purposes. If any notice is transmitted by facsimile transmission, the notice shall be deemed delivered upon telephone confirmation of receipt of the transmission thereof at the appropriate party's address for notice purposes. A copy of all notices delivered to a party by facsimile transmission shall also be mailed to the party on the date the facsimile transmission is completed. If notice is received on Saturday, Sunday or a legal holiday, it shall be deemed received on the next business day. Nothing contained herein shall be construed to limit Landlord's right to serve any notice to pay rent or quit or similar notice by any method permitted by applicable law, and any such notice shall be effective if served in accordance with any method permitted by applicable law whether or not the requirements of this Section have been met.

44.     **Waivers.**  No waiver by Landlord or Tenant of any provision hereof shall be deemed a waiver of any other provision hereof or of any subsequent breach by Landlord or Tenant of the same or any other provision. Landlord's consent to, or approval of, any act shall not be deemed to render unnecessary the obtaining of Landlord's consent to or approval of any subsequent act by Tenant. The acceptance of rent hereunder by Landlord shall not be a waiver of any preceding breach by Tenant of any provision hereof, other than the failure of Tenant to pay the particular rent so accepted, regardless of Landlord's knowledge of such preceding breach at the time of acceptance of such rent. No acceptance by Landlord of partial payment of any sum due from Tenant shall be deemed a waiver by Landlord of its right to receive the full amount due, nor shall any endorsement or statement on any check or accompanying letter from Tenant be deemed an accord and satisfaction. Tenant hereby waives the protection of any statute which allows tenants to obtain relief from the forfeiture of a lease. Tenant hereby waives for Tenant and all those claiming under Tenant all rights now or hereafter existing to redeem by order or judgment of any court or by legal process or writ Tenant's right of occupancy of the Premises after any termination of this Lease.

45.     **Covenants.**  This Lease shall be construed as though Landlord's covenants contained herein are independent and not dependent and Tenant hereby waives the benefit of any statute to the contrary. All provisions of this Lease to be observed or performed by Tenant are both covenants and conditions.

46.     **Binding Effect; Choice of Law.**  Subject to any provision hereof restricting assignment or subletting by Tenant, this Lease shall bind the parties, their heirs, personal representatives, successors and assigns. This Lease shall be governed by the laws of the state in which the Project is located, and any litigation concerning this Lease between the parties hereto shall be initiated in the county in which the Project is located.

47.     **Attorneys' Fees.**  If Landlord or Tenant brings an action to enforce the terms hereof or declare rights hereunder, the prevailing party in any such action, or appeal thereon, shall be entitled to its reasonable attorneys' fees and court costs to be paid by the losing party as fixed by the court in the same or separate suit, and whether or not such action is pursued to decision or judgment. The attorneys' fee award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees and court costs reasonably incurred in good faith. Landlord shall be entitled to reasonable attorneys' fees and all other costs and expenses incurred in the preparation and service of notices of default and consultations in connection therewith, whether or not a legal action is subsequently commenced in connection with such default. Landlord and Tenant agree that attorneys' fees incurred with respect to defaults and bankruptcy are actual pecuniary losses within the meaning of Section 365(b)(1)(B) of the Bankruptcy Code or any successor statute. Notwithstanding the foregoing to the contrary, in the event legal action or other judicial proceeding is brought, the defending party shall have the right to make an offer of judgment to the plaintiff or claimant (or counter-plaintiff or counter-claimant). If an offer of judgment is made and not accepted, if the judgment that the offeree finally obtains is not more favorable than the unaccepted offer, the offeree must pay the costs (as applied in Rule 68(d) of the Federal Rules of Civil Procedure) by the offerer incurred after the offer was made.

48.     **Auctions.**  Tenant shall not conduct, nor permit to be conducted, either voluntarily or involuntarily, any auction or going-out-of-business sale upon the Premises or the Common Areas.

49.     **Merger.**  The voluntary or other surrender of this Lease by Tenant, or a mutual cancellation thereof, or a termination by Landlord, shall not result in the merger of Landlord's and Tenant's estates and shall, at the option of Landlord, terminate all or any existing subtenancies or may, at the option of Landlord, operate as an assignment to Landlord of any or all of such subtenancies.

50.     **Quiet Possession.**  Subject to the other terms and conditions of this Lease, and provided Tenant is not in default beyond any applicable notice and cure period hereunder, Tenant shall have quiet possession of the Premises for the entire Term hereof.

51.     **Authority.**  If Tenant is a corporation, trust, limited liability company, limited liability partnership or general or limited partnership, Tenant, and each individual executing this Lease on behalf of such entity, represents and warrants that such individual is duly authorized to execute and deliver this Lease on behalf of said entity, that said entity is duly authorized to enter into this Lease, and that this Lease is enforceable against said entity in accordance with its terms.

23

If Tenant is a corporation, trust, limited liability company, limited liability partnership or other partnership, Tenant shall deliver to Landlord upon demand evidence of such authority reasonably satisfactory to Landlord. Landlord hereby warrants and represents that (i) it is the fee simple owner of the Project, (ii) it has taken all action necessary to authorize the execution and performance of this Lease, and (iii) the person(s) executing this Lease on behalf of the Landlord are all of the persons required to execute this Lease in order to bind the Landlord.

52.     **Conflict.**  Except as otherwise provided herein to the contrary, any conflict between the printed provisions, exhibits, addenda or riders of this Lease and the typewritten or handwritten provisions, if any, shall be controlled by the typewritten or handwritten provisions.

53.     **Multiple Parties.**  If more than one person or entity is named as Tenant herein, the obligations of Tenant shall be the joint and several responsibility of all persons or entities named herein as Tenant.  Service of a notice in accordance with Section 43 on one Tenant shall be deemed service of notice on all Tenants.

54.     **Interpretation.**  This Lease shall be interpreted as if it was prepared by both parties, and ambiguities shall not be resolved in favor of Tenant because all or a portion of this Lease was prepared by Landlord.  The captions contained in this Lease are for convenience only and shall not be deemed to limit or alter the meaning of this Lease.  As used in this Lease, the words tenant and landlord include the plural as well as the singular.  Words used in the neuter gender include the masculine and feminine gender.  Notwithstanding anything to the contrary contained in this Lease, if the Term of the Lease has not commenced within twenty-one (21) years after the date of this Lease, this Lease shall automatically terminate on the twenty-first (21st) anniversary of such date.  The sole purpose of this provision is to avoid any interpretation of this Lease as a violation of the Rule Against Perpetuities, or any other rule of law or equity concerning restraints on alienation.

55.     **Prohibition Against Recording.**  Neither this Lease, nor any memorandum, affidavit or other writing with respect thereto, shall be recorded by Tenant or by anyone acting through, under or on behalf of Tenant.  Landlord shall have the right to record a memorandum of this Lease, and Tenant shall execute, acknowledge and deliver to Landlord for recording any memorandum reasonably prepared by Landlord.

56.     **Relationship of Parties.**  Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third party to create the relationship of principal and agent, partnership, joint venturer or any association between Landlord and Tenant.

57.     [Intentionally omitted]

58.     **Rules and Regulations.** Tenant agrees to abide by and conform to the Rules and to cause its employees, suppliers, customers and invitees to so abide and conform.  Landlord shall have the right, from time to time, to modify, amend and enforce the Rules in a nondiscriminatory manner.  Landlord shall not be responsible to Tenant for the failure of other persons, including, but not limited to, other tenants, their agents, employees and invitees, to comply with the Rules.

59.     **Right to Lease.**  Landlord reserves the absolute right to effect such other tenancies in the Project as Landlord in its sole discretion shall determine, and Tenant is not relying on any representation that any specific tenant or number of tenants will occupy the Project.

60.     [Intentionally omitted]

61.     **OFAC Certification.**

61.1.   Tenant certifies that:  (i) it is not acting, directly or indirectly, for or on behalf of any person, group, entity, or nation named by any Executive Order or the United States Treasury Department as a terrorist, "Specially Designated National and Blocked Person," or other banned or blocked person, entity, nation, or transaction pursuant to any law, order, rule, or regulation that is enforced or administered by the Office of Foreign Assets Control; and (ii) it is not engaged in this transaction, directly or indirectly on behalf of, or instigating or facilitating this transaction, directly or indirectly on behalf of, any such person, group, entity, or nation.

61.2.   Tenant hereby agrees to defend, indemnify, and hold harmless Landlord from and against any and all claims, damages, losses, risks, liabilities, and expenses (including reasonable attorney's fees and costs) arising from or related to any breach of the foregoing certification.

62.     **WAIVER OF JURY TRIAL.**  LANDLORD AND TENANT HEREBY WAIVE THEIR RESPECTIVE RIGHT TO TRIAL BY JURY OF ANY CAUSE OF ACTION, CLAIM, COUNTERCLAIM OR CROSS-COMPLAINT IN ANY ACTION, PROCEEDING AND/OR HEARING BROUGHT BY EITHER LANDLORD AGAINST TENANT OR TENANT AGAINST LANDLORD ON ANY MATTER WHATSOEVER ARISING OUT OF, OR IN ANY WAY CONNECTED WITH, THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, TENANT'S USE OR OCCUPANCY OF THE PREMISES, OR ANY CLAIM OF INJURY OR DAMAGE, OR THE ENFORCEMENT OF ANY REMEDY UNDER ANY LAW, STATUTE, OR REGULATION, EMERGENCY OR OTHERWISE, NOW OR HEREAFTER IN EFFECT.

*See Addendum Paragraph 10*

[SIGNATURES APPEAR ON NEXT PAGE]

24

LANDLORD AND TENANT ACKNOWLEDGE THAT THEY HAVE CAREFULLY READ AND REVIEWED THIS LEASE AND EACH TERM AND PROVISION CONTAINED HEREIN AND, BY EXECUTION OF THIS LEASE, SHOW THEIR INFORMED AND VOLUNTARY CONSENT THERETO. THE PARTIES HEREBY AGREE THAT, AT THE TIME THIS LEASE IS EXECUTED, THE TERMS OF THIS LEASE ARE COMMERCIALLY REASONABLE AND EFFECTUATE THE INTENT AND PURPOSE OF LANDLORD AND TENANT WITH RESPECT TO THE PREMISES. TENANT ACKNOWLEDGES THAT IT HAS BEEN GIVEN THE OPPORTUNITY TO HAVE THIS LEASE REVIEWED BY ITS LEGAL COUNSEL PRIOR TO ITS EXECUTION. PREPARATION OF THIS LEASE BY LANDLORD OR LANDLORD'S AGENT AND SUBMISSION OF SAME TO TENANT SHALL NOT BE DEEMED AN OFFER BY LANDLORD TO LEASE THE PREMISES TO TENANT OR THE GRANT OF AN OPTION TO TENANT TO LEASE THE PREMISES. THIS LEASE SHALL BECOME BINDING UPON LANDLORD ONLY WHEN FULLY EXECUTED BY BOTH PARTIES AND WHEN LANDLORD HAS DELIVERED A FULLY EXECUTED ORIGINAL OF THIS LEASE TO TENANT.

LANDLORD

**THE REALTY ASSOCIATES FUND VIII, L.P.,**
a Delaware limited partnership

By:   Realty Associates Fund VIII LLC, a
      Massachusetts limited liability company,
      general partner

      By:   Realty Associates Advisors LLC, a
            Delaware limited liability company,
            Manager

            By:   Realty Associates Advisors Trusts, a
                  Massachusetts business trust,
                  Manager

                  By:   _____
                              Officer

                        James P. Knowles
                        Regional Director

TENANT

**TRI-COASTAL DESIGN SERVICES, LLC,**
a New Jersey limited liability company

By:   _____

      Dennis Mastrangelo
                  (Print Name)

Its:  Chief Operating Officer
                  (Print Title)

25

Tri-Coastal-LEASE-Wharton-FINAL-1-20-10.doc

Addendum

**Addendum to Standard Industrial Lease (the "Lease")
dated January 19, 2010 between
THE REALTY ASSOCIATES FUND VIII, L.P. ("Landlord") and
TRI-COASTAL DESIGN SERVICES, LLC ("Tenant")**

It is hereby agreed by Landlord and Tenant that the provisions of this Addendum are a part of the Lease. If there is a conflict between the terms and conditions of this Addendum and the terms and conditions of the Lease, the terms and conditions of this Addendum shall control. Capitalized terms in this Addendum shall have the same meaning as capitalized terms in the Lease, and, if a Work Letter Agreement is attached to this Lease, as those terms have been defined in the Work Letter Agreement.

1.  **As-Is Condition; Undemised Space; Tenant Improvements.**

a.  Subject to Paragraph 4 hereinbelow, Tenant hereby agrees to accept the Premises in its "as-is, where-is" condition existing on the date hereof, subject to Landlord's repair and maintenance obligations, if any, set forth in Section 11 of this Lease and subject to Paragraph 4 below.

b.  The Premises is currently part of a larger space which is not currently separately demised. The portion of such space which does not constitute the Premises consisting of approximately Seventy-Seven Thousand Forty-Three (77,043) rentable square feet shall be known herein as the "Remaining Space". Tenant hereby acknowledges that Landlord and its agents and employees shall have the right to enter the Remaining Space at any time in order to market the Remaining Space to third parties. Subject to Paragraphs 7 and 8 below, Landlord shall have the right at any time during the Term hereof, at Landlord's sole cost and expense, to cause the Premises to be separately demised from the Remaining Space, including the separation of utilities (the "Demising Work"). Prior to (i) Landlord's performance of the Demising Work, including pursuant to Tenant's exercise of its Option to expand set forth in Paragraphs 7 and 8 below, or (ii) the date on which Landlord has executed a lease with Tenant or a third party for the Remaining Space, whichever is earlier, Tenant may use all or any portion of the Remaining Space without charge but Tenant shall be required to pay utilities and provide insurance required under this Lease for the Premises for the Remaining Space. Tenant hereby acknowledges that the Demising Work shall be performed while Tenant is in occupancy of the Premises, and Landlord's actions in connection with the Demising Work or entry to the Remaining Space for the purposes of showing the Remaining Space to prospective tenants shall in no way constitute a constructive eviction of Tenant or entitle Tenant to any abatement of rent or subject Landlord to any liability for any injury or interference with Tenant's business. Following the completion of the Demising Work, Landlord shall not permit any third party access through the Premises to the Remaining Spaces.

c.  Tenant shall construct tenant improvements (the "Improvements") for the Premises in accordance with the Work Letter Agreement attached hereto as Schedule 1. In connection with the construction of the Improvements, Landlord hereby grants to Tenant an allowance in the amount of Two Hundred Seventy-Five Thousand and 00/100 Dollars ($275,000.00) (the "Improvement Allowance") to be used (i) for the items specified in the Cost Breakdown (defined in Schedule 1), and/or (ii) the Rent Credit (defined in the Work Letter Agreement).

2.  **Security Deposit Letter of Credit.** Section 7 of the Lease is hereby amended by adding the following at the end of Section 7:

a.  The Security Deposit shall be in the form of an irrevocable, unconditional letter of credit (the "Security Deposit L/C") in the amount set forth in Section 1.14, as security for Tenant's full and faithful performance of Tenant's obligations hereunder. The Security Deposit L/C shall be delivered to Landlord and maintained at Tenant's sole cost and expense. The Security Deposit L/C shall be issued by and drawn on a bank reasonably acceptable to Landlord, in Landlord's reasonable discretion, and shall name Landlord as Beneficiary. The Security Deposit L/C shall be substantially in the form attached hereto as Exhibit D. If the maturity date of the Security Deposit L/C is prior to the one hundred twentieth (120th) day following the end of the Term of the Lease, Tenant shall renew the Security Deposit L/C as often as is necessary with the same bank or financial institution (or a similar bank or financial institution reasonably acceptable to Landlord) and upon the same terms and conditions, not less than thirty (30) days prior to the purported expiration date of the Security Deposit L/C in order that the Security Deposit L/C shall not expire prior to that day which is one hundred twenty (120) days following the expiration of the Term. In the event that Tenant fails to timely renew the Security Deposit L/C as aforesaid, Landlord shall be entitled to draw against the entire amount of the Security Deposit L/C. The Security Deposit L/C shall be assignable by Landlord and upon such assignment to any party assuming in writing the lessor interest in this Lease, Landlord shall be relieved from all liability to Tenant therefor.

b.  Upon the occurrence of any default by Tenant in the payment of Base Rent or upon the occurrence of the events described in Section 17.1 of the Lease that continue beyond the expiration of any applicable notice and cure period set forth therein or in the event that Landlord terminates this Lease in accordance with the terms hereof following a default by Tenant that continues beyond the expiration of any applicable notice and cure period set forth therein, Landlord shall have the right to draw the entire amount of the Security Deposit L/C. Landlord agrees to copy Tenant on any notice to the issuing bank requesting a draw against the Security Deposit L/C. In the event that Tenant defaults in making any money payment required to be made by Tenant under the terms of this Lease other than the payment of Base Rent, then Landlord shall be entitled to draw upon so much of the Security Deposit L/C as equals the defaulted payment(s), plus any interest or other charges due thereon in accordance with this Lease. If Landlord elects to make a partial draw upon the Security Deposit L/C, Tenant shall promptly restore the Security Deposit L/C to its original amount within ten (10) business days after written demand therefor. Landlord's election to make a partial draw upon the Security Deposit L/C shall in no event prejudice or waive Landlord's right to terminate this Lease if permitted under applicable provisions of this Lease, nor shall such election prejudice or waive any

Add-1

other remedy of Landlord reserved under the terms of this Lease, including the right to draw the entire amount of the Security Deposit L/C, if applicable. The Security Deposit L/C shall be available for payment against the presentation of a sight draft by the Landlord together with a certificate from Landlord that Tenant is in default of its obligations hereunder beyond expiration of any applicable notice and cure periods and that Landlord is entitled, by the terms of this Lease, to draw upon the Security Deposit L/C. The proceeds of the Security Deposit L/C, if drawn by Landlord pursuant to the terms hereof, shall be held by Landlord in accordance with the provisions of Section 7 of the Lease and applied to reduce any amount owed by Tenant to Landlord. No interest shall be payable for any Security Deposit L/C proceeds held on account.

c.  In the event that (1) Landlord draws the full amount of the Security Deposit L/C as a result of a default by Tenant that continues beyond the expiration of any applicable notice and cure period set forth therein, (2) this Lease is not terminated by Landlord as a result of such default, (3) such default is fully cured by Tenant, and (4) there is no outstanding uncured default by Tenant, then the balance of the sums drawn (after the payment of any sums related to the curing of any defaults) shall be applied first to obtain a replacement letter of credit as security for Tenant's performance hereunder, and the remaining balance, if any, will be refunded to Tenant. Upon the termination of this Lease and the payment in full to Landlord of all damages, costs and expenses to which Landlord is entitled, the balance of any funds drawn from the Security Deposit L/C after satisfying such obligations in full shall be refunded to Tenant.

d.  To the extent that the Security Deposit L/C is either lost or the issuing bank will not honor the Security Deposit L/C, Tenant guarantees the proceeds of the Security Deposit L/C and will immediately remit to Landlord the amount of the Security Deposit in cash to be held in accordance with this Section 7 of the Lease.

3.  **Landlord Granted Tax Reduction.**  Landlord is currently in the process of applying for a reduction (the "2007 Reduction") to Real Property Taxes due with respect to the Project for the tax fiscal year 2007. Notwithstanding anything to the contrary contained in Section 9 of the Lease, during the Term hereof, subject to the last sentence of this Paragraph 3, Tenant's Percentage Share of Real Property Taxes shall be reduced by eighteen cents (18¢) per rentable square foot of space in the Premises of the actual amount of Real Property Taxes payable by Landlord for the Project (the "Landlord Granted Tax Reduction"). The estimated monthly Operating Expense and Real Property Tax payment set forth in Section 1.11 above reflects the Landlord Granted Tax Reduction. Tenant hereby agrees that Tenant shall not be entitled to any further adjustments to estimated payments of the Real Property Taxes actually paid by Tenant in the event that the 2007 Reduction is greater than eighteen cents (18¢) per rentable square foot of space in the Premises for any time period for which Tenant has actually made estimated payments of Tenant's Percentage Share of Real Property Taxes based on the Landlord Granted Tax Reduction. Once the 2007 Reduction is in place or there is a final determination by the taxing authority that the 2007 Reduction shall not be granted, thereafter Tenant shall no longer be entitled to the Landlord Granted Tax Reduction and Tenant shall be obligated to pay Tenant's Percentage Share of Real Property Taxes actually payable by Landlord for the Project and this provision shall be of no further force and effect.

4.  **Systems Warranty; Capital Replacements.**

a.  All mechanical (including the HVAC system), plumbing, and electrical systems serving the Premises shall be in good working order as of the Commencement Date (the "Building Systems"). Tenant shall be obligated to maintain the HVAC Maintenance Contract and any other maintenance contract required to be maintain by Tenant for the Building Systems pursuant to Section 12 of the Lease. Notwithstanding anything to the contrary set forth in Section 12 of the Lease, Landlord hereby agrees that, during the first twelve (12) consecutive months of the initial Term of the Lease (the "Warranty Period"), Landlord shall be responsible for the cost of any necessary repair or replacement of the Building Systems (including any major components thereof), provided (i) Tenant has entered into and maintains the HVAC Maintenance Contract and any other maintenance contracts required to be maintained by Tenant pursuant to this Lease, and (ii) the need for such repair or replacement is not the result of the negligence or willful misconduct of Tenant, its employees, agents, contractors or invitees. If, during the Warranty Period, the need for such a replacement to the Building Systems is the result of the negligence or willful misconduct of Tenant, its employees, agents, contractors or invitees, then the entire cost of such repair or replacement shall be borne by Tenant, notwithstanding anything to the contrary contained herein. The provisions of this Paragraph shall apply only to the existing Building Systems serving or within the Premises as of the date hereof and shall not apply to any replacement equipment, supplemental HVAC systems or any additional HVAC equipment installed at the Premises following the Commencement Date.

b.  Following the expiration of the Warranty Period, notwithstanding anything to the contrary contained in Section 12.1, if, during the Term of the Lease, a Building System requires replacement and such replacement is capital in nature (i.e., the cost is not fully deductible in the year incurred in accordance with generally accepted accounting principles ("GAAP")), then, so long as such replacement was not necessitated by the negligent or willful act or omission of Tenant (in which case Tenant shall be responsible for payment of the full amount thereof), Landlord shall replace such Building System and the cost incurred by Landlord in connection with such replacement shall be amortized over the useful economic life of said equipment  as determined in accordance with GAAP, together with an interest factor on the unamortized cost of such item equal to eight percent (8%) per annum, and Tenant shall be responsible for the payment of the annual amortized portion during the Term of the Lease, as the same may be extended.

5.  **Roof.** In accordance with Section 11 of the Lease, the cost of any non-structural repairs or maintenance made by Landlord to the roof to the Building (hereinafter "Non-Structural Roof Repairs") during the Term of the Lease shall be considered an Operating Expense and shall be reimbursed by Tenant in accordance with Section 6 of the Lease, unless the need for such repair is due to the negligence or willful misconduct of Tenant or any Tenant Party, in which case the entire cost of any such repair shall be borne solely by Tenant. Notwithstanding anything to the contrary set forth in Section 11 of the Lease, Landlord hereby agrees that for any calendar year during the Roof Repair Warranty Period (defined hereinafter), to the extent that any Non-Structural Roof Repairs (i) are not a result of the negligence or willful misconduct of Tenant, (ii) are not covered by a warranty, and (iii) exceed Seven Thousand Five Hundred Dollars

Add-2

($7,500.00) per calendar year (the "Non-Structural Roof Repair Cap"), Landlord shall be responsible for any amounts in excess of the Non-Structural Roof Repair Cap for such calendar year and no such excess amounts shall be included in Operating Expenses. For clarification purposes, in the event any Non-Structural Roof Repairs incurred in any calendar year exceeds the Non-Structural Roof Repair Cap, the amounts in excess of the Non-Structural Roof Repair Cap that Landlord was unable to pass through to Tenant during such calendar year, if any, shall not be passed through to Tenant in any subsequent calendar years during the Term. If the need for any repair or replacement during any such calendar year of the Roof Repair Warranty Period is the result of the negligence or willful misconduct of Tenant or any Tenant Party, then the cost for such repair or replacement shall be borne solely by Tenant and such cost shall not be included in the Non-Structural Roof Repair Cap for such calendar year. The "Roof Repair Warranty Period" shall mean that period commencing on the Commencement Date and ending upon the completion of a replacement of the roof by Landlord. From and after the expiration of the Roof Repair Warranty Period, this Paragraph 5 shall be of no further force and effect.

6. **Sign.** Subject to all applicable laws and subject to Landlord's prior written approval and otherwise subject to the other terms and conditions of this Lease, Tenant, at Tenant's sole cost and expense, shall have the right to place its signage in the location of the existing sign for the current tenant for the Premises. After the installation of any such sign, Tenant shall be responsible at Tenant's sole cost and expense for maintaining such sign in good condition and repair and removing any such signage at the expiration or earlier termination of the Lease and repairing and restoring the exterior of the Building in connection with such removal.

7. **Expansion Option.** Subject to the provisions of Section 29 of the Lease, and provided that Tenant is not in default beyond the expiration of any applicable notice and cure period at the time of Tenant's exercise of the Option, at any time prior to the date on which Landlord has receives a bona fide third party offer for all or any portion of the Remaining Space which includes the Expansion Space (defined hereinafter), Tenant shall have the one-time Option to expand into a portion of the Remaining Space consisting of approximately Twenty Thousand (20,000) rentable square feet of contiguous space and shown on Exhibit A-1 attached hereto (the "Expansion Space") following written notice to Landlord. Such notice shall be given in accordance with Section 43 of the Lease. If notification of the exercise of this Option is not so given and received prior to the date of Landlord's notice to Tenant pursuant to Paragraph 8 below that Landlord has received a bona fide third-party offer for all or any portion of the Remaining Space which includes the Expansion Space, Tenant shall have no further Option to expand into the Expansion Space pursuant to this Paragraph 7. Landlord shall notify Tenant within twenty (20) days following Tenant's exercise of the Option when Landlord shall deliver the Expansion Space to Tenant. Notwithstanding anything to the contrary hereinabove, Landlord shall have one hundred eighty (180) days from receipt of Tenant's written notice exercising the aforementioned Option to deliver the Expansion Space to Tenant. The Base Rent payable for the Expansion Space shall be at the same Base Rent rate in effect for the Premises at the time of the effective date of Tenant's lease of the Expansion Space and shall escalate at the same time and at the same rates as Base Rent for the Premises, and all other terms and conditions of the Lease applicable to the Premises shall be applicable to the Expansion Space, including without limitation, the Landlord Granted Tax Reduction, except Tenant shall not be entitled to any additional Improvement Allowance. Tenant agrees to accept the Expansion Premises in its "as-is" condition existing on such date except that Landlord shall separately demise the Expansion Space from the remaining portion of the Remaining Space. All other terms and conditions of the Lease shall remain the same. Upon determination of the date on which Landlord shall deliver the Expansion Premises, the parties shall promptly execute an amendment to the Lease incorporating the provisions of this Paragraph.

8. **Right of First Refusal.** Subject to the provisions of Section 29 of the Lease, including without limitation Landlord's right to first offer and lease any such space to any tenant who is then occupying or leasing such space at the time the space becomes available for leasing, and subject to all other options held by tenants of the Building and provided Tenant is not in default under the Lease beyond the expiration of any applicable notice and cure period at the time it exercises this Option or at the commencement of the term with respect to the Option Space, Tenant shall have the right of first refusal to lease all or any smaller portion of the Remaining Space (referred to herein as the "Option Space"). Prior to entering into a lease for any of the Option Space, Landlord shall give Tenant written notice of all the terms and conditions of a bona fide third-party offer ("Offered Terms") Landlord has received for the Option Space. Tenant may exercise such right only as to all of the Option Space and all of the Offered Terms described in the Landlord's notice, and not to merely a part of such Option Space or such Offered Terms. Tenant shall have five (5) business days in which to elect to lease the Option Space, time being of the essence. Such notice shall be given in accordance with Section 43 of the Lease. If Tenant does not give Landlord written notice of its election to lease such Option Space within the five (5) business day period, Landlord shall thereafter be free to lease such Option Space to any third-party on any terms and conditions that Landlord shall select, with no further obligation to Tenant. In the event that Landlord offers any space to Tenant pursuant to this right of first refusal, and Tenant elects not to lease the space, the space so offered shall no longer be subject to this right of first refusal, and thereafter Landlord shall not be obligated to offer said space to Tenant, until such space once again becomes available for leasing following the expiration of a third-party lease. In the event Tenant exercises the Option pursuant to this provision, then, the parties shall promptly execute an amendment to this Lease incorporating the Offered Terms. Tenant's Option to expand set forth in Paragraph 7 above shall automatically expire upon the date of Landlord's notice to Tenant of the Offered Terms.

9. **Options to Renew.**

a. Subject to the provisions of Section 29 of the Lease, and provided that Tenant has not been in default under the Lease beyond any applicable notice and cure period during either the twelve (12) month period immediately preceding Tenant's exercise of the Option or the commencement of the extended term, Tenant shall have two (2) five (5) year Options to renew this Lease. Tenant shall provide to Landlord on a date which is prior to the date that the applicable Option period would commence (if exercised) by at least two hundred seventy (270) days and not more than three hundred sixty-five (365) days, a written notice of the exercise of the Option to extend the Lease for the additional Option term, time being of the essence. Such notice shall be given in accordance with Section 43 of the Lease. If notification of the exercise of the Option is not so given and received, all Options granted hereunder shall automatically expire. Base Rent applicable to the Premises for each Option Term (the "Option Rent") shall be equal to

Add-3

Fair Market Rental (as hereinafter defined). All other terms and conditions of the Lease shall remain the same, except that (i) following Tenant's proper exercise of the first Option to renew, Tenant shall have only one (1) Option to renew remaining, and following Tenant's proper exercise of the second Option to renew, Tenant shall have no further Option to renew this Lease pursuant to this Paragraph, and (ii) Landlord shall not be required to provide any tenant improvements, the Improvement Allowance, the Roof Warranty or a warranty for the Building Systems described in Paragraph 4 hereinabove.

        b.      If the Tenant exercises the Option, the Landlord shall determine the Option Rent for the Option term by using its good faith judgment. Landlord shall provide Tenant with written notice of such amount within fifteen (15) business days after Tenant exercises its Option. Tenant shall have fifteen (15) days ("Tenant's Review Period") after receipt of Landlord's notice of the new base rent within which to accept such rental. In the event Tenant fails to accept in writing such rental proposal by Landlord, then such proposal shall be deemed rejected and Landlord and Tenant shall attempt to agree upon such Option Rent, using their best good faith efforts. If Landlord and Tenant fail to reach agreement within fifteen (15) business days following Tenant's Review Period ("Outside Agreement Date") then the parties shall each within ten (10) business days following the Outside Agreement Date appoint a real estate broker who shall be licensed in the State of New Jersey and who specializes in the field of commercial office space leasing in the Borough of Wharton, New Jersey market, has at least ten (10) years of experience and is recognized within the field as being reputable and ethical. If one party does not timely appoint a broker, then the broker appointed by the other party shall promptly appoint a broker for such party. Such two individuals shall each determine within ten (10) business days after their appointment such base rent. If such individuals do not agree on Fair Market Rental, then the two individuals shall, within five (5) business days, render separate written reports of their determinations and together appoint a third similarly qualified individual having the qualifications described above. If the two brokers are unable to agree upon a third broker, the third broker shall be appointed by the President of the Morris County Board of Realtors. In the event the Morris County Board of Realtors is no longer in existence, the third broker shall be appointed by the President of its successor organization. If no successor organization is in existence, the third broker shall be appointed by the Assignment Judge of the Superior Court of Morris County, New Jersey. The third individual shall within ten (10) business days after his or her appointment make a determination of such Fair Market Rental. The third individual shall determine which of the determinations of the first two individuals is closest to his own and the determination that is closest shall be final and binding upon the parties, and such determination may be enforced in any court of competent jurisdiction. Landlord and Tenant shall each bear the cost of its broker and shall share equally the cost of the third broker. Upon determination of the Option Rent payable pursuant to this Paragraph, the parties shall promptly execute an amendment to this Lease stating the rent so determined.

        c.      The term "Fair Market Rental" shall mean the annual amount per rentable square foot that a willing, comparable renewal tenant would pay and a willing, comparable landlord of a similar building would accept at arm's length for similar space, giving appropriate consideration to the following matters: (i) annual rental rates per rentable square foot; (ii) the type of escalation clauses (including, without limitation, operating expenses, real estate taxes, and CPI) and the extent of liability under the escalation clauses (i.e., whether determined on a "net lease" basis or by increases over a particular base year or base dollar amount); (iii) rent abatement provisions reflecting free rent and/or no rent during the lease term; (iv) length of lease term; (v) size and location of premises being leased; and (vi) other generally applicable terms and conditions of tenancy for similar space; provided, however, Tenant shall not be entitled to any tenant improvement or refurbishment allowance. The Fair Market Rental may also designate periodic rental increases and similar economic adjustments. The Fair Market Rental shall be the Fair Market Rental in effect as of the beginning of the applicable Option period, even though the determination may be made in advance of that date, and the parties may use recent trends in rental rates in determining the proper Fair Market Rental as of the beginning of the applicable Option period.

        10.    *ROOF-TOP ACCESS.* Landlord hereby agrees that Tenant shall have, subject to the rights of other roof-top users in the Building, non-exclusive access to and use of a portion of the Building roof for Tenant to install, maintain and operate one (1) satellite dish or antennae (including appropriate conduit and utilities for the operation thereof), the location of which shall be reasonably agreed upon by Landlord and Tenant. In the event Tenant wishes to place communication equipment on the roof, it shall be (i) screened in a manner and design acceptable to Landlord in its sole but reasonable discretion, (ii) installed and maintained in compliance in all aspects with all applicable codes, (iii) subject to Landlord's approval on use and method of attachment, and (iv) at Tenant's sole cost and expense, including all reasonable out-of-pocket consulting and administrative fees, if any, incurred by Landlord in connection with Tenant's use of the roof. Landlord reserves the right to require Tenant to use Landlord's roofing contractor in connection with any work to be performed on the roof of the Building. Tenant shall indemnify Landlord against any costs in connection with the voiding of the warranty for the roof if caused by Tenant's use of the roof of the Building as provided herein. Prior to installing any such equipment on the roof of the Building, Tenant shall execute a license agreement substantially in the form attached to this Lease as Exhibit E. Tenant hereby agrees that such right shall be personal to Tenant only and Tenant's use thereof shall be in connection with Tenant's intended use of the Premises and shall not be used to produce revenues other than incidentally in connection with Tenant's use of the Premises set forth in Section 1.7 above.

<div align="center">Add-4</div>

EXHIBIT A

PREMISES



18011-                                                  Tri-Coastal-LEASE-Wharton-FINAL-1-20-10.doc

EXHIBIT A-1

EXPANSION SPACE

EXHIBIT A-2

WAREHOUSE PARKING AREA



EXHIBIT B

VERIFICATION LETTER

**TRI-COASTAL DESIGN SERVICES, LLC,** a New Jersey limited liability company ("Tenant") hereby certifies that it has entered into a lease with **THE REALTY ASSOCIATES FUND VIII, L.P.,** a Delaware limited partnership ("Landlord") and verifies the following information as of the ___ day of _____ _____, 20___:

Address of Premises: _____

Leasable Area of Premises: _____

Commencement Date: _____

Lease Termination Date: _____

Initial Base Rent: _____

Billing Address for Tenant: _____

_____

Attention:_____

Telephone Number: _____

Federal Tax ID No.: _____

Tenant acknowledges and agrees that all tenant improvements Landlord is obligated to make to the Premises, if any, have been completed to Tenant's satisfaction, that Tenant has accepted possession of the Premises, and that as of the date hereof there exist no offsets or defenses to the obligations of Tenant under the Lease.

TENANT

**TRI-COASTAL DESIGN SERVICES, LLC,**
a New Jersey limited liability company

By: _____

_____
(PRINT NAME)

Its: _____
(PRINT TITLE)

ACKNOWLEDGED AND AGREED TO:

LANDLORD

**THE REALTY ASSOCIATES FUND VIII, L.P.,**
a Delaware limited partnership

By: Realty Associates Fund VIII LLC, a
    Massachusetts limited liability company,
    general partner

    By: Realty Associates Advisors LLC, a
        Delaware limited liability company,
        Manager

        By: Realty Associates Advisors Trusts, a
            Massachusetts business trust,
            Manager

            By: _____
                Officer

B-1

EXHIBIT C

RULES AND REGULATIONS

GENERAL RULES

Tenant shall faithfully observe and comply with the following Rules and Regulations:

1.      Tenant shall not alter any locks or install any new or additional locks or bolts on any doors or windows of the Premises without obtaining Landlord's prior written consent, which consent shall not be unreasonably withheld or delayed.  Tenant shall bear the cost of any lock changes or repairs required by Tenant.

2.      Access to the Project may be refused unless the person seeking access has proper identification or has a previously received authorization for access to the Project.  Landlord and its agents shall in no case be liable for damages for any error with regarding to the admission to or exclusion from the Project of any person.  In case of invasion, mob, riot, public excitement or other commotion, Landlord reserves the right to prevent access to the Project during the continuance thereof by any means it deems appropriate for the safety and protection of life and property.

3.      No cooking shall be done or permitted on the Premises (without Landlord's prior written consent), nor shall the Premises be used for any improper, objectionable or immoral purposes.  Notwithstanding the foregoing, Underwriters' Laboratory-approved equipment and microwave ovens may be used in the Premises for heating food and brewing coffee, tea, hot chocolate and similar beverages for employees and visitors of Tenant, provided that such use is in accordance with all applicable federal, state and city laws, codes, ordinances, rules and regulations; and provided further that such cooking does not result in odors escaping from the Premises.

4.      No boring or cutting for wires shall be allowed without the consent of Landlord.  Tenant shall not install any radio or television antenna, satellite dish (except as expressly provided in the Lease), loudspeaker or other device on the roof or exterior walls of the Building.  Tenant shall not interfere with broadcasting or reception from or in the Project or elsewhere.

5.      Landlord reserves the right to exclude or expel from the Project any person who, in the judgment of Landlord, is intoxicated or under the influence of liquor or drugs, or who shall in any manner do any act in violation of any of these Rules and Regulations.

6.      Tenant shall store all its trash and garbage within the interior of the Premises or in other locations approved by Landlord, in Landlord's reasonable discretion.  No material shall be placed in the trash boxes or receptacles if such material is of such nature that it may not be disposed of in the ordinary and customary manner of removing and disposing of trash in the vicinity of the Project without violation of any law or ordinance governing such disposal.

7.      Tenant shall comply with all safety, fire protection and evacuation procedures and regulations established by Landlord or any governmental agency.

PARKING RULES

1.      Tenant shall not permit or allow any vehicles that belong to or are controlled by Tenant or Tenant's employees, suppliers, shippers, customers or invitees to be loaded, unloaded or parked in areas other than its own loading dock or those areas designated by Landlord for such activities and at times approved by Landlord.  Users of the parking area will obey all posted signs and park only in the areas designated for vehicle parking. Tenant and its customers, employees, shippers and invitees shall comply with all rules and regulations adopted by Landlord from time to time relating to truck parking and/or truck loading and unloading.

2.      Landlord reserves the right to reasonably relocate all or a part of parking spaces within the parking area, except that Landlord shall not relocate Tenant's parking spaces to a location which is outside of the Project except on a temporary basis in connection with an emergency or repairs.

3.      Landlord will not be responsible for any damage to vehicles, injury to persons or loss of property, all of which risks are assumed by the party using the parking area.

4.      The maintenance, washing, waxing or cleaning of vehicles in the parking area or Common Areas is prohibited.

5.      Tenant shall be responsible for seeing that all of its employees, agents, contractors and invitees comply with the applicable parking rules, regulations, laws and agreements.

6.      At Landlord's request, Tenant shall provide Landlord with a list which includes the name of each person using the parking facilities based on Tenant's parking rights under this Lease and the license plate number of the vehicle being used by that person.

Landlord reserves the right at any time to change or rescind any one or more of these Rules and Regulations, or to make such other and further reasonable Rules and Regulations as in Landlord's reasonable judgment may from time to time be necessary for the management, safety, care and cleanliness of the Project, and for the preservation of good order therein, as well as for the convenience of other occupants and tenants therein; provided, however, Tenant shall not be bound by any amendment or modification until Tenant has be provided with written notice of the same.  Landlord may waive any one or more of these Rules and Regulations for the benefit of any particular tenant, but no such waiver by Landlord shall be construed as a waiver of such Rules and Regulations in favor of any other tenant, nor prevent Landlord from thereafter enforcing any such Rules or Regulations against any or all tenants of the Project.  Tenant shall be deemed to have read these Rules and Regulations and to have agreed to abide by them as a condition of its occupancy of the Premises.  In the event of a conflict between the terms and provisions of the Lease and these Rules and Regulations, the terms and provisions of the Lease shall prevail.

18011-                                                                          Tri-Coastal-LEASE-Wharton-FINAL-1-20-10.doc

EXHIBIT D

IRREVOCABLE STANDBY LETTER OF CREDIT
NUMBER _____

| LETTER OF CREDIT AMOUNT | ISSUE DATE | EXPIRY DATE | |
|---|---|---|---|
| US [AMOUNT] | [DATE] | [DATE] | |

BENEFICIARY:                                                      APPLICANT:
THE REALTY ASSOCIATES FUND VIII, L.P.            [TENANT]
C/O TA ASSOCIATES REALTY                               [ADDRESS OF PROPERTY]
28 STATE STREET
BOSTON, MASSACHUSETTS 02109
ATTENTION:  LEASE ADMINISTRATOR – NEW JERSEY

WITH COPY TO:
KWARTLER ASSOCIATES, INC.
2 NORTH STREET
WALDWICK, NEW JERSEY  07643

GENTLEMEN:

WE HEREBY ISSUE OUR IRREVOCABLE STANDBY LETTER OF CREDIT IN YOUR FAVOR FOR THE ACCOUNT OF THE ABOVE REFERENCED APPLICANT IN THE AGGREGATE AMOUNT OF US [AMOUNT] WHICH IS AVAILABLE BY PAYMENT OF YOUR DRAFT(S), AT SIGHT, DRAWN ON OURSELVES, , WHEN ACCOMPANIED BY THE FOLLOWING DOCUMENTS:

1.        A STATEMENT PURPORTEDLY SIGNED BY AN AUTHORIZED REPRESENTATIVE OF [LANDLORD] (HEREIN CALLED "THE LANDLORD") STATING THAT:

           "THIS CERTIFIES THAT A DEFAULT EXISTS BEYOND THE EXPIRATION OF ANY APPLICBLE NOTICE AND CURE PERIODS PURSUANT TO THAT CERTAIN STANDARD INDUSTRIAL LEASE BETWEEN BENEFICIARY, AS LANDLORD AND APPLICANT, AS TENANT, AS AMENDED FROM TIME TO TIME."

                                                -OR-

           "APPLICANT HAS FAILED TO RENEW OR REPLACE THIS LETTER OF CREDIT THIRTY (30) DAYS BEFORE ITS CURRENT EXPIRATION DATE AND BENEFICIARY IS ACCORDINGLY ENTITLED TO DRAW UPON THIS LETTER OF CREDIT."

2.        THE ORIGINAL OF THIS LETTER OF CREDIT.

IT IS A CONDITION OF THIS LETTER OF CREDIT THAT IT SHALL BE DEEMED AUTOMATICALLY EXTENDED WITHOUT WRITTEN AMENDMENT FOR ONE YEAR FROM THE PRESENT OR ANY FUTURE EXPIRY DATE UNLESS AT LEAST FORTY-FIVE (45) DAYS PRIOR TO SUCH EXPIRATION DATE, WE NOTIFY YOU IN WRITING AT THE ABOVE ADDRESS BY EXPRESS COURIER THAT WE ELECT NOT TO RENEW THIS LETTER OF CREDIT FOR ANY SUCH ADDITIONAL PERIODS(S).  UPON RECEIPT BY YOU OF SUCH NOTICE, YOU MAY DRAW HEREUNDER BY PRESENTATION OF YOUR DRAFT AT SIGHT ON US.

PARTIAL DRAWINGS ARE PERMITTED.

THIS LETTER OF CREDIT IS TRANSFERABLE ON ONE OR MORE OCCASIONS BY BENEFICIARY.

THIS IRREVOCABLE LETTER OF CREDIT SETS FORTH IN FULL THE TERMS OF OUR UNDERTAKING.   THIS UNDERTAKING SHALL NOT IN ANY WAY BE MODIFIED, AMENDED, AMPLIFIED OR INCORPORATED BY REFERENCE TO ANY DOCUMENT OR CONTRACT REFERRED TO HEREIN.

WE HEREBY AGREE WITH YOU THAT DRAFT(S) DRAWN UNDER AND IN COMPLIANCE WITH THE TERMS AND CONDITIONS OF THIS CREDIT SHALL BE DULY HONORED IF PRESENTED TOGETHER WITH DOCUMENT(S) AS SPECIFIED ABOVE AND THE ORIGINAL OF THIS CREDIT, AT OUR OFFICE LOCATED AT **[MUST BE ADDRESS LOCAL TO THE WHARTON, NEW JERSEY AREA]** ON OR BEFORE THE ABOVE STATED EXPIRY DATE.  DRAFT(S) DRAWN UNDER THIS CREDIT MUST SPECIFICALLY REFERENCE OUR CREDIT NUMBER.  DRAFTS DRAWN IN COMPLIANCE WITH THE TERMS OF THIS LETTER OF CREDIT SHALL BE HONORED BY US WITHOUT INQUIRY AS OF THE TRUTH OF THE STATEMENTS SET FORTH IN THE DRAW REQUEST AND REGARDLESS OF WHETHER APPLICANT DISPUTES THE CONTENT OR ACCURACY OF SUCH STATEMENTS.  FACSIMILE DRAWINGS ARE PERMITTED.  IF A DRAFT IS PRESENTED TO US BY FACSIMILE TO OUR FAX NUMBER _____, THE ORIGINAL LETTER OF CREDIT IS NOT REQUIRED.

WE HEREBY ENGAGE WITH YOU THAT DRAWINGS PRESENTED UNDER AND IN COMPLIANCE WITH THE TERMS OF THIS LETTER OF CREDIT WILL BE DULY HONORED WITHIN TWO (2) BUSINESS DAYS AFTER OUR RECEIPT OF YOUR PRESENTATION OF THE CERTIFICATE AND ANY SUCH DOCUMENTS SPECIFIED HEREIN AT THE ABOVE ADDRESS.

D-1

EXCEPT AS OTHERWISE EXPRESSLY STATED HEREIN, THIS LETTER OF CREDIT IS SUBJECT TO THE UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY CREDITS, ESTABLISHED BY THE INTERNATIONAL CHAMBER OF COMMERCE, AS IN EFFECT ON THE DATE OF ISSUANCE OF THIS CREDIT.

SINCERELY,

_____
AUTHORIZED REPRESENATIVE

EXHIBIT E

LICENSE AGREEMENT FOR SATELLITE DISH

THIS LICENSE AGREEMENT FOR SATELLITE DISH (the "Agreement") is made as of this 19th day of January 2010, by and between **THE REALTY ASSOCIATES FUND VIII, L.P.**, a Delaware limited partnership (the "Licensor"), and **TRI-COASTAL DESIGN SERVICES, LLC** (the "Licensee"), a New Jersey Limited Liability Company.

RECITALS

A.      This Agreement is attached to and made a part of that certain Lease Agreement dated January 19, 2010 ("Lease") by and between Licensee, as tenant, and Licensor, as landlord, for the lease by Licensee of approximately 180,000 rentable square feet of office space (the "demised premises") in the building located at 20 Harry Schupe Boulevard, Wharton, NJ 07885 (the "Building"), all as more particularly described in the Lease.

B.      Under the terms of the Lease, Licensor has the exclusive right to use or permit the use of all or any portion of the roof of the Building for any purpose; Licensee desires to use a portion of the roof space to maintain and operate thereon a satellite dish and/or related microwave facilities, antennae and related equipment, all as more particularly described in Exhibit A and Exhibit B attached hereto and incorporated herein by this reference (the "Equipment Location and Specifications").

C.      Licensor and Licensee desire to provide the terms and conditions for Licensee's use of the roof space as a location for an antenna and the equipment required for the operation thereof.

NOW, THEREFORE, in consideration of the foregoing, the sum of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Licensor and Licensee, intending legally to be bound, hereby agree as follows:

1.      The foregoing recitals are hereby incorporated herein and made a part hereof by this reference.

2.      Satellite Dish Equipment: Permitted Uses.  Provided Licensee is not in default under the terms and conditions of the Lease, Licensee's agent, as approved by Licensor, in Licensor's sole discretion, will install and maintain, at the sole cost of Licensee and Licensee may, at its own expense, operate on the roof of the Building, a satellite dish and/or related microwave facilities and antenna as specified in Exhibit A attached hereto, to be located as designated on Exhibit B attached hereto (said equipment is collectively referred to hereinafter as the "Satellite Dish").  The Satellite Dish shall be deemed to be the Licensee's Personal Property (as defined in the Lease) and to the extent not inconsistent with this Agreement, the ownership, installation, use and removal thereof shall be governed by the terms of the Lease applicable to Licensee's Personal Property.

3.      Licensor's Prior Approval.  Licensor shall reasonably approve or reject the installation and operation of the Satellite Dish within a reasonable time after Licensee submits (i) plans and specifications for the Satellite Dish (including size, location, height, weight and color); (ii) copies of all required governmental and quasi-governmental permits, licenses, special zoning variances, and authorizations, all of which Licensee shall obtain at its own cost and expense; and (iii) a policy or certificate of insurance evidencing such insurance coverage as may reasonably be required by Licensor for the installation, operation and maintenance of the Satellite Dish and sufficient to cover, among other things, the indemnities from Licensee to Licensor as hereinafter provided.  Licensor may withhold approval if the installation, operation or removal of the Satellite Dish may (a) damage the structural integrity of the Building; (b) unreasonably interfere with any service provided by Licensor; (c) interfere with any zoning ordinances or other governmental regulation applicable to the Building; or (d) reduce the amount of leasable space in the Building.  Licensee shall not be entitled to rely on any such approval as being a representation by Licensor that such installation and operation is permitted by or in accordance with any governmental or quasi-governmental entity, authority or regulation.  If Licensor rejects the installation and operation of the Satellite Dish, Licensor's written rejection shall state with specificity the reason for Licensor's rejection and, if applicable, Licensee may correct any defects in Licensee's previous submission and resubmit to Licensor for approval.

4.      Installation.

(a)      Installation and maintenance of the Satellite Dish shall be performed solely by Licensee's agent or its contractors, as approved by Licensor, in Licensor's reasonable discretion.  The Satellite Dish shall not be located on top of any existing structure on the roof of the building.

(b)      Licensee shall bear all costs and expenses incurred in connection with the installation, operation and maintenance of the Satellite Dish.  If operation of the Satellite Dish shall require electrical power Licensor may, at its sole option, install a separate meter, at Licensee's sole expense.  Licensee shall pay the actual cost of all electricity used in the operation of the Satellite Dish, all as determined by Licensor.

5.      Rental Payments.  Licensee shall pay, as additional rent, a fee to Licensor for the use of the rooftop space.  Such fee shall be –0– per month –0– per year due in advance, on or before the first of each month.  Such fee shall commence _____[N/A]_____, 20____.  In addition, if Licensor's insurance premium or real estate tax assessment increases as a result of the Satellite Dish, or if any governmental or quasi-governmental authority shall levy, assess or impose any tax, license fee, use fee or other sum against Licensor, as owner of the Building, as a result of the Satellite Dish, Licensee shall pay all such amounts as additional rent (as defined in the Lease), promptly upon receipt of a bill from Licensor for any such amount.  Licensee will have no right to an abatement or reduction in the amount of basic monthly rent, additional rent or any other sums due and payable under the Lease if for any reason Licensee is unable to obtain any required approval for installation of the Satellite Dish, or is thereafter unable to use the 'Satellite Dish for any reason, but Licensee shall not be obligated to pay the fee specified in this Section 5 during any month or portion thereof during which Licensee is unable to use the Satellite Dish.

6.      Indemnification.  Licensee covenants and agrees that the installation, operation, maintenance and removal of the Satellite Dish, or the demised premises with respect thereto, shall be solely at its own risk.  Licensee covenants and agrees absolutely and unconditionally to indemnify, defend and hold Licensor harmless against all claims, actions, damages, judgments, settlements, liability, costs and expenses (including reasonable attorneys' fees and expenses) in connection with death, bodily or personal injury, damage to property or business or any other loss or injury arising out of or related to the installation, operation, maintenance or removal of the Satellite Dish.

E-1

7.      Termination Rights.  Licensor may require Licensee, at any time prior to the expiration of the Lease, to terminate the operation of the Satellite Dish if it is causing physical damage to the structural integrity of the Building, unreasonably interfering with any other service provided by the Building, unreasonably interfering with any prior licensee of the roof, or causing the violation of any condition or provision of the lease or any law, regulation or ordinance promulgated by any governmental or quasi-governmental authority now or hereafter permitted to continue any similar use or operation.   If, however, Licensee can correct the damage or prevent said interference caused by the Satellite Dish to Licensor's satisfaction within thirty (30) days, Licensee may restore its operation so long as Licensee promptly commences to cure such damage and diligently pursues such cure to completion.  If the Satellite Dish is not completely corrected and restored to operation within thirty (30) days, Licensor, at its sole option, may require that the Satellite Dish be removed at Licensee's expense.  If Licensor or any other tenant in the Building shall require that the Satellite Dish be moved to another location on the roof, either to accommodate Licensor or to provide other tenants in the Building with access to the roof for placement of other antennas, other electrical equipment or other Licensor-approved uses or installations, Licensor shall have the right, at its sole expense, to relocate the Satellite Dish to another place on the roof.

8.      Removal of the Satellite Dish.  At the expiration or earlier termination of the Lease or upon termination of the operation of the Satellite Dish as provided hereinabove in Section 7, the Satellite Dish and all cabling and other equipment relating thereto shall be removed from the Building at Licensee's sole cost.  Licensee hereby authorizes Licensor to remove and dispose of the Satellite Dish and charge Licensee for all costs and expenses incurred.  Licensee agrees that Licensor shall not be liable for any property disposed of or removed by Licensor.  Licensee's obligation to perform and observe this covenant shall survive the expiration or earlier termination of the Term of this Agreement.

9.      Time of the Essence.  Time shall be of the essence of the Licensee's obligations hereunder.

10.     Entire Agreement.  This Agreement contains the entire agreement of the parties hereto and neither Licensor nor any agent or representative of Licensor has made or is making, and Licensee, in executing and delivering this Agreement, is not relying upon any warranties, representations, promises or statements whatsoever.  No waiver or modification of any provision of this Agreement shall be effective unless expressed in writing and signed by all parties hereto.

11.     Successors and Assigns.  The obligations of this Agreement shall bind and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

12.     Notices.  All notices hereunder shall be given by hand delivery or by certified mail, return receipt requested, and shall be deemed delivered upon receipt or refusal to accept delivery, if addressed as noted in the Lease.

13.     Governing Law.  This Agreement shall be construed and enforced in accordance with the laws of the State of New Jersey.

IN WITNESS WHEREOF, Licensor and Licensee have duly executed this Agreement under seal as of the day and year first above written.

LICENSOR:

WITNESS/ATTEST:

By: _____          By:_____

Date:_____

LICENSEE:

WITNESS/ATTEST:                        TRI-COASTAL DESIGN SERVICES, LLC

By: _____          By:_____
                                          Dennis Mastrangelo
                                          Chief Operating Officer

Date:  January 21, 2010

E-2

Tri-Coastal-LEASE-Wharton-FINAL-1-20-10.doc

EXHIBIT F

TENANT'S REMOVABLE ALTERATIONS

**NONE**

**NOTE:  THE PARTIES HERETO AGREE THAT, DURING THE FIRST THIRTY-SIX (36) MONTHS OF THE TERM, THIS EXHIBIT F MAY BE REPLACED WITH A REVISED EXHIBIT F WHICH HAS BEEN MUTUALLY AND REASONABLY AGREED TO BY THE PARTIES PURSUANT TO SECTION 13.5 OF THE LEASE.**

F-1

SCHEDULE 1

WORK LETTER AGREEMENT

1.      Plans.

Tenant shall cause its architects and engineers to prepare and submit to Landlord for approval detailed plans, specifications and working drawings ("Plans") for the construction of Tenant's leasehold improvements (the "Improvements") to the Premises. Tenant's construction of the Improvements shall also be subject to the provisions of Section 13 of the Lease; provided, however, in the event of a conflict between the terms and provisions of this work letter agreement and the terms and provisions of Section 13 of the Lease, the terms and provisions of this work letter agreement shall control. Landlord reserves the right to approve any space planner, architect or engineer employed by Tenant. Tenant's Plans shall include any information as Landlord shall reasonably require to evaluate Tenant's work. Tenant shall use the Plans to obtain all permits and approvals which are necessary to construct the Improvements. All Improvements shall be constructed in a good and workmanlike manner and in accordance with all applicable laws, codes and regulations, including the Americans with Disabilities Act ("ADA"). It is expressly agreed that (a) Tenant shall not commence any such work until said Plans have been approved by Landlord, and (b) the Plans which have been so approved by Landlord shall be used by Tenant to obtain all permits that are necessary to construct the Improvements. As used herein, the term "Improvements" shall include all work to be done in the Premises pursuant to the Plans, including, but not limited to: demolition work, partitioning, doors, ceiling, floor coverings, wall finishes (including paint and wallcoverings), window coverings, electrical (excluding the cost of computer cabling, Tenant's telephone system and wiring, and any other special electrical or wiring dedicated to Tenant's operations or business), plumbing, heating, ventilating and air conditioning, fire protection, cabinets and other millwork. Whenever applicable, Landlord shall respond to Tenant's request for approval of Tenant's Plans or revisions thereto, as the case may be, within five (5) business days after Landlord's receipt of such Plans or revisions, by giving written approval with respect thereto or requesting revisions or modifications therein. After approval of the Plans by Landlord, no further changes to the Plan shall be made without the prior written approval of Landlord. Tenant acknowledges that Landlord's review and approval of the Plans is not conducted for the purpose of determining the accuracy and completeness of the Plans, their compliance with applicable codes and governmental regulations including ADA, or their sufficiency for purposes of obtaining a building permit, all of which shall remain the responsibility of Tenant and Tenant's architect. Accordingly, Landlord shall not be responsible for any delays in obtaining the building permit due to the insufficiency of the Plans or any delays due to changes in the Plans required by the applicable governmental regulatory agencies reviewing the Plans.

2.      Improvement Costs.

2.1     Tenant shall provide Landlord with a breakdown of the estimated total cost of the Improvements ("Cost Breakdown"), including, without limitation: construction cost of the Improvements; architectural and engineering fees relating to the preparation and review of the space plan and the Plans (inclusive of the initial space plan and all design work above and below the ceiling); governmental agency plan check, permit and other fees; sales and use taxes; testing and inspection costs; and construction fees (including general contractor's overhead and supervision fees and the construction supervisory fee referred to in Section 3.6 hereof). Landlord has granted to Tenant the Improvement Allowance specified in Paragraph 1(c) of the Addendum, which Improvement Allowance shall be used only for the items specified in the Cost Breakdown or the Rent Credit (described below).

2.2     The Improvement Allowance shall be disbursed to Tenant not more frequently than once per month based on disbursement requests (each, a "Disbursement Request") submitted by Tenant to Landlord and certified by Tenant's architect. Each Disbursement Request shall set forth the total amount incurred, expended and/or due for each requested item less prior disbursements and a description of the work performed, and materials supplied and/or costs incurred or due with respect to each item for which disbursement is requested. Each Disbursement Request shall be accompanied by invoices, vouchers, statements, affidavits, payroll records and/or other documents reasonably requested by Landlord, which substantiate costs incurred to justify such a disbursement, together with lien waivers for those contractors and materialmen providing construction services or materials. In addition, each disbursement shall be subject to inspection and approval of completed work by Landlord's construction engineer. The final disbursement of the Improvement Allowance shall not be made by Landlord until Tenant (i) has completed the Improvements in accordance with the Plans (as evidenced by a certificate provided by Tenant's architect and subject to Landlord's inspection, provided Landlord will not unreasonably withhold its approval in connection with any such inspection), (ii) has obtained final unconditional lien waivers from all contractors, subcontractors, suppliers and material persons waiving any liens against the Premises and the Project, as well as the general contractor's affidavit specifying the names of all contractors, subcontractors, suppliers and material persons who have supplied labor, services, goods or materials to the Premises and stating that all such listed persons and entities have been paid in full, and (iii) Tenant has obtained a certificate of occupancy for the Premises (collectively, the "Final Disbursement Conditions").

2.3     In the event the Cost Breakdown exceeds the Improvement Allowance, Tenant shall pay from another source of funds the amount by which the Cost Breakdown exceeds the Improvement Allowance prior to any disbursement of the Improvement Allowance by Landlord. If, at any time during the construction of the Improvements, the total amount remaining to be paid for construction of the Improvements exceeds the amount of the Improvement Allowance remaining to be disbursed, at Landlord's option, no further disbursement of the Improvement Allowance shall be made by Landlord unless, and until Tenant has expended such sums as to cause the Improvement Allowance to again be sufficient to pay the remaining costs.

2.4     Tenant may elect to use a portion of the Improvement Allowance in an amount not to exceed Two Hundred Thousand Dollars ($200,000.00) (the "Maximum Rent Credit"), to be applied as a credit against a portion of Tenant's next monthly installment(s) of Base Rent coming due under the Lease but the Maximum Rent Credit may not be applied to more than fifty percent (50%) of the monthly installment of Base Rent, and the Operating Expense and Real Property Tax estimated payments due for any one (1) calendar month (the "Rent Credit").

2.5     In the event that the actual cost of the Improvements is less than the Improvement Allowance, reduced by the Maximum Rent Credit, any remaining unused portion of the Improvement Allowance shall not be paid or refunded to Tenant. Furthermore, if the Improvement Allowance has not been fully disbursed (either as a reimbursement for the Improvements pursuant to Section 2.2 above or as the Maximum Rent Credit) on or before May 31, 2011, thereafter Tenant shall not be entitled to receive any amounts of the unused Improvement Allowance, if any, exceeding Seventy-Five Thousand Dollars ($75,000.00) (such portion being referred to herein as the "Surviving

18011-

Tri-Coastal-LEASE-Wharton-FINAL-1-20-10.doc

Improvement Allowance") and any remaining portion of the Improvement Allowance, other than the Surviving Improvement Allowance, not previously disbursed or credited to Tenant shall accrue to the benefit of Landlord as of such date and Tenant shall no longer be entitled to receive any such amounts. The Surviving Improvement Allowance may only be used to reimburse Tenant (in the manner described in Section 2.2 of this Work Letter Agreement), for Improvements actually constructed by Tenant for the Premises provided such construction is completed and such properly submitted Disbursement Request(s) has been received by Landlord on or before May 31, 2013. Any remaining portion of the Surviving Improvement Allowance shall accrue to the benefit of Landlord from and after May 31, 2013 and Tenant shall no longer be entitled to receive any such remaining portion.

2.6     Tenant shall not be entitled to receive any portion of the Improvement Allowance (including the Rent Credit and/or any Surviving Improvement Allowance, if any) during any period in which Tenant is in default under the Lease beyond the expiration of any applicable notice and cure period set forth therein.

3.     Construction of Improvements.

3.1     Tenant shall obtain Landlord's approval of Tenant's contractor, which approval shall not be unreasonably withheld. Additionally, Tenant shall submit a copy of the proposed construction contract to Landlord for Landlord's approval. Landlord's approval, when required in this Work Letter Agreement, shall be given or denied (as applicable) within ten (10) business days of receipt of the necessary information from Tenant. Tenant's contractors and subcontractors shall be required to provide the following types of insurance, in the minimum amounts indicated, naming Landlord (and Landlord's mortgagee, if required by Landlord) as additional insured:

(a)     Workmen's Compensation with full statutory limits for employer's liability.

(b)     Commercial General Liability Insurance including direct and contingent liability in the aggregate amount of Three Million and No/100 Dollars ($3,000,000.00) combined single limit coverage per occurrence for personal injury, death or property damage.

(c)     The Liability Policy shall include coverage for Broad Form Hold Harmless Agreement as is contained in the standard contract.

(d)     Automobile Liability insurance with bodily injury limits of $500,000 per person, $1,000,000 per accident, and $100,000 per accident for Property Damage.

Original policies or copies of or certificates evidencing all of the foregoing insurance shall be delivered to Landlord before construction of the Improvements is started and before Tenant's contractor's equipment is placed upon the Premises. In all other respects, the insurance coverage above mentioned shall comply with the Lease provisions.

3.2     It is agreed that Tenant assumes the entire responsibility and liability due to its negligence, including statutory or common law, for any and all injuries or death of any or all persons, including its contractor, subcontractors and employees, and for any and all damages to property caused by or resulting from or arising out of any act or omission on the part of Tenant, its contractor, subcontractors or employees, in the prosecution of the work thereunder. With respect to such work Tenant agrees to indemnify and save harmless Landlord, its mortgagee, architect, engineers and their employees and all other tenants of the Property from and against all losses and expense, including legal fees, which they may suffer or pay as the result of claims or lawsuits due to, because of or arising out of any and all such injuries, death or damage, whether real or alleged, and Tenant, its contractor and subcontractors shall assume and defend at their own expense all such claims or lawsuits. Tenant agrees to insure this assumed liability in its Comprehensive General Liability Policy and the original or copy of the policy delivered to Landlord shall indicate this contractual coverage.

3.3     For and during the period of construction, Tenant shall provide and pay for all utilities consumed upon the Premises during said period and for the removal of all temporary connections.

3.4     Upon completion of the Improvements, Tenant's contractors and/or subcontractors shall provide Landlord, without cost to Landlord, with one (1) set of transparent or CAD "as built" drawings.

3.5     Completion. Tenant shall endeavor to cause the contractor to substantially complete construction of the Improvements in a diligent manner. It shall be the sole responsibility of Tenant to file all drawings and specifications, pay all fees and obtain all permits and applications from any governmental authorities having jurisdiction, and to obtain any certificates or approvals, including a certificate of occupancy, required to enable Tenant to occupy the Premises. Landlord shall not be liable for any loss or damages as a result of delays in construction of the Premises. No delay in completion of construction of the Improvements shall delay the Commencement Date or the Rent Commencement Date set forth in the Lease or Tenant's obligation to pay rent or otherwise perform its obligations under the Lease.

3.6     Construction Supervisory Fee. The cost of the Improvements shall include a construction supervisory fee payable to Landlord or Landlord's agent in an amount equal to three percent (3%) of the total cost of the Improvements for the supervision of the construction of the Improvements by Landlord.

4.     Incorporation. This Agreement is and shall be incorporated by reference in the Lease, and all of the terms and conditions of the Lease are and shall be incorporated herein by this reference.

# EXHIBIT B

## LEASE AMENDING AGREEMENT

THIS AGREEMENT made as of the 3 day of January 2020

AMONG:

**WHARTON LH LP**
(the "Landlord")

- and –

**TRI-COASTAL DESIGN SERVICES, LLC,**
(the "Tenant")

WHEREAS:

A.     By a lease (the "Lease") dated January 19, 2010, The Realty Associates Fund VIII, L.P. (the "Original Landlord") leased to the Tenant premises (the "Leased Premises") located in the building municipally known as 20 Harry Shupe Boulevard, Wharton, New Jersey 07885;

B.     The Landlord is the successor in interest to the Original Landlord; and

C.     The parties have agreed to certain amendments to the Lease effective on the date hereof (the "Effective Date") in accordance with the terms and conditions hereinafter set forth.

NOW THEREFORE THE PARTIES AGREE AS FOLLOWS:

1.     The consideration for this Agreement is the mutual covenants and agreements between the parties and the sum of One Dollar ($1.00) that has been paid by each of the parties to the other, the receipt and sufficiency of which is acknowledged.

2.     The parties hereby acknowledge, confirm and agree that the foregoing recitals are true in substance and in fact.

3.     From and after the Effective Date, the following provisions shall be added to the Lease and the Lease is hereby amended as follows:

a)     **Term:** Section 1.8 of the Basic Lease Provisions of the Lease shall be amended by adding the following paragraph:

"Notwithstanding the foregoing, the Landlord and the Tenant agree that, commencing on January 6, 2020, the Landlord shall market the Premises for lease with a commencement date of no earlier than July 1, 2020 (the "**New Lease**"). In the event that the Landlord finds a new tenant prior to the expiration of the Lease and enters into a New Lease: (i) the Landlord shall provide the Tenant at least thirty (30) days' prior written notice of the commencement of the New Lease. For clarity, the commencement date of the New Lease shall be no earlier than July 1, 2020, unless otherwise agreed to in writing by both the Landlord and Tenant; (ii) the Lease shall be terminated effective on the date which is one day prior to the commencement of the New Lease (the "**Termination Date**"); and (iii) the Tenant shall vacate the Premises on the Termination Date and in accordance with the Lease. Unless and until the Landlord executes a New Lease and provides the Tenant with notice as set out above, the Lease shall terminate on November 30, 2020."

4.      The Tenant shall reasonably cooperate with the Landlord and its brokers to show space to prospective new tenants.

5.      The parties confirm that the terms, covenants and conditions of the Lease remain unchanged and in full force and effect, except as modified by this Agreement. It is understood and agreed that all terms and expressions when used in this Agreement, unless a contrary intention is expressed herein, have the same meaning as they have in the Lease.

6.      This Agreement shall enure to the benefit of and be binding upon the parties hereto and their respective heirs, executors, administrators, successors and assigns, as the case may be.

[signature page follows]

IN WITNESS WHEREOF the Landlord has duly executed this Agreement at
_____, this _____ day of ____ _____, 20___.

<div align="right">

**Landlord:**
**WHARTON LH LP**
By: Wharton LH GP LLC, Its general partner

Per: _____
     Name
     Title

I have authority to bind the corporation

**Tenant:**
TRI-COASTAL DESIGN SERVICES LLC

Per: _____
     Name
     Title   COO

Per: _____
     Name
     Title

I have authority to bind the corporation

</div>

# EXHIBIT C

.

DAY PITNEY LLP
ONE JEFFERSON ROAD
PARSIPPANY, NJ 07054
(973) 966-6300
C. John DeSimone, III
Attorney I.D. No. 035101997
Stephen R. Catanzaro
Attorney I.D. No. 073402013
Attorneys for Plaintiff
Wharton LH LP

| | |
|---|---|
| WHARTON LH LP, | SUPERIOR COURT OF NEW JERSEY LAW DIVISION:  MORRIS COUNTY DOCKET NO.: L-000978-20 |
| Plaintiff, | |
| v. | Civil Action |
| TRI-COASTAL DESIGN SERVICES, LLC, and MARVIN STUTZ, | **CONSENT JUDGMENT AGAINST DEFENDNT TRI-COASTAL DESIGN SERVICES, LLC (Only)** |
| Defendants. | |

THIS MATTER having been opened to the Court by Day Pitney LLP, attorneys for plaintiff

Wharton LH LP, with the consent of Defendant, Tri-Coastal Design Services, LLC ("Defendant")

represented by The Law offices of Tedd S. Levine, LLC; and Defendant having been duly personally

served with a copy of the Summons and Complaint in the above entitled action, and Defendant not

being an infant or incompetent person or in military service, and it appearing that Defendant has

indicated a willingness to resolve this matter by entering into a Consent Judgment; and good cause

appearing;

IT IS on this 23rd day of September , 2020, ORDERED as follows:

106429932

1.     Judgment be and the same is entered in favor of plaintiff Wharton LH LP and against Defendant Tri-Coastal Design Services, LLC in the amount of $723,459.46, representing the amounts due and owing under the subject commercial lease through September 30, 2020 (except as to legal fees and costs, which is through September 11, 2020) as follows:

| DESCRIPTION | AMOUNT |
|---|---|
| 2017 Recovery Reconciliation | (2,900.48) |
| 2018 Recovery Reconciliation | 9,810.84 |
| Railing Replacement - Panzarella Contracting Inv. No. 9709 | 1,599.38 |
| Base Rent | 472,500.00 |
| Additional Rent | 67,200.00 |
| Realty Taxes | 163,800.00 |
| Late Fee | 35,600.49 |
| Interest | 23,349.23 |
| Legal Fees and Costs | 50,000.00 |
| Less Letter of Credit | (97,500.00) |
| **TOTAL** | **$723,459.46** |

together with interest through the date all sums due and owing are paid in full, together with any additional attorneys' fees incurred by Wharton LH LP in an amount to be determined by the Court;

2.     The Court finds that, pursuant to R. 4:42-2, there is no just reason for delay of enforcement of this Consent Judgment and it shall therefore be deemed a final order for execution purposes as to Defendant Tri-Coastal Design Services, LLC;

3.     A copy of this Consent Judgment shall be served upon all counsel of record via e-courts.

/s/ Stuart A. Minkowitz

Hon. Stuart A. Minkowitz, A.J.S.C.

- 2 -

106429932

**We hereby consent to
the form and entry of
this Consent Judgment:**

DAY PITNEY LLP
Attorneys for Plaintiff
Wharton LH LP

By: _____
    C. JOHN DeSIMONE, III
    A Member of the Firm

Dated: **September 18, 2020**
_____

THE LAW OFFICES OF TEDD S. LEVINE, LLC
Attorneys for Defendant *on behalf of*
Tri-Coastal Design Services, LLC

By: _____
    TEDD S. LEVINE, ESQ.
    A Member of the Firm

Dated: 9/16/20
_____

WITNESS:
_____

TRI-COASTAL DESIGN SERVICES, LLC

_____
Name:
Title:

Dated: 9/16/20
_____

- 3 -

106429932

# EXHIBIT D

**DAY PITNEY LLP**

ONE JEFFERSON ROAD
PARSIPPANY, NJ 07054
(973) 966-6300
C. John DeSimone, III
Attorney I.D. No. 035101997
Stephen R. Catanzaro
Attorney I.D. No. 073402013
Attorneys for Plaintiff
Wharton LH LP

| | |
|---|---|
| WHARTON LH LP, | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: MORRIS COUNTY<br>SPECIAL CIVIL PART,<br>LANDLORD/TENANT |
| Plaintiff, | |
| v. | DOCKET NO.: MRS-LT-1050-20 |
| TRI-COASTAL DESIGN SERVICES, LLC, | Civil Action |
| Defendant. | **CONSENT JUDGMENT<br>FOR POSSESSION<br>(TENANT TO VACATE)** |

THIS MATTER having been opened to the Court by Day Pitney LLP, attorneys for plaintiff

Wharton LH LP ("Plaintiff"), with the consent of Defendant, Tri-Coastal Design Services, LLC

("Defendant") represented by The Law offices of Tedd S. Levine, LLC; and Defendant having been

duly personally served with a copy of the Summons and Complaint in the above entitled action, and

Defendant not being an infant or incompetent person or in military service, and it appearing that

Defendant has indicated a willingness to resolve this matter by entering into a Consent Judgment;

and good cause appearing;

IT IS on this ____ day of _____, 2020, ORDERED as follows:

106430127

1.     Judgment for Possession of the commercial leasehold located at 20 Harry Shupe Boulevard Unit 2 aka 40 Harry Shupe Boulevard, Wharton, New Jersey 07885 (the "Property") be and the same is entered in favor of plaintiff Wharton LH LP and against Defendant Tri-Coastal Design Services, LLC;

2.     Defendant must quit and vacate the Property, removing all of its personal property (and such personal property belonging to others as Defendant may have at the Property) by no later than 5:00 p.m. on September 30, 2020 ("Surrender Date");

3.     Defendant agrees that Plaintiff may recapture the Property on 5:01 p.m. on September 30, 2020, by physical lockout and self-help;

4.     Plaintiff reserves all of its rights and remedies against Defendant, including without limitation (i) to pursue Defendant for any rent owed and unpaid for through the balance of the lease term; (ii) any damage to the Property; and (iii) Defendant's obligations to indemnify, defend, and hold harmless Plaintiff as provided for in the lease, and to comply with such other terms of the lease not specifically altered by this Consent Judgment;

5.     After September 30, 2020, Defendant agrees that should Plaintiff so request, a Warrant of Removal and lockout may immediately be issued by the Clerk of the Court. Defendant hereby waives all rights (if any) to preclude the issuance of said Warrant of Removal and lockout, nor shall Defendant seek an extension of the removal date, once set. Defendant further agrees to timely surrender possession of the Property if so ordered.

6.     A copy of this Consent Judgment shall be served upon all counsel of record.

<div style="text-align: right;">_____</div>
<div style="text-align: right;">J.S.C.</div>

106430127

We hereby consent to
the form and entry of
this Consent Judgment:

DAY PITNEY LLP
Attorneys for Plaintiff
Wharton LH LP

By: _____
     C. JOHN DeSIMONE, III
     A Member of the Firm

Dated: September 18, 2020
_____

THE LAW OFFICES OF TEDD S. LEVINE, LLC
Attorneys for Defendant *on behalf of*
Tri-Coastal Design Services, LLC

By: _____
     TEDD S. LEVINE, ESQ.
     A Member of the Firm

Dated: 9/6/20
_____

WITNESS:

_____

Dated: 9/16/20
_____

TRI-COASTAL DESIGN SERVICES, LLC

Michael Martinello

Name:
Title:

– 3 –

106430127

# EXHIBIT E

Information Subpoena and Written Questions

<div style="border:1px solid;">

## <u>IMPORTANT NOTICE - Please Read Carefully</u>
# Failure to Comply with this Information Subpoena May Result in Your Arrest and Incarceration

</div>

Name: <u>Day Pitney LLP; C. John DeSimone, III, Esq.</u>

Address: <u>One Jefferson Road</u>
<u>Parsippany, NJ 07054</u>

Telephone Number: <u>(973) 966-6300</u>

              Plaintiff

Attorney(s) for:

<u>Wharton LH LP</u>

                      Plaintiff

        -vs-

<u>Tri-Coastal Design Services, LLC et al</u>

                    Defendant

Superior Court of New Jersey
Law Division
<u>Morris</u>      County
Docket Number: <u>MRS-L-000978-20</u>

**Civil Action**
**Information Subpoena**

THE STATE OF NEW JERSEY, to: <u>Tri-Coastal Design Services, LLC</u>  ,

Judgment has been entered against you in the Superior Court of New Jersey, Law Division, <u>Morris</u> County, on <u>September 23</u>, 20<u>20</u>, in the amount of $ <u>$723,459.46</u> plus costs, of which $ <u>723,459.46</u> together with interest from <u>September 23</u>, 20<u>20</u>, remains due and unpaid.

Attached to this Information Subpoena is a list of questions that court rules require you to answer within 14 days from the date you receive this subpoena. If you do not answer the attached questions within the time required, the opposing party may ask the court to conduct a hearing in order to determine if you should be held in contempt. You will be compelled to appear at the hearing and explain your reasons for your failure to answer.

If this judgment has resulted from a default, you may have the right to have this default judgment vacated by making an appropriate motion to the court. Contact an attorney or the clerk of the court for information on making such a motion. Even if you dispute the judgment you must answer all of the attached questions.

You must answer each question giving complete answers, attaching additional pages if necessary. False or misleading answers may subject you to punishment by the court. However, you need not provide information concerning the income and assets of others living in your household unless you have a financial interest in the assets or income. Be sure to sign and date your answers and return them to the address in the upper left hand corner within 14 days.

Dated: <u>September 24</u>, 20<u>20</u>

/s/ C. John DeSimone, III

/s/ Michelle M. Smith, Esq.

Attorney for
Wharton LH LP

Clerk Michelle M. Smith, Esq.

Revised 09/01/2014, CN 11840

page 1 of 11

Information Subpoena and Written Questions

## Questions for Business Entity

**1.** Name of business including all trade names.

Tri-Coastal Design Services LLC a/k/a Tri-Coastal a/k/a Tri-Coastal Design

**2.** Address of all business locations.

No longer operating.  Last address was 40 Harry Shupe Blvd., Wharton, NY 07885

**3.** If the judgment-debtor is a corporation, the names and addresses of all stockholders, officers and directors.

| Name | Address |
|------|---------|
| N/A | |

**4.** If a partnership, list the names and addresses of all partners.

| Name | Address |
|------|---------|
| N/A | |

**5.** If a limited partnership, list the names and addresses of all general partners.

| Name | Address |
|------|---------|
| N/A | |

**6.** If the judgment-debtor is a limited liability company, the names and addresses of all members.

| Name | Address |
|------|---------|
| Tri-Coastal Design Group Inc. | No longer operating.  Last Addresses:  40 Harry Shupe Blvd., Wharton, NJ 07885;  49 West 37th Street, New York, NY 10001 |

**7.** Set forth in detail the name, address and telephone number of all businesses in which the principals of the judgment-debtor now have an interest and set forth the nature of the interest.

| Name | Address | Phone Number |
|------|---------|--------------|
| Loop Design Co., Inc. | Same as above | Disconnected |

Nature of Interest
Affiliated Company

| Name | Address | Phone Number |
|------|---------|--------------|
| Loop Licensing Co., Inc. | Same as above | Disconnected |

Nature of Interest
Affiliated Company

Section "7" continued on attached page

Revised 09/01/2014, CN 11840

7.  Continued

| Name | Address | Phone Number |
|------|---------|--------------|
| Tri-Coastal Design Services LLC | Same as above | Disconnected |

Affiliated Company

_____

| Tri-Coastal Design-Character License LLC | | Disconnected |
|------|------|------|
| | Same as above | |

Affiliated Company

_____

| _ Posh and Pop Online LLC | Same as above | Disconnected |
|------|------|------|

Affiliated Company

Information Subpoena and Written Questions - Questions for Business Entity

**8.** For all bank accounts of the judgment-debtor business entity, list the name of the bank, the bank's address, the account number and the name in which the account is held.  NOTE:  On or about August 24, 2020 Isreal Discount Bank foreclosed on all assets of the judgment-debtor.

| Bank Name | Address |
|---|---|
| Israel Discount Bank of New York | 511 5th Avenue, New York, NY 10017 |

| Account Number | Account Name |
|---|---|
| 1314407 | Tri-Coastal Design Services LLC |

| Bank Name | Address |
|---|---|
| | |

| Account Number | Account Name |
|---|---|
| | |

| Bank Name | Address |
|---|---|
| | |

| Account Number | Account Name |
|---|---|
| | |

**9.** Specifically state the present location of all books and records of the business, including checkbooks.

1 Cardinal Drive, Little Falls, NJ

**10.** State the name and address of the person, persons, or entities who prepare, maintain and/or control the business records and checkbooks.

Name   Company is no longer operating;   Address

the company has no employees.  The books

& records are available thru counsel of record.

**11.** List all physical assets of the business and their location.  If any asset is subject to a lien, state the name and address of the lienholder and the amount due on the lien.  NOTE:  On or about August 24, 2020 Isreal Discount Bank foreclosed on all assets of the judgment-debtor.

Asset  Bank Account (see Section "8" above)   Location
Israel Discount Bank of New York (see address in Section "8")

| Lien | Lien holder name/address | Amount Due |
|---|---|---|
| [X] Yes [ ] No | Israel Discount Bank of New York | $ 4.2MM |

Asset   Location
Judgment-Debtor never owned any other assets.

| Lien | Lien holder name/address | Amount Due |
|---|---|---|
| [ ] Yes [ ] No | . | $ |

Asset   Location

| Lien | Lien holder name/address | Amount Due |
|---|---|---|
| [ ] Yes [ ] No | | $ |

**12.** Does the business own any other real estate?  If yes, state the following for each property:   [ ] Yes   [X] No
(a) Name(s) in which property is owned

| (b) Address of property | (c) Date property was purchased | (d) Purchase price $ |
|---|---|---|

| (e) Name and address of mortgage holder | (f) Balance due on mortgage $ |
|---|---|

Information Subpoena and Written Questions - Questions for Business Entity

**12.** (g) The names and addresses of all tenants and monthly rentals paid by each tenant.

| Name | Address | Monthly Rent |
|------|---------|--------------|
| Not Applicable | | $ |
| | | $ |
| | | $ |
| | | $ |
| | | $ |
| | | $ |

**13.** List all motor vehicles owned by the business, stating the following for each vehicle:   None

(a) Make, model and year        (b) License plate number      (c) Vehicle identification number

(d) If there is a lien on the vehicle, state the name and address of the lienholder       Amount due on lien
$

**14.** List all accounts receivable due to the business, stating the name, address and amount due on each receivable.

| Name | Address | Amount Due |
|------|---------|------------|
| None | | $ |
| NOTE: For purposes of full disclosure, the accounts receivable of the sole member of the Judgment Debtor, namely, Tri-Coastal Design Group Inc., are owned by its lienholder, Israel Discount Bank of New York. | | $ |
| | | $ |
| | | $ |
| | | $ |
| | | $ |
| | | $ |

**15.** For any transfer of business assets that has occurred within six months from the date of this subpoena, specifically identify:

(a) The nature of the asset

Bank Account (see Section "8" above) - was the sole asset of the Judgment Debtor

(b) The date of transfer

On or about August 24, 2020

(c) Name and address of the person to whom the asset was transferred

Israel Discount Bank of New York

(d) The consideration paid for the asset and the form in which it was paid (check, cash, etc.)

Towards repayment of loan

(e) Explain in detail what happened to the consideration paid for the asset

Foreclosed on pursuant to Article 9 of the UCC

Information Subpoena and Written Questions - Questions for Business Entity

**16.** If the business is alleged to be no longer active, set forth:

(a) The date of cessation

August 24, 2020

(b) All assets as of the date of cessation

Sole asset was the bank account listed in Section "8" above.

(c) The present location of those assets

Applied towards loan due to Israel Discount Bank of New York pursuant to Article 9 of the UCC

(d) If the assets were sold or transferred, set forth:   Not applicable

  1. The nature of the assets

  2. Date of transfer

  3. Name and address of the person to whom the assets were transferred

  4. The consideration paid for the assets and the form in which it was paid.

  5. Explain in detail what happened to the consideration paid for the assets:

**17.** Set forth all other judgments that you are aware of that have been entered against you and include:

| Creditor's Name | Creditor's Attorney | Amount Due |
|---|---|---|
| None known of at this time. | | $ |

| Name of Court | | Docket Number |
|---|---|---|
| | | |

| Creditor's Name | Creditor's Attorney | Amount Due |
|---|---|---|
| | | $ |

| Name of Court | | Docket Number |
|---|---|---|
| | | |

## Information Subpoena and Written Questions - Questions for Business Entity

| Creditor's Name | Creditor's Attorney | Amount Due $ |
|---|---|---|
| Name of Court | | Docket Number |

| Creditor's Name | Creditor's Attorney | Amount Due $ |
|---|---|---|
| Name of Court | | Docket Number |

| Creditor's Name | Creditor's Attorney | Amount Due $ |
|---|---|---|
| Name of Court | | Docket Number |

**18.** For all litigation in which the business is presently involved, state:

(a) Date litigation commenced

> Based on knowledge and belief, no other actions pending against the Judgment Debtor

(b) Name of party who started the litigation

(c) Nature of the action

(d) Names of all parties and the names, addresses and telephone numbers of their attorneys

Party Name

| Attorney Name | Attorney Address | Telephone Number |
|---|---|---|

Party Name

| Attorney Name | Attorney Address | Telephone Number |
|---|---|---|

Party Name

| Attorney Name | Attorney Address | Telephone Number |
|---|---|---|

(e) Trial date      (f) Status of case

(g) Name of the court and docket number

Revised 09/01/2014, CN 11840

Information Subpoena and Written Questions - Questions for Business Entity

**19.** State the name, address and position of the person answering these questions:

(a) Name

Michael Mastrangelo

(b) Address

121 Old Chester Rd., Essex Fells, NJ 07021

(c) Position

President

I hereby certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

10/6/2020
_____
Date

_____
Signature

[Note:  Former Appendix XI-K adopted June 29, 1990, effective September 4, 1990; amended July 14, 1992, effective September 1, 1992; redesignated as Appendix XI-L and amended July 13, 1994, effective September 1, 1994; amended July 28, 2004 to be effective September 1, 2004; amended July 22, 2014 to be effective September 1, 2014.]

Revised 09/01/2014, CN 11840