# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

------------------------------------------------------X

WHARTON LH LP,

                    Plaintiff,

                    v.

TRI-COASTAL DESIGN SERVICES, LLC,
TRI-COASTAL DESIGN GROUP, INC.,
TRI-COASTAL DESIGN-CHARACTER
LICENSE, LLC, POSH AND POP ONLINE, LLC,
LOOP DESIGN CO., INC., LOOP LICENSING
CO., MARVIN STUTZ, MICHAEL MASTRANGELO,
DENNIS MASTRANGELO, TODD SOLOMON,
JOHN/JANE DOES 1-10 (fictitious persons), and
ABC CORP. 1-10 (fictitious entities),

Case No.: 2:20-cv-18008-JMV-JBC

------------------------------------------------------X

---

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION TO DISMISS THE AMENDED COMPLAINT
## PURSUANT TO FED.R.CIV.P. § 12(b)(6)

---

Dated:  December 16, 2020

Tedd S. Levine, Esq.
On the brief

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES                                                              i

PRELIMINARY STATEMENT                                                            1

RELEVANT FACTS                                                                   2

LEGAL ARGUMENT                                                                   7

I.   THE AMENDED COMPLAINT IS DEFICIENT ON ITS
     FACE AND MUST BE DISMISSED AS A MATTER OF
     LAW PUSUANT TO FEDERAL RULE OF CIVIL
     PROCEDURE 12(b)(6)                                                          7

     A.  Legal Standard.                                                         7

     B.  Plaintiff fails to plead facts sufficient to demonstrate a
         valid claim of a violation of the New Jersey Uniform
         Fraudulent Transfer Act.                                               9

     C.  Plaintiff fails to plead facts sufficient to demonstrate a
         valid claim for Fraud.                                                 19

     D.  Plaintiff fails to plead facts sufficient to demonstrate a
         valid claim for Unjust Enrichment.                                     28

     E.  Plaintiff fails to plead facts sufficient to demonstrate a
         valid cause of action under the New Jersey Consumer
         Fraud Act, N.J.S.A. 56:8-2 et seq.                                     31

     F.  Plaintiff fails to plead facts sufficient to demonstrate a
         valid cause of action for Civil Conspiracy.                           33

CONCLUSION                                                                      36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Angrisani v. Capital Access Network, Inc.,*
175 Fed.Appx. 554, 556 (3d Cir.2006)                                    20, 25

*Aronsohn & Springstead v. Weissman,*
230 N.J.Super. 63, 552 A.2d 649 (N.J.Super.Ct.App.Div.),
*certif. denied,* 117 N.J. 36, 563 A.2d 808 (1989)                       18

*Ashcroft v. Iqbal,*
556 U.S. 662, 677-78 (2009)                                             7, 8, 9, 28

*Associated Gen. Contractors of Cal. v. California State Council of Carpenters,*
459 U.S. 519, 526 (1983)                                                8

*Atlas Acquisitions, LLC v. Porania, LLC,*
No. 18-CV-17524, 2019 WL 6130774,
at *6 (D.N.J. Nov. 19, 2019)                                            32

*Baraka v. McGreevey,*
481 F.3d 187, 195 (3d Cir. 2007)                                        8, 12, 17, 19, 22, 26

*Bd. of Trustees of Teamsters Local 863 v. Foodtown, Inc.,*
296 F.3d 164, 172 (3d Cir. 2002)                                        35

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544, 550 (2007)                                                7, 8, 9

*Bistrian v. Levi,*
696 F.3d 352, 365 (3d Cir. 2012)                                        8, 9

*Centrum Fin. Servs., Inc. v. Chicago Title Ins. Co.,*
No. CIVA09-3300, 2010 WL 936201,
at *4 (D.N.J. Mar. 12, 2010)                                            32

*Cetel v. Kirwan Financial Group, Inc.,*
460 F.3d 494, 514 (3d Cir. 2006)                                        31, 32

*D & D Assocs., Inc. v. Bd. of Educ. of N. Plainfield,*
No. CIV.A. 03-1026MLC, 2007 WL 4554208,
at *27 (D.N.J. Dec. 21, 2007), aff'd, 552 F. App'x 110 (3d Cir. 2014)    20

|  | **Page(s)** |
|---|---|
| **Cases** | |
| *Darrick Enter. v. Mitsubishi Motors Corp.*, 05–4359, 2007 U.S. Dist. LEXIS 72956, at *7, 2007 WL 2893366 (D.N.J. Sept. 28, 2007) | 19, 20 |
| *Deutsch v. United States*, 67 F.3d 1080, 1085 (3d Cir. 1995) | 9 |
| *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) | 8, 9, 17 |
| *Gant v. Ragone*, No. CV2001727RBKKMW, 2020 WL 6797125, at *9 (D.N.J. Nov. 19, 2020) | 28 |
| *Grudkowski v. Foremost Ins. Co.*, 556 F. App'x 165, 170 (3d Cir. 2014) | 31 |
| *Heffernan v. Hunter*, 189 F.3d 405, 412 n.5 (3d Cir. 1999) | 34 |
| *IDT Telecom, Inc. v. CVT Prepaid Sols., Inc.*, No. CIV.A. 07-1076(GEB), 2009 WL 5205968, at *6 (D.N.J. Dec. 28, 2009) | 32 |
| *Internet Prod. LLC v. LLJ Enterprises, Inc.*, No. CV1815421RBKAMD, 2020 WL 6883430, at *8 (D.N.J. Nov. 24, 2020) | 35 |
| *Leibholz v. Hariri*, No. CV 05-5148 (DRD), 2006 WL 8457502, at *7 (D.N.J. July 13, 2006) | 26 |
| *MSKP Oak Grove, LLC v. Venuto*, 875 F. Supp. 2d 426 (D.N.J. 2012) | 9 |
| *Maniscalco v. Brother Intern. Corp. (USA)*, 627 F. Supp. 2d 494, 505 (D.N.J. 2009) | 28 |
| *Marascio v. Campanella*, 689 A.2d 852 (N.J. App. Div. 1997) | 32 |
| *MaxLite, Inc. v. ATG Elecs., Inc.*, 193 F.Supp.3d 371, 390 (D.N.J. 2016) | 33 |

**Page(s)**

**Cases**

*Morganroth & Morganroth v. Norris, McLaughlin & Marcus,*
331 F.3d 406, 414 (3d Cir. 2003)                                    33

*Morrow v. Balaski,*
719 F.3d 160, 165 (3d Cir. 2013)                    8, 12, 17, 19, 22, 26

*Neitzke v. Williams,*
490 U.S. 319, 327 (1989)                                            9

*New Jersey Citizen Action v. Schering-Plough Corp.,*
367 N.J.Super. 8, 842 A.2d 174, 176 (N.J. App. Div. 2003)          32

*Phillips v. County of Allegheny,*
515 F.3d 224, 234–35 (3d Cir.2008)                               9, 17

*Ponzio v. Mercedes-Benz USA, LLC,*
447 F. Supp. 3d 194, 242 (D.N.J. 2020)                            32

*Pricaspian Dev. Corp. v. Martucci,*
759 F. App'x 131, 135 (3d Cir. 2019)                              10

*State, Dep't of Envtl. Prot. v. Ventron Corp.,*
94 N.J. 473, 468 A.2d 150 (1983)                                  35

*Travelers Cas. & Sur. Co. of Am. v. K.O.O. Constr., Inc.,*
No. 16-CV-00518-JCS, 2017 WL 2473125, at *8 (N.D. Cal. June 8, 2017)   18

*VRG Corp. v. GKN Realty Corp.,*
135 N.J. 539, 641 A.2d 519 (1994)                                 28

*Velis v. Kardanis,*
949 F.2d 78 (3d Cir. 1991)                                        18

*Warren Gen. Hosp. v. Amgen Inc.,*
643 F.3d 77, 84 (3d Cir. 2011)                                     8

*Watson v. Sunrise Sr. Living Servs., Inc.,*
No. CIV.A. 10-230 KM, 2013 WL 103966,
at *13 (D.N.J. Jan. 8, 2013)                                      35

*Werner & Pfleiderer Corp. v. Gary Chem. Corp.,*
697 F. Supp. 808 (D.N.J. 1988)                                    26

|  | **Page(s)** |
|---|---|
| **Cases** |  |
| *Werwinski v. Ford Motor Co.,* |  |
| 286 F.3d 661, 675-81 (3d Cir. 2002) | 27 |
|  |  |
| *World Express & Connection, Inc. v. Crocus Investments, LLC*, |  |
| No. CV158126KMMAH, 2020 WL 5088633, |  |
| at *20 (D.N.J. Aug. 28, 2020) | 34 |
|  |  |
| **Statutes** |  |
| 26 CFR § 1.856-10(f)(2) | 30 |
| Article 9 of the UCC | 15, 16, 17 |
| Federal Rule of Civil Procedure 8(a) | 7 |
| Federal Rule of Civil Procedure 9(b) | 35 |
| Federal Rule of Civil Procedure 12(b)(6) | 8, 36 |
| N.J.S.A. § 25:2–25(a) | 9 |
| N.J.S.A. § 56:8-1 | 32 |
| N.J.S.A. § 56:8–2 | 31, 33, 34 |
| New Jersey Uniform Fraudulent Transfer Act ("NJUFTA") | 9 |
| New Jersey Consumer Fraud Act, ("NJCFA") | 31, 32, 33 |
| UCC § 9-609 | 16, 17, 26 |
| UCC § 9-610 | 15, 16, 17, 26 |
| UCC § 9-611(b) | 15, 26 |
| UCC § 9-611(c) | 15, 16, 26 |
| UCC § 9-617(a) | 16, 17, 26 |

**PRELIMINARY STATEMENT**

While the Court is required at this stage of the litigation to accept Plaintiff's factual contentions as true, it should not accept Plaintiff's unsupported conclusions and unwarranted inferences, adhere to legal conclusions couched as factual allegations, or permit mere conclusory allegations to proceed.   Here, Plaintiff attempts to spin a story of Defendants' deceit aimed at depriving it of its rent but leaves gaping holes causing the Amended Complaint to be fatally flawed. To be clear, Defendants are not asking the Court to omit Plaintiff's facts, or otherwise correct them, but to recognize, despite setting forth a plethora of allegations, Plaintiff actually leaves many voids that need to be filled to rectify unreasoned conclusions.  Defendants are also requesting that the Court apply relevant and prevailing legal tenets which have been disregarded or misapplied by Plaintiff when considering the purported claims.

In a nutshell, Plaintiff suggests there was a systematic dissipation and transfer of assets in an effort to evade a debt owed by Tri-Coastal Services (the tenant) to Plaintiff.  Plaintiff claims that Defendants achieved that aim by selling off some of their assets to Israel Discount Bank of New York ("IDB"), and surreptitiously hiding the sale.  To support those suppositions, Plaintiff looks to the loan agreement that Company Defendants entered into with IDB, but fails to exactly consider when such arrangement commenced, IDB's rights under such agreement, and established law.   For example, Plaintiff ignores that each of the Company Defendants are jointly and severally liable to IDB and that IDB had a perfected security interest under the UCC that gives it the right to foreclose under certain conditions.  It should be also noted that Plaintiff fails to consider that at the time of the foreclosure, Company Defendants owed greater than $10MM to IDB and $40MM to its unsecured creditors.   Clearly, Plaintiff is not entitled to a preferential transfer.  Also disregarded is that the combined assets of all Company Defendants were considerably below the

1

amount due IDB.  Thus, the whole premise of Plaintiff's lawsuit that Defendants inconspicuously contrived a scheme aimed at preventing Plaintiff from collecting its rent by entering into the IDB loan and security agreement (which was Tri-Coastal Services' only source of funds),  Company Defendants shifted their assets among Company Defendants and away from Tri-Coastal Services, and Company Defendants ultimately "sold" all such assets to IDB, is not only implausible when considering all facts and laws germane to the matter but, frankly, delusional.

Consistent with the above, the Amended Complaint is laden with other farfetched conclusions that supposedly confirm a fraudulent conspiracy hatched by Defendants to deprive Plaintiff of its rent.  Again, the Amended Complaint is missing key factual allegations, fails to consider relevant aspects of the law, reaches unwarranted inferences, and adheres to legal conclusions couched as factual allegations.

Such matters are addressed more fully below.

### RELEVANT FACTS

On or about April 27, 2007, defendants Tri-Coastal Design Group, Inc. ("Tri-Coastal Group"), Loop Design Co., Inc. ("Loop Design"), Loop Licensing Co., Inc. ("Loop Licensing"), Tri-Coastal Design Services, LLC ("Tri-Coastal Services"), and Tri-Coastal Design-Character License, LLC ("Tri-Coastal Character") (collectively, "Company Defendants") entered into a loan and security agreement with Israel Discount Bank of New York ("IDB") to finance such entities operations.  To secure such financing, Company Defendants granted IDB Uniform Commercial Code ("UCC") liens on all their business assets; IDB perfected such liens by filing UCC Financing Statements.  The Company Defendants are jointly and severally obligated for all debts owed to IDB under the loan and security agreement.  *See* Levine Dec., ¶2, Ex. A; *see also,* Levine Dec., ¶9, Ex. H.

Tri-Coastal Group is the sole member of Tri-Coastal Services and Tri-Coastal Character; Loop Design and Loop Licensing are affiliated companies.

Tri-Coastal Services was formed on December 23, 2008.  Tri-Coastal Services' sole source of funds is from a management fee that was paid from loans made by IDB; it never purchased or sold any goods.  *See* Levine Dec., ¶3, Ex. B.

On or about January 19, 2010, Tri-Coastal Services and The Realty Associates Fund VIII, L.P. ("Realty Associates"), predecessor to Plaintiff Wharton LH LP, entered into a lease agreement (the "Lease") whereby Tri-Coastal Services agreed to lease from Realty Associates 180,000 square feet of commercial space. *See* **Ex. A**, Amend. Comp.

On or about November 30, 2010, defendants Tri-Coastal Group, Loop Design, Loop Licensing, Tri-Coastal Services, and Tri-Coastal Character entered into a restated and amended loan and security agreement with IDB to continuing the financing of such entities.  The UCC liens previously granted to IDB were extended.  The Company Defendants are jointly and severally obligated for all debts owed to IDB under the restated loan and security agreement. *See* Levine Dec., ¶4, Ex. C, p.2.

Defendant Posh and Pop Online, LLC ("Posh & Pop") was formed on February 7, 2017; such entity is included herein as one of the "Company Defendants".

On or about August 24, 2017, defendants Tri-Coastal Group, Loop Design, Loop Licensing, Tri-Coastal Services, Tri-Coastal Character, and Posh & Pop entered into a further restated and amended loan and security agreement with IDB to continue the financing of such entities.  *See* ¶61, Amend Comp.  The UCC liens previously granted to IDB were extended. The Company Defendants are jointly and severally obligated for all debts owed to IDB under the restated loan and security agreement. *See* Levine Dec., ¶4, Ex. C.

Through the end of calendar year 2017, Company Defendants were substantially profitable. *See* Levine Dec., ¶3, Ex. B.

Commencing 2018, Company Defendants began experiencing operational losses due to production problems with certain of its suppliers from China and the imposition of Tariff's by the United States government on Chinese imports. *See* ¶47a, Amend. Comp.   The tariff's caused Tri-Coastal to lose significant sales margin, experience cash flow problems, and incur substantial demurrage costs.   These financial issues continued into 2020 causing Company Defendants to default under its loan and security agreement with IDB and to become significantly in arrears with its unsecured suppliers and landlords.

Commencing 2019, Company Defendants commenced an aggressive campaign to find investors and an alternative lender.   *See* ¶47b, Amend. Comp.   With regard to such an effort, Company Defendants retained consultants and investment bankers; a business plan was created that included significant cost reductions and debt relief from unsecured creditors.   In view of such effort, IDB was willing to forbear for a certain period of time from foreclosing on its UCC liens.

On or about January 3, 2020, Plaintiff and Company Defendants negotiated  and entered into an amendment to the lease agreement ("Amended Lease").   *See* **Ex. B**, Amend. Comp.

In or about February 2020, the Covid 19 Pandemic began impacting the United States.   The Pandemic caused nationwide retailers to close and international supply chains for goods to tighten. These events caused Company Defendants the final blow in their chances to turnaround their business.   *See* ¶36, Amend. Comp.   Nonetheless, Company Defendants continued to aggressively pursue alternative financing and potential investors.

In or about March, 2020, IDB stopped virtually all lending to Company Defendants under the August 24, 2017 restated loan and security agreement.

Since March, 2020, the New Jersey Supreme Court placed a moratorium on all residential and commercial eviction cases in the State of New Jersey.

On May 1, 2020, Plaintiff filed an action in the Superior Court of New Jersey, Law Division, Morris County, Docket No. MRS-L-000978-20, to recover unpaid rent under the Lease. *See* ¶52, Amend. Comp.

On or about May 6, 2020, Tri-Coastal Group entered into a term note with PNC Bank under the "Paycheck Protection Program" ("PNC Term Note"). *See* ¶47c, Amend. Comp. The funds loaned to Tri-Coastal Group were used by management in their commercially reasonable judgment to do what they deemed necessary to enable its business to continue to operate. Nothing in the Term Note required Tri-Coastal Group to fund Tri-Coastal Services or to pay rent to Plaintiff. *See* Levine Dec., ¶5, Ex. D.

IDB's UCC lien covered Tri-Coastal Group's funds held at PNC bank.

Tri-Coastal Group, was a tenant of office and showroom space located at 49 West 37th Street, New York, NY. The landlord for the New York location is entirely unrelated to Plaintiff. Tri-Coastal Group did make rent payments to the New York landlord from funds it borrowed under the PNC Term Note. Tri-Coastal Group continues to owe such landlord unpaid rent.

On July 1, 2020, Plaintiff filed an action in the Superior Court of New Jersey, Law Division, Special Civil Part (Landlord/Tenant), Morris County, Docket No. MRS-LT 001050-20, to evict Tri-Coastal Services. *See* ¶57, Amend. Comp.

On or about August 24, 2020, IDB and Company Defendants entered into an agreement whereby Company Defendants surrendered, delivered, granted, and turned over to IDB, as secured party, peaceful possession of all of their assets (the "Peaceful Possession Agreement") pursuant to

Article 9 of the UCC.[1]   IDB had the unequivocal right to take ownership of all such assets due to its UCC liens and Company Defendants' multiple defaults under the August 24, 2017 restated loan and security agreement.  The unpaid loan amount owed to IDB at the time of the foreclosure was $10,164,401.49.  *See* ¶70, Amend Comp.  On that same day, IDB sold certain of the assets it foreclosed on to a third-party investor group located in Italy.   The sale price of those assets was $1,787,413.35, which was applied against the amount Company Defendants owed IDB under the August 24, 2017 restated loan and security agreement.  *See* ¶71, Amend Comp.  Company Defendants owes approximately $40,000,000 to its unsecured creditors (which includes Plaintiff). *See* Levine Dec., ¶¶6 and 7, Ex. E and Ex. F.

On September 23, 2020, the Superior Court of New Jersey, Law Division, Morris County so-ordered a Consent Judgment entered into by the parties against Tri-Coastal Services for the unpaid rent and expenses.  *See* **Ex. C**, Amend. Comp.

The last rent payment to Plaintiff that Tri-Coastal Services was able to fund from a loan made by IDB under the August 24, 2017 restated loan and security agreement was for the month of February, 2020. Plaintiff was paid March, 2020 rent from a standby letter of credit that Tri-Coastal Services provided to Plaintiff as security under the Lease. *See* **Ex. C**, Amend. Comp.

On September 16, 2020, the parties entered into a Consent Judgment whereby Tri-Coastal Services consented to vacate the premises by September 30, 2020. *See* **Ex. D**, Amend. Comp.

The individual defendants include Michael Mastrangelo, Marvin Stutz, Dennis Mastrangelo, and Todd Solomon ("Individual Defendants").  None of the Individual Defendants are parties to the Lease.

---

[1] Litigation would have been the alternative to entering into a Peaceful Possession Agreement which would have resulted in a substantial dissipation of Company Defendants' assets and likely the same outcome.

Michael Mastrangelo, owns 60% of Company Defendants and served as their President.

Marvin Stutz, owns 40% of Company Defendants and served as Tri-Coastal Group's Vice President.

Dennis Mastrangelo, has no ownership interests in Company Defendants and served as their Chief Operating Officer.

Todd Solomon, has no ownership interests in Company Defendants and served as their Chief Financial Officer until January, 2020.

Neither Michael Mastrangelo nor Marvin Stutz have received any compensation or distributions of any kind from Company Defendants since March, 2020. Attempting to keep the business from failing, during 2019 and 2020, both Michael Mastrangelo and Marvin Stutz loaned and contributed over $8,500,000 to the capital of Company Defendants. Such amount remains unpaid and is part of Company Defendants unsecured debt.

## LEGAL ARGUMENT

**I.   THE AMENDED COMPLAINT IS DEFICIENT ON ITS FACE AND MUST BE DISMISSED AS A MATTER OF LAW PUSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6).**

### A. <u>Legal Standard</u>.

The Supreme Court holds that the pleading standard of Rule 8(a) requires that the complaint set forth "a short and plain statement of the claim showing that the pleader is entitled to relief in order to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 550 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009). While the complaint may be short and plain, it must also state facts that at least raise a right above a speculative level. *Twombly,* 550 U.S. at 555.

Federal Rule of Civil Procedure 12(b)(6) provides that a cause of action shall be dismissed if a complaint fails "to state a claim upon which relief can be granted." "To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.' " *Twombly,* 550 U.S. at 570. "Under Rule 12(b)(6), a motion to dismiss may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court finds the plaintiff's claims lack facial plausibility." *Warren Gen. Hosp. v. Amgen Inc*., 643 F.3d 77, 84 (3d Cir. 2011) (citing *Twombly*, 550 U.S. at 555–56). Although a court must accept the fact allegations in a complaint as true, it is not compelled to accept "unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013) (quoting *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007)). Additionally, a court need not assume that a plaintiff can prove facts that the plaintiff has not alleged. *Associated Gen. Contractors of Cal. v. California State Council of Carpenters*, 459 U.S. 519, 526 (1983).

Pleading standards have shifted from simple notice pleading to a more heightened form of pleading, requiring a plaintiff to plead more than the possibility of relief to survive a motion to dismiss. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). The Third Circuit requires a three-step analysis to meet the plausibility standard mandated by *Twombly* and *Iqbal*. First, the court should "outline the elements a plaintiff must plead to a state a claim for relief." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012). Next, the court should "peel away" legal conclusions that are not entitled to the assumption of truth. *Id*.; see also *Iqbal*, 556 U.S. at 678-79 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). It is well-established that a proper complaint "requires more than labels and

conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.  Finally, the court should assume the veracity of all well-pled factual allegations, and then "determine whether they plausibly give rise to an entitlement to relief." *Bistrian*, 696 F.3d at 365 (*quoting* Iqbal, 556 U.S. at 679). A claim is facially plausible when there is sufficient factual content to draw a "reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The third step of the analysis is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

A frivolous complaint is one which is either based upon an indisputably meritless legal theory or based upon factual contentions which are clearly baseless (such as when the factual scenario described is fanciful or delusional).   *Neitzke v. Williams*, 490 U.S. 319, 327 (1989); *Deutsch v. United States*, 67 F.3d 1080, 1085 (3d Cir. 1995).  Here, Plaintiff set forth a plethora of factual detail, but the factual detail does not show an entitlement to relief that is plausible; in fact, such detail is actually "delusional" when consideration is given to missing facts and legal principles. *Id., see also, Fowler v. UPMC Shadyside,* 578 F.3d 203, 211 (3d Cir.2009) (citing *Phillips v. County of Allegheny,* 515 F.3d 224, 234–35 (3d Cir.2008)).

**B.  <u>Plaintiff fails to plead facts sufficient to demonstrate a valid claim of a violation of the New Jersey Uniform Fraudulent Transfer Act</u>.**

Two elements must be alleged and proven to prevail on an intentional fraudulent transfer claim under the New Jersey Uniform Fraudulent Transfer Act (NJUFTA): (1) Debtor or person making a conveyance has put some asset beyond reach of creditors which would have been available to creditors at some point in time but for the conveyance, and (2) Debtor transferred property with an intent to defraud, delay, or hinder the creditor. N.J.S.A. 25:2–25(a).  See *MSKP*

*Oak Grove, LLC v. Venuto*, 875 F. Supp. 2d 426 (D.N.J. 2012); see also, *Pricaspian Dev. Corp. v.*

*Martucci*, 759 F. App'x 131, 135 (3d Cir. 2019).

To support its claim, Plaintiff alleges the following:

o   Tri-Coastal Services, with the approval and participation of all Defendants, collected the revenue and then transferred the revenue outside of the company … in an attempt to render Tri-Coastal Services judgment-proof vis-à-vis Wharton. *See* ¶36, Amend Comp.

o   Such transfers were done before, immediately after and during the time period that Tri-Coastal Services was incurring a substantial debt obligation to Wharton, and such transfers were concealed from Wharton. *See* ¶37, Amend Comp.

o   Tri-Coastal Services, with the approval and participation of all Defendants, made the concealed transfer of capital and other things of value with knowledge that a collection and/or eviction lawsuit was likely to be filed ... *See* ¶38, Amend Comp.

o   During the fall of 2019 through to and including the present, Defendants escalated their efforts at causing Tri-Coastal Services to be judgment proof, working together … to maximize the transfers of assets and other things of value from Tri-Coastal Services to the other Defendants. *See* ¶44, Amend Comp.

o   Upon information and belief, sometime after the commencement of the Lease, the Company Defendants entered into a lender/borrower relationship with the Israel Discount Bank of New York ("IDBNY"). *See* ¶60, Amend Comp.

o   Defendants hid the Loan Agreement from Wharton. *See* ¶62, Amend Comp.

o   At the time of the Loan Agreement Tri-Coastal Services was already subject to the Lease and the financial obligations contained therein. *See* ¶63, Amend Comp.

o   Upon information and belief, Defendants structured the Loan Agreement in such a way to: (a) subject Tri-Coastal Services to the debts of the other Company Defendants and (b) subject the other Company Defendants to the revenue, assets, and other things of value belonging to Tri-Coastal Services. In so doing, Defendants structured the Loan Agreement in such a way as to frustrate Tri-Coastal Services' ability to pay its obligations pursuant to the Lease with Wharton. *See* ¶64, Amend Comp.

o   On September 11, 2020 (twelve (12) days before Tri-Coastal Services executed the Consent Judgment in the Breach Litigation), Tri-Coastal Services and Stutz disclosed for the first time that the IDBNY supposedly took ownership of all of Tri-Coastal Services' assets and, through a private sale, sold them to a third party incorporating and existing under the laws of Italy. *See* ¶65, Amend Comp.

o   On or about September 15, 2020, Tri-Coastal Services' and Stutz provided for the first time a document titled "Secured Party Bill of Sale," dated August 24, 2020 (the "Bill of Sale"), which purported to memorialize what occurred with the IDBNY. Tri-Coastal Services and Stutz refused to provide any additional documents concerning the same. *See* ¶68, Amend Comp.

o   Tri-Coastal Services and Stutz, with the approval and participation of Defendants, failed to disclose that Tri-Coastal Services had retained the Excluded Assets. *See* ¶76, Amend Comp.

o   Tri-Coastal Services and Stutz, with the approval and participation of Defendants, failed to disclose that Tri-Coastal Services had also retained certain valuable Soft Assets (defined below), which it subsequently transferred to the other Defendants for no value. *See* ¶77, Amend Comp.

o   As noted above, Tri-Coastal Services, with the approval and participation of Defendants, and without receiving value in return, transferred assets, revenue, and other things of value, to Defendants, thereby minimizing the assets of Tri-Coastal Services from Wharton's ability to collect. *See* ¶79, Amend Comp.

o   Upon information and belief, Tri-Coastal Services began, at least as early as the fall of 2019, with the approval and participation of Defendants, to accelerate the shift in revenue, assets, and other things of value to the rest of the Defendants, without receiving value in return. Such transfers were done in a concealed manner …. *See* ¶80, Amend Comp.

o   None of the revenue earned by Tri-Coastal Services from February 2020 through October 1, 2020, was paid to Wharton. Instead, upon information and belief Tri-Coastal Services … used the revenue for Defendants without receiving anything of value. *See* ¶83, Amend Comp.

o   Upon information and belief, Tri-Coastal Services, with the approval and participation of Defendants, (a) transferred revenue, assets, and other things of value to the Company Defendants and Individual Defendants (or for their benefit) and/or (b) transferred revenue, assets, and other things of value to the Fictitious Defendants (or for their benefit). Tri-Coastal Services did not receive value for such transfers. *See* ¶84, Amend Comp.

o   Defendants, working together and separately for a shared goal and purpose, engaged in, directed, and/or implemented, a series of financial and other transactions designed to divert, transfer, and assign revenue, assets and other things of value away from Tri-Coastal Services … Tri-Coastal Services did not receive reasonably equivalent value for such diversions, transfers, and/or assigns. *See* ¶87, Amend Comp.

o   Upon information and belief, Tri-Coastal Services transferred its assets to the other Defendants. Such transfers were done before and during the time period that Tri-Coastal Services was incurring a substantial debt obligation to Wharton, and such transfers were concealed from Wharton. *See* ¶90, Amend Comp.

o Absent from the Information Subpoena response is any mention of any of the "Excluded Assets" from the Bill of Sale, including accounts receivable, any cash on hand (including SBA loan), or the $1.2 million collateral alleged being held by Avalon Risk Management. *See* ¶95, Amend Comp.

o Upon information and belief, Tri-Coastal Services has provided the Soft Assets to Defendants for no value. Tri-Coastal Services has done so with knowledge that it is indebted to Wharton. *See* ¶102, Amend Comp.

o Defendants have conspired to transfer the Soft Assets from Tri-Coastal Services to Defendants as part of attempting to frustrate Wharton's collection of debts owed under the Lease and Judgment. *See* ¶104, Amend Comp.

o On January 18, 2020, fifteen (15) days after Tri-Coastal Services entered into the Amended Lease and after numerous misrepresentations made by Stutz to Wharton, Stutz executed a Trust Transfer Deed and other real estate documents which were recorded in title (the "Stutz Property Transfer"). *See* ¶107, Amend Comp.

o In the Stutz Property Transfer, Stutz transferred his interest in real property to the Marvin A. Stutz Declaration of Trust dated January 18, 2020, for no consideration. *See* ¶108, Amend Comp.

o M. Mastrangelo's actions with respect to the Company Defendants and with respect to the Bill of Sale were designed, in part, to protect the M. Mastrangelo Property from foreclosure by the IDBNY. *See* ¶115, Amend Comp.

o Stutz and D. Mastrangelo's actions with respect to the Company Defendants and with respect to the Bill of Sale were designed, in part, to protect their respective mortgaged real properties from foreclosure by the IDBNY. *See* ¶117, Amend Comp.

Plaintiff's factual allegations, albeit mostly false, even if accepted as true, lead to bogus inferences of wrong doing. Although a court must accept the fact allegations in a complaint as true, it is not compelled to accept "unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Morrow*, 719 F.3d at 165 (quoting *Baraka*, 481 F.3d at 195). The facts alleged in the Amended Complaint that purportedly support this cause of action are broken down into the following categories:

1. Tri-Coastal Services transferred all of its revenue and assets to other parties in an attempt to circumvent paying Plaintiff.  *See* ¶¶36, 37, 38, 44, 79, 80, 83, 84 & 90, Amend Comp.

2. The loan agreement entered into with IDB was part of a scheme to divert assets away from Plaintiff.  *See* ¶¶60, 63, 64 & 68, Amend Comp.

3. Defendants hid assets from Plaintiff by not disclosing the IDB loan agreement and IDB's foreclosure of its UCC liens.  *See* ¶¶62 & 65, Amend Comp.

4. The "Excluded Assets" listed in the Bill of Sale, including the so-called "Soft Assets", were owned by Tri-Coastal Services and diverted to third-parties to avoid paying Plaintiff. *See* ¶¶76, 77, 102 & 104, Amend Comp.

5. Michael Mastrangelo and Marvin Stutz diverted their personal real estate in an attempt to avoid paying Plaintiff. *See* ¶¶107, 108, 115 & 117, Amend Comp.

*Plaintiff's recitation of the facts leads*
*to a bogus inference that a conveyance occurred*
*which prevents Plaintiff from being paid rent*

The underlying assumption that leads Plaintiff to conclude that Tri-Coastal Services transferred all of its revenue and assets to other parties in an attempt to circumvent paying Plaintiff is based upon a specious inference that this company earned any revenue from outside sources and had any assets.   Tri-Coastal Group is the sole member of Tri-Coastal Services and Tri-Coastal Character.  Tri-Coastal Services was formed on December 23, 2008 with its sole source of funds coming from loans made by IDB; since inception, it never purchased or sold any goods.  *See* Levine Dec., ¶3, Ex. B.  The company was established to provide warehouse and office services to the other Company Defendants.  In consideration for providing such services, Tri-Coastal Services  received a management fee funded pursuant to the IDB loan and security agreement. This management fee served to cover its expenses, including rent.  When IDB refused to provide

any further loans to Company Defendants, Tri-Coastal Services was unable to pay rent to Plaintiff. Thus, having no outside revenue or assets, it is plainly wrong to infer that any transfer occurred or could have occurred by Tri-Coastal Services to prevent Plaintiff from being paid.

*Plaintiff wrongly infers the IDB loan and security agreement was purposefully aimed at diverting funds and hindering Plaintiff from being paid its rent*

The inference that the loan and security agreement entered into with IDB was part of a scheme to divert assets away from Plaintiff is purely a fallacy.  As part of a combined group of companies, IDB first entered into the loan and security agreement on about April 27, 2007, whereby IDB acquired UCC liens on all the assets of Tri-Coastal Group, its subsidiaries (which includes Tri-Coastal Services) and affiliated companies. *See* Levine Dec., ¶2, Ex. A.  Not until on or about January 19, 2010, did Tri-Coastal Services and Realty Associates, predecessor to Plaintiff, enter into the Lease.  *See*, **Ex A**, Amend. Comp.  Since the IDB loan agreement was signed almost three years *before* the Lease was entered into, it makes absolutely no sense to infer that the loan agreement was entered into for the purpose of preventing Plaintiff from being paid rent.  While the Amended Complaint recognizes the 2017 restated and amended IDB loan and security agreement (*see* ¶61, Amend Comp.), it fails to consider that the arrangement was initially entered into in 2007.

As noted above, having no outside revenue or assets, it is clear that Tri-Coastal Services only had the capability to receive funds from loans made by IDB and pay rent because it was affiliated with Company Defendants and a party to the IDB loan and security agreement. Therefore, it is fanciful for Plaintiff to infer that any transfer occurred (or could have occurred) among Company Defendants to prevent Plaintiff from being paid as a result of how the IDB loan

14

and security agreement was structured.   It is commonplace that as a condition to enter into such a loan agreement, lenders require that they be granted a perfected security interest on *all* the assets of the borrowers and holding such borrowers jointly and severally liable.   Thus, regardless how funds were credited to the borrowers, IDB had an absolute right to take ownership and possession all of them in the event of a default.

Plaintiff's additional conclusion that Defendants hid assets from Plaintiff by not making prior disclosure of the IDB loan agreement and IDB's foreclosure on its UCC liens is based on several false premises: (1) Defendants had a legal obligation to disclose such matters; (2) entering into the IDB loan and security agreement was a conveyance aimed at diverting funds from Plaintiff; and (3) Plaintiff had no knowledge, actual or constructive, of Company Defendants arrangement with IDB.

<u>Defendants had no legal obligation to disclose such matters to Plaintiff</u>.   Despite Plaintiff inferring otherwise, nothing in the law or the Lease required Tri-Coastal Services to advise Plaintiff of or otherwise get Plaintiff to consent to its decision to enter into the IDB loan and security agreement.   The truth is, without such loan facility, Tri-Coastal Services could not have paid Plaintiff any rent.  Furthermore, nothing in the law required Defendants to advise Plaintiff of IDB's decision to foreclose on and later sell Tri-Coastal Services' assets.  As far notifying Plaintiff of IDB's intent to foreclose on Company Defendants' assets, and ultimate sale of certain of those assets to a third-party, Article 9 of the UCC provides that … a secured party that disposes of collateral under Section 9-610 shall send to the persons specified in subsection (c) a reasonable authenticated notification of disposition. UCC § 9-611(b).   Subsection (c) provides that to comply with subsection (b), the secured party shall send an authenticated notification of

disposition to: (1) the debtor; (2) any secondary obligor; and (3) if the collateral is other than consumer goods: (A) any other person from which the secured party has received, before the notification date, an authenticated notification of a claim of an interest in the collateral; (B) any other secured party … UCC § 9-611(c).[2]   Plaintiff does not fall into any of those categories.

Entering into the IDB loan and security agreement was not a conveyance nor was such an arrangement aimed at diverting funds from Plaintiff.   Plaintiff wrongly assumes that Tri-Coastal Services' participation as a borrower in the IDB loan and security agreement gave rise to a conveyance of its revenue and assets.   As noted above, having no outside revenue or assets, Tri-Coastal Services only had the ability to receive funds and pay rent because it was affiliated with Company Defendants.   In addition, the IDB loan and security agreement was initially entered into in 2007, or three years before the Lease.   The reality is that the IDB loan and security agreement did not act as a conveyance but actually as a source of assets for Tri-Coastal Services.

Plaintiff had prior knowledge, actual and constructive, of Company Defendants arrangement with IDB.   Although Plaintiff concludes it had no information to know of the IDB loan and security agreement, since inception of the Lease, Plaintiff had actual knowledge of Tri-Coastal Services' relationship with IDB.   As stated in the Consent Judgment, which is referenced in the Amended Complaint (*see* Amend. Comp., **Ex. C**), the letter of credit Plaintiff accepted as security under the Lease was issued by IDB.   Moreover, IDB's liens in all of Company Defendants'

---

[2] The following UCC Article 9 provisions are also noteworthy:  After default, a secured party  (1) may take possession of the collateral …  UCC § 9-609.  After default, a secured party may sell, lease, license, or otherwise dispose of any or all of the collateral in its present condition or following any commercially reasonable preparation or processing. UCC § 9-610.   A secured party's disposition of collateral after default: (1) transfers to a transferee for value all of the debtor's rights in the collateral; …. UCC § 9-617(a), Rights of Transferee of Collateral.

assets have been publicly filed since 2007 (or approximately three years before the Lease was entered into).

The inference Plaintiff makes that the "Excluded Assets" listed in the Bill of Sale, including the so-called "Soft Assets", were owned by Tri-Coastal Services and diverted to third-parties to avoid paying Plaintiff is a blatant disregard and contradiction of what the documents referenced in the Amended Complaint and the law provides. As discussed above, IDB acquired such ownership when it foreclosed on its UCC liens in all Company Defendants' assets, including the "Excluded Assets" and so-called "Softs Assets", pursuant to Article 9 of the UCC. *See* UCC §§ 9-609; 9-610; and 9-617(a). Such assets were never owned by Tri-Coastal Services. Again, the Court should not accept such unsupported conclusions and unwarranted inferences couched as factual allegations, Plaintiff disregarding facts that are referenced in the Amended Complaint, and contradictory conclusions. See *Morrow,* 719 F.3d at 165 (quoting *Baraka*, 481 F.3d at 195).

It is also noteworthy that Plaintiff's whole premise that "[t]he Bill of Sale evidences that on August 24, 2020 (after the Breach Litigation had commenced, and a matter of weeks before Tri-Coastal signed the Judgment), the Company Defendants ***sold*** their assets to the IDBNY" (emphasis added) (*see* ¶69, Amend Comp.) is fallacious. As documented, pursuant to Article 9 of the UCC, IDB ***foreclosed*** on such assets as a matter of right.

Lastly, to suggest that Michael Mastrangelo and Marvin Stutz diverted their personal real estate in an attempt to avoid paying Plaintiff is beyond the bounds of unsupported conclusions and unwarranted inferences and is actually "delusional". See, *Fowler,* 578 F.3d at 211 (citing *Phillips,* 515 F.3d at 234–35). The inference that Mr. Stutz "on January 18, 2020, fifteen (15) days after Tri-Coastal Services entered into the Amended Lease … executed a Trust Transfer

Deed" (*see* ¶107, Amend Comp.) to "transfer[ ] his interest in real property … for no consideration" (*see* ¶108, Amend Comp.) to circumvent paying Plaintiff, fails to consider (1) although the Court is obligated to accept Plaintiff's allegations as true, such trust was actually formed on January 18, 20**10**[3] (*see* Levine Dec., ¶8, Ex. G), and (2) even if such date is accepted by the Court, the trust at issue is revocable and was formed for estate planning purposes.   Here, it is somewhat unclear whether California or New Jersey law applies since the trust at issue was formed under the laws of the State of California.   Under the laws of either state, however, it is evident that revocable trusts do not protect the settlor of a trust (in this case Mr. Stutz) from his creditors.   See *Travelers Cas. & Sur. Co. of Am. v. K.O.O. Constr., Inc.*, No. 16-CV-00518-JCS, 2017 WL 2473125, at *8 (N.D. Cal. June 8, 2017)(It is not controversial that judgment creditors can reach assets held in a revocable trust.); see also, *Aronsohn & Springstead v. Weissman,* 230 N.J.Super. 63, 552 A.2d 649 (N.J.Super.Ct.App.Div.), *certif. denied,* 117 N.J. 36, 563 A.2d 808 (1989); see also, *Velis v. Kardanis*, 949 F.2d 78 (3d Cir. 1991)("There is ... a strong public policy that will prevent any person from placing his property in what amounts to a revocable trust for his own benefit which would be exempt from the claims of his creditors.").

If the above isn't reason enough to discard the claim, the underlying allegations suggesting Stutz anticipated he would be accused of being liable under the Lease causing him to transfer assets is vacuous. Mr. Stutz is neither a guarantor nor a party to the Lease, he acted strictly in his capacity as an officer of a company, and the claim of fraud being alleged against him is bogus (see discussion below).   Consequently, the idea that Mr. Stutz transferred his real estate into such a trust to prevent him from having to pay Plaintiff rent is truly unfounded.

---

[3] The trust was amended and restated in 2013, or seven years before the Lease was entered into. *See* Levine Dec., ¶8, Ex. G.

Equally, to consider the discharge of a mortgage held strictly by IDB as security for the guarantor's obligations to pay the loan as a fraudulent transfer is based upon an unsupported conclusion and unwarranted inference as well as an incorrect legal conclusion couched as a fact. See *Morrow,* 719 F.3d at 165 (quoting *Baraka*, 481 F.3d at 195). The real estate at issue was pledged as collateral to IDB to induce IDB to continue to make loans to Company Defendants (including Tri-Coastal Services) when the company hit hard times. All such real estate collateral was pledged by Michael Mastrangelo. In conjunction with IDB's foreclosure on its UCC liens, it discharged the mortgage it held on one such property. Such collateral was never available to unsecured creditors and IDB's decision to release it had zero effect on Plaintiff. Likewise, as noted above relating to Mr. Stutz, Mr. Mastrangelo is neither a guarantor nor a party to the Lease, he acted strictly in his capacity as an officer of a company, and the claim of fraud being alleged against him is bogus (see discussion below). Consequently, the idea that Mr. Mastrangelo transferred his real estate into such a trust to prevent him from having to pay Plaintiff rent is truly baseless.

For the reasons stated, Plaintiff's claim under the New Jersey Uniform Fraudulent Transfer Act should be dismissed in its entirety.

**C. <u>Plaintiff fails to plead facts sufficient to demonstrate a valid claim for Fraud</u>.**

The Amended complaint merely alleges "fraud". Nonetheless, the same legal standard governs common law fraud, fraudulent inducement, and fraudulent misrepresentation claims. *Darrick Enter. v. Mitsubishi Motors Corp.,* 05–4359, 2007 U.S. Dist. LEXIS 72956, at *7, 2007 WL 2893366 (D.N.J. Sept. 28, 2007). To establish a fraud claim under New Jersey law, a plaintiff must show that (1) the defendant made a material misrepresentation of

a currently existing or past fact, (2) the defendant knew or believed the statement was false, (3) the defendant intended for the plaintiff to rely on the misrepresentation, (4) the plaintiff relied on the misrepresentation, and (5) the plaintiff was damaged. *Angrisani v. Capital Access Network, Inc.,* 175 Fed.Appx. 554, 556 (3d Cir.2006); *see Darrick Enter.,* 2007 U.S. Dist. LEXIS 72956, at *7, 2007 WL 2893366. See *D & D Assocs., Inc. v. Bd. of Educ. of N. Plainfield*, No. CIV.A. 03-1026MLC, 2007 WL 4554208, at *27 (D.N.J. Dec. 21, 2007), aff'd, 552 F. App'x 110 (3d Cir. 2014).

Plaintiff's claim of fraud is based on the allegation that "Defendants, individually and through other Defendants, knowingly made false or misleading statements, or failed to make statements necessary to prevent Plaintiff from being misled, as to material facts about the Lease, Lease Amendment, rent owed, intention to repay Plaintiff, their occupancy of the Property, assets, transfers of assets, solvency of Tri-Coastal Services, and other issues, intending that Plaintiff would rely thereon and be harmed." *See* ¶138, Amend Comp.

To support its claim of fraud, Plaintiff pleads the following:

o In late 2019, Tri-Coastal Services, Stutz, and D. Mastrangelo, with the approval and participation of all Defendants, advised Wharton that Tri-Coastal Services was experiencing business difficulties and wanted to renegotiate some of the terms of the Original Lease. *See* ¶30, Amend Comp.

o Tri-Coastal Services, Stutz, and D. Mastrangelo, with the approval and participation of all Defendants, represented to Wharton that if Wharton agreed to modify the terms of the Lease, that Tri-Coastal Services would timely remit rent and its other financial obligations to Wharton. *See* ¶31, Amend Comp.

o Relying on the representations from Tri-Coastal Services, Stutz, and D. Mastrangelo, Wharton agreed to modify the Original Lease. *See* ¶32, Amend Comp.

o … with the approval and participation of all Defendants, collected the revenue and then transferred the revenue outside of the company to insiders such as the Individual Defendants, Company Defendants, Fictitious Defendants, and/or to others, all in an attempt to render Tri-Coastal Services judgment-proof vis-à-vis Wharton. *See* ¶36, Amend Comp.

o  Such transfers were done before, immediately after and during the time period that Tri-Coastal Services was incurring a substantial debt obligation to Wharton, and such transfers were concealed from Wharton. *See* ¶37, Amend Comp.

o  Despite continuing to operate and earn revenue, Tri-Coastal Services and Stutz, with the approval and participation of all Defendants, represented to Wharton in the Breach Litigation that Tri-Coastal Services was effectively defunct and insolvent. *See* ¶39, Amend Comp.

o  Defendants hid from Wharton that the other Company Defendants were utilizing the Property for business, generating income from their use of the Property. *See* ¶41, Amend Comp.; *see also,* ¶¶42 & 43, Amend Comp.

o  During the fall of 2019 through to and including the present, Defendants escalated their efforts at causing Tri-Coastal Services to be judgment proof, working together and separately but with a shared goal and purpose, to maximize the transfers of assets and other things of value from Tri-Coastal Services to the other Defendants. *See* ¶44, Amend Comp.

o  Tri-Coastal Services, Stutz and D. Mastrangelo, with the approval and participation of all Defendants, also made various promises during February 2020 through June 2020 …  By way of additional example and not of limitation:

   a.) … represented that Tri-Coastal Services' business difficulties were being caused by government to government trade disputes with China, and that therefore these business difficulties were only temporary in nature;
   b.) … Defendants had arranged for outside investors to provide financing to help Tri-Coastal Services pay rent …
   c.) … Tri-Coastal Services had applied for a government loan

   *See* ¶47, Amend Comp.

o  Tri-Coastal Design Services, Stutz and D. Mastrangelo, with the approval and participation of all Defendants, repeatedly made the above statements and promises, and similar statements and promises, during February 2020 through June 2020, in an attempt to reassure Wharton that Wharton would be paid in full and to get Wharton to show restraint in (i) not seeking the eviction of Tri-Coastal and (ii) causing Wharton to forebear commencing suit. …  *See* ¶48, Amend Comp.

o  The lender/borrower relationship between the Company Defendants and the IDBNY was restated on or about August 24, 2017 (the "Loan Agreement"). *See* ¶61, Amend Comp.

o  Defendants hid the Loan Agreement from Wharton. *See* ¶62, Amend Comp.

o  Upon information and belief, Defendants structured the Loan Agreement in such a way to: (a) subject Tri-Coastal Services to the debts of the other Company Defendants and (b)

subject the other Company Defendants to the revenue, assets, and other things of value belonging to Tri-Coastal Services. *See* ¶64, Amend Comp.

o On September 11, 2020 (twelve (12) days before Tri-Coastal Services executed the Consent Judgment in the Breach Litigation), Tri-Coastal Services and Stutz disclosed for the first time that the IDBNY supposedly took ownership of all of Tri-Coastal Services' assets and, through a private sale, sold them to a third party incorporating and existing under the laws of Italy. *See* ¶65, Amend Comp.; *see also,* ¶¶66 - 69, Amend Comp.

o As noted above, Tri-Coastal Services, with the approval and participation of Defendants, and without receiving value in return, transferred assets, revenue, and other things of value, to Defendants, thereby minimizing the assets of Tri-Coastal Services from Wharton's ability to collect. *See* ¶79, Amend Comp.; *see also,* ¶¶80 - 117, Amend Comp.

Again, Plaintiff's recitation of the facts, albeit mostly false, even if accepted as true, are based upon specious inferences of wrong doing.  See *Morrow*, 719 F.3d at 165 (quoting *Baraka*, 481 F.3d at 195).   The facts alleged in the Amended Complaint that purportedly support a cause of action for fraud are broken down into the following categories:

1. Multiple misrepresentations were made to Plaintiff by Defendants that were relied upon by Plaintiff. *See* ¶¶30, 31, 32, 47 & 48, Amend Comp.

2. Defendants' hid information from Plaintiff. *See* ¶¶41 – 43; 61 & 62, Amend Comp.

3. Transfers were made to cause Tri-Coastal Services to become judgment proof.  *See* ¶¶36, 37, 39, 44, 64, 65 & 79 - 117, Amend Comp.

Regardless of the plethora of allegations, Plaintiff has failed to set-forth a *prima facie* claim for fraud.  As a fundamental matter, the Amended Complaint does not provide allegations that support Plaintiff relied on Defendants' purported misrepresentations causing Plaintiff to be damaged. Moreover, Plaintiff's claim of fraud overlaps with its breach of contract claim that Plaintiff concedes in the Amended Complaint was settled (*see* ¶16, Amend Comp.), is based on incorrect legal conclusions couched as factual allegations, and the core of the allegations are conclusory.

*Plaintiff fails to allege a prima facie cause of action
that its reliance on Defendants' purported misrepresentations
caused it to be damaged*

The Amended Complaint makes the allegation that Plaintiff relied upon Defendants' misrepresentations.  *See* ¶32, Amend Comp.  The underlying facts that were pled, however, not only demonstrate Plaintiff didn't rely on any supposed statements but, even if it did, such statements could not have caused Plaintiff any damages.  Plaintiff contends that based on misrepresentations that were made to it by Defendants regarding the financial condition of Tri-Coastal Services, Plaintiff was prevented from collecting its rent and evicting the tenant.  Plaintiff alleges such statements commenced at the end of 2019 and continued through June 2020.

As far reliance, Plaintiff suggests it entered into the Amended Lease (*see* ¶32, Amend Comp.), which was signed in January 2020, and it withheld taking further action against Company Defendants.  In support, Plaintiff references and attaches such agreement to the Amended Complaint (*see* Amend. Comp., **Ex. B**), which by its express terms does not change Tri-Coastal Services' rent obligations (*see* ¶34, Amend Comp.), but merely paves the way for Plaintiff to immediately work on finding a new tenant.  Clearly, regardless of what Defendants are accused of saying, entering into such an agreement resulted in a reduction of potential damages not an increase.

Moreover, when combined with missing facts, the Amended Complaint demonstrates further that Plaintiff's supposed reliance on Defendants' misrepresentations did not cause it any damages.  To that end, Plaintiff's allegations, in conjunction with what was conveniently excluded from the pleadings, support the following:

o   Tri-Coastal paid rent through the month of February, 2020 (*see* **Ex. C**, Amend. Comp.). Therefore, it wasn't until March, 2020 when Tri-Coastal Services was finally in an uncurable position of default under the Lease.

o   Tri-Coastal Services has been a party to a loan and security agreement with IDB since 2007, three years before the Lease was entered into, whereby IDB had UCC liens on all the assets of Tri-Coastal Services as well as the other Company Defendants who are parties to the same loan and security agreement.  *See* Levine Dec., ¶2, Ex. A; Levine Dec., ¶9, Ex. H; see *also,* **Ex. A**, Amend Comp.

o   As a result of Company Defendants defaulting under the August 24, 2017 restated loan and security agreement, in or about March, 2020, IDB stopped virtually all lending to Company Defendants.

o   Since March, 2020, the New Jersey Supreme Court placed a moratorium on all residential and commercial eviction cases in the State of New Jersey.   The Court should take judicial notice of this fact.

o   On May 1, 2020, Plaintiff filed an action in the Superior Court of New Jersey, Law Division, Morris County, Docket No. MRS-L-000978-20, to recover unpaid rent under the Lease. *See* ¶52, Amend. Comp.

o   On July 1, 2020, Plaintiff filed an action in the Superior Court of New Jersey, Law Division, Special Civil Part (Landlord/Tenant), Morris County, Docket No. MRS-LT 001050-20, to evict Tri-Coastal Services.  *See* ¶57, Amend. Comp.

o   On or about August 24, 2020, IDB and Company Defendants entered into an agreement whereby Company Defendants surrendered, delivered, granted, and turned over to IDB, as secured party, peaceful possession of all of their assets pursuant to Article 9 of the UCC.

IDB had the unequivocal right to take ownership of all such assets.  *See* Levine Dec., ¶¶6 and 7, Ex. E and Ex. F.

To reiterate, establishing a fraud claim under New Jersey law requires a plaintiff to show that … (4) the plaintiff relied on the misrepresentation, and (5) the plaintiff was damaged as a result.  *Angrisani.,* 175 Fed.Appx. at 556.   To that end, the Amended Complaint establishes that even if Plaintiff trusted what Defendants' said, which it didn't since Plaintiff admits it commenced legal action just weeks after the alleged statements were made (*see* ¶¶52 and 57, Amend. Comp.), it had absolutely no recourse; thus, nothing that Defendants allegedly stated to Plaintiff caused it to change its position or resulted in any damages.  Despite commencing two separate actions to recover money damages and for eviction, Plaintiff didn't have an ability to obtain a remedy any earlier (if at all).

*Plaintiff 's allegation that Defendants*
*hid information does not support*
*its claim of fraud*

As far the allegation that Defendants "hid information" by selling assets to IDB, not disclosing the IDB loan and security agreement, and allowing other members of Company Defendants to utilize the premises without Plaintiff's knowledge, even if true, fail to give rise to a claim of fraud.   As an overall matter, no such allegations fall within the *prima facie* elements of such a claim. *Id.* at 556.

With regard to Tri-Coastal Services participating as a borrower in the IDB loan agreement, as noted above, having no outside revenue or assets, Tri-Coastal Service only had the ability to borrow funds because it is affiliated with Company Defendants.   This arrangement did not act as a conveyance but actually as a source of assets.  In addition, the IDB loan agreement was entered

25

into three years before the Lease.[4]  Finally, since inception of the Lease, Plaintiff knew of Tri-Coastal Services' relationship with IDB; as stated in the Consent Judgment referenced in the Amended Complaint (*see* Amend. Comp., **Ex. C**) the letter of credit Plaintiff accepted as security was issued by IDB.  Moreover, IDB's liens on all of Company Defendants' assets have been publicly filed since 2007 (or approximately three years before the Lease was entered into).  Hence, Plaintiff had constructive knowledge of the IDB loan and security agreement.

As far as Plaintiff alleging that Company Defendants "sold" their assets to IDB, such an inference is unfounded; IDB actually foreclosed on such assets, which it had an unequivocal right to do, and neither IDB nor Company Defendants had a duty to notify Plaintiff beforehand of IDB's intentions.  *See* Article 9 of the UCC, including §§ 9-609; 9-610; 9-617(a); 9-611(b); and 9-611(c).

Lastly, accepting the allegations as true for this purpose that Tri-Coastal Services allowed other members of the Company Defendants to use the leased premises and hid such activity from Plaintiff, such a violation would not give rise to a claim for fraud but for breach of contract against Tri-Coastal Services.  Where damages for fraud and breach of contract overlap, plaintiff may not pursue tort damages in fraud; plaintiff's case was "essentially contractual in nature." *Leibholz v. Hariri*, No. CV 05-5148 (DRD), 2006 WL 8457502, at *7 (D.N.J. July 13, 2006), citing *Werner*

---

[4] Plaintiff incorrectly concludes "At the time of the Loan Agreement Tri-Coastal Services was already subject to the Lease and the financial obligations contained therein." *See* ¶63, Amend. Comp.  Plaintiff, however, fails to recognize that on or about April 27, 2007, Company Defendants entered into a loan and security agreement with IDB (*see* Levine Dec., ¶2, Ex. A) which was three years before the Lease was entered into on or about January 19, 2010 (*see* Amend. Comp., **Ex. A)**. Although a court must accept the fact allegations in a complaint as true, it is not compelled to accept "unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Morrow*, 719 F.3d at 165 (quoting *Baraka*, 481 F.3d at 195).

& *Pfleiderer Corp. v. Gary Chem. Corp.,* 697 F. Supp. 808 (D.N.J. 1988); see also, *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 675-81 (3d Cir. 2002).

*Plaintiff's inferences that transfers were made
causing Tri-Coastal Services to become
judgment proof is baseless*

Basing the claim of fraud on the allegations that transfers were made to cause Tri-Coastal Services to become judgment proof is equally groundless on its face.   Not only does such allegations not satisfy the *prima facie* elements of a claim for fraud, as discussed more fully above, the underlying assumption that leads Plaintiff to conclude that Tri-Coastal Services transferred all of its revenue and assets to other parties in an attempt to circumvent paying Plaintiff is based upon a specious inference that this company earned any outside revenue and had any assets.    Since inception, Tri-Coastal Services never purchased or sold any goods.  *See* Levine Dec., ¶3, Ex. B.  The company was established to provide warehouse and office services to the other Company Defendants.   Thus, having no outside revenue or assets, it is plainly wrong to infer that any transfer of revenue and assets occurred or could have occurred by Tri-Coastal Services to prevent Plaintiff from being paid.

Likewise, inferring that the loan and security agreement entered into with IDB was part of a scheme to divert assets away from Plaintiff is a misleading notion.   Plaintiff reaches such an erroneous conclusion having relied on limited facts.    Not only was the IDB loan and security agreement entered into three years before the Lease, IDB's agreement to loan funds was subject to having a perfected security interest on *all* the assets of Company Defendants.  Having no outside revenue or assets, it is clear that Tri-Coastal Services only had the ability to borrow funds because it is affiliated with Company Defendants.   Plaintiff fails to consider or otherwise purposely elects

to disregard such essential facts thereby cherry-picking only those allegations that suit its false narrative.

A claim is facially plausible when there is *sufficient* factual content to draw a "reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. This is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679. Defendants are not at this stage asking the Court to disregard Plaintiff's facts, or otherwise amend them, but to recognize that the Amended Complaint leaves gaping holes that need to be filled. Failure to fill those holes will permit Plaintiff to make false inferences and pursue a bogus claim of fraud.

For the reasons stated, Plaintiff's cause of action labeled as fraud should be dismissed in its entirety.

**D. Plaintiff fails to plead facts sufficient to demonstrate a valid claim for Unjust Enrichment.**

There are two basic elements of a claim for unjust enrichment. A plaintiff must demonstrate "both that defendant received a benefit and that retention of that benefit without payment would be unjust." *VRG Corp. v. GKN Realty Corp.,* 135 N.J. 539, 641 A.2d 519 (1994). New Jersey law also "requires that plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights." *Maniscalco v. Brother Intern. Corp. (USA)*, 627 F. Supp. 2d 494, 505 (D.N.J. 2009); see also, *Gant v. Ragone*, No. CV2001727RBKKMW, 2020 WL 6797125, at *9 (D.N.J. Nov. 19, 2020)

*Plaintiff pleads facts to support Tri-Coastal Services'*
*breach of the Lease not the unjust enrichment*
*of Company Defendants*

Here, Plaintiff seemingly pleads a cause of action for breach of contract and *not* for unjust enrichment since the claim is rooted in Tri-Coastal Services improperly permitting the other Company Defendants to use the property in violation of the Lease.

To support such claim, Plaintiff pleads the following:

o   Under the Lease, Tri-Coastal Services was not permitted to sub-lease the Property without advance written consent from Wharton. (Ex. A § 16). *See* ¶40, Amend Comp.

o   Defendants hid from Wharton that the other Company Defendants were utilizing the Property for business, generating income from their use of the Property. *See* ¶41, Amend Comp.

o   Upon information and belief, beginning no earlier than January 2010, and continuing to October 1, 2020, Tri-Coastal Services, with the approval and participation of all Defendants, permitted Tri-Coastal Group, Tri-Coastal License, Posh and Pop, Loop Design, and Loop Licensing to utilize the Property without paying rent or other things of value to Tri-Coastal Services for the other Company Defendants' use of the Property. *See* ¶42, Amend Comp.

o   Upon information and belief, beginning no earlier than January 2010, and continuing to October 1, 2020, while Tri-Coastal Services was permitting Tri-Coastal Group, Tri-Coastal License, Posh and Pop, Loop Design, and Loop Licensing to utilize the Property without paying rent or other things of value, the Individual Defendants profited from such use without paying anything of value to Tri-Coastal Services. *See* ¶43, Amend Comp.

*Plaintiff fails to plead facts that show it*
*conferred a benefit to Company Defendants*

The Amended Complaint fails to plead a plausible cause of action for unjust enrichment against Company Defendants since the alleged facts don't set forth a plausible claim that Tri-Coastal Services *sublet* its space in violation of ¶16 of the Lease.  *See* Ex. A, Amend Comp.  More specifically, Plaintiff actually pleads a license arrangement was entered into and *not* a sublease which would not contravene the Lease or result in Plaintiff conferring a benefit.  The difference

between a sublease and license is the difference between two distinct legal concepts pertaining to an individual's duties and rights in a contract. A sublease is a contract between a tenant and a landlord that provides the tenant with exclusive interest in the property.   A license, on the other hand, is when the owner of a property right gives permission to a licensee to conduct an action on such property.  The main difference then is that subleases give an individual the right to control property, while licenses only give an individual the right to perform an act on it.  Unlike a sublease, a license does not transfer Plaintiff's interest in the real property which is what the Lease prohibits. *See* 26 CFR § 1.856-10(f)(2).   The Lease expressly precludes Tri-Coastal Services from transferring or encumbering all or a part of Tenant's *interest* in the Lease or in Plaintiff's rights in the Premises.  *See*  ¶16.1 of the Lease.  Here, there are no facts alleged that support a transfer of the Lease or Plaintiff's interest in the real property to Company Defendants (other than to Tri-Coastal Services).  The only allegations are that Tri-Coastal Services was not permitted to sub-lease the Property without advance written consent from Wharton (*see* ¶40, Amend Comp.) and Tri-Coastal Services permitted the other Company Defendants to use the Property (*see* ¶41, Amend Comp.).

> *Plaintiff fails to plead that it expected remuneration*
> *from Company Defendants at the time it performed*
> *or conferred the supposed benefit or such parties*
> *had a contractual right*

Nowhere does Plaintiff show that it expected remuneration from any party other than Tri-Coastal Services at the time it purportedly conferred a benefit, nor does Plaintiff indicate that the failure of remuneration enriched Company Defendants (other than Tri-Coastal Services) beyond their contractual rights. *Id.*  In fact, Plaintiff doesn't allege, nor can it allege, any of the Company

Defendants, except for Tri-Coastal Services, had any contractual rights since such parties are not in any manner in privity of contract with Plaintiff.

<em>Unjust enrichment is not an available remedy<br>since the validity of the Lease is<br>not being challenged</em>

There is no dispute whether or not Tri-Coastal Services has the right to voluntarily sublet it space. The validity of the Lease is not being challenged. Pleading both breach of contract and unjust enrichment is plausible only when the validity of the contract itself is actually disputed, making unjust enrichment a potentially available remedy. See *Grudkowski v. Foremost Ins. Co.*, 556 F. App'x 165, 170 (3d Cir. 2014).

For the reasons stated, Plaintiff's cause of action for unjust enrichment should be dismissed in its entirety.

### E. <u>Plaintiff fails to plead facts sufficient to demonstrate a valid cause of action under the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-2 et seq.</u>

The New Jersey Consumer Fraud Act, N.J.S.A. 56:8–2 ("NJCFA"), provides, "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice … N.J. Stat. Ann. § 56:8-2 "[T]he [NJ]CFA seeks to protect consumers who purchase goods or services generally sold to the public at large." *Cetel v. Kirwan Financial Group, Inc.*, 460 F.3d 494, 514 (3d Cir. 2006)

(quoting *Marascio v. Campanella*, 689 A.2d 852 (N.J. App. Div. 1997)); see *Atlas Acquisitions, LLC v. Porania, LLC*, No. 18-CV-17524, 2019 WL 6130774, at *6 (D.N.J. Nov. 19, 2019).

"[T]o state a claim under the [NJ]CFA, a plaintiff must allege each of three elements: (1) unlawful conduct by the defendants; (2) an ascertainable loss on the part of the plaintiff; and (3) a causal relationship between the defendants' unlawful conduct and the plaintiff's ascertainable loss." *New Jersey Citizen Action v. Schering-Plough Corp.,* 367 N.J.Super. 8, 842 A.2d 174, 176 (N.J. App. Div. 2003). See *Ponzio v. Mercedes-Benz USA, LLC*, 447 F. Supp. 3d 194, 242 (D.N.J. 2020).  The Amended Complaint states as follows:

> o Defendants engaged in unconscionable commercial practices, deception, fraud, false promises, misrepresentations, and the knowing, concealment, suppression, and/or omission of material facts in connection with the negotiation of the Amended Lease for the rental of the Property, the financial obligations inherent in the Lease relating to the rental of the Property, Tri-Coastal's ability to pay rent, various financial transactions, and the use and occupancy of the Property, with the intention to mislead and deceive Wharton. *See* ¶149, Amend Comp.

As stated throughout the Amended Complaint, this action is between sophisticated merchants and has nothing to do with a consumer having a dispute with a merchant.   Although the term "person" as used in this Act shall include any natural person or his legal representative, partnership, corporation, company, trust, business entity or association, and any agent, employee, salesman, partner, officer, director, member, stockholder, associate, trustee or cestuis que trustent thereof (N.J. Stat. Ann. § 56:8-1),  here, the Plaintiff is not an "ordinary consumer".   "… [T]he entire thrust of the Act is pointed to products and services sold to consumers in the popular sense." *Cetel v. Kirwan Fin. Group, Inc. .,* 460 F.3d 494, 514 (3d Cir.2006); see also, *Centrum Fin. Servs., Inc. v. Chicago Title Ins. Co.*, No. CIVA09-3300, 2010 WL 936201, at *4 (D.N.J. Mar. 12, 2010).   Under the NJCFA only consumers have standing to sue under the Act.  *IDT Telecom,*

*Inc. v. CVT Prepaid Sols., Inc.,* No. CIV.A. 07-1076(GEB), 2009 WL 5205968, at \*6 (D.N.J. Dec. 28, 2009).

This matter concerns an experienced landlord claiming its tenant didn't pay its rent. Plaintiff attempts to expand such a claim into the province of fraud but, regardless, Plaintiff makes no allegations that fall under the umbrella of the NJCFA.  Making a conclusory statement that "Defendant's engaged in unconscionable commercial practices" does not satisfy the statute. Moreover, Plaintiff does not set forth any ascertainable loss but only a general demand for compensatory, punitive, and treble damages.  *See* FOURTH COUNT, *Ad Damnum*, Amend Comp.

For the reasons stated, Plaintiff's cause of action regarded as a violation of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8–2 should be dismissed in its entirety.

### F.  **Plaintiff fails to plead facts sufficient to demonstrate a valid cause of action for Civil Conspiracy.**

In New Jersey, four elements comprise civil conspiracy: " '(1) a combination of two or more persons; (2) a real agreement or confederation with a common design; (3) the existence of an unlawful purpose, or of a lawful purpose to be achieved by unlawful means; and (4) proof of special damages.' " *MaxLite, Inc. v. ATG Elecs., Inc.*, 193 F.Supp.3d 371, 390 (D.N.J. 2016) (quoting *Morganroth & Morganroth v. Norris, McLaughlin & Marcus*, 331 F.3d 406, 414 (3d Cir. 2003).

*The Amended Complaint does not*
*plead a sustainable unlawful purpose or*
*unlawful means*

As discussed above, Plaintiff fails to plead facts sufficient to demonstrate (i) a valid claim of a violation of the New Jersey Uniform Fraudulent Transfer Act, (ii) a valid claim for Fraud, (iii)

a valid claim for Unjust Enrichment, or (iv) a valid cause of action under the New Jersey Consumer Fraud Act, *N.J.S.A.* 56:8-2 et seq.  Without the existence of an unlawful purpose, or of a lawful purpose to be achieved by unlawful means, there is no cause of action for civil conspiracy.

<em>The Amended Complaint fails to adequately<br>plead that the Individual Defendants<br>are personally liable</em>

Although Plaintiff claims all the Defendants conspired to commit fraud aimed at Plaintiff, the intra-corporate conspiracy doctrine bars allegations of conspiracy because employees generally cannot conspire with their organization. *Heffernan v. Hunter*, 189 F.3d 405, 412 n.5 (3d Cir. 1999); see *World Express & Connection, Inc. v. Crocus Investments, LLC*, No. CV158126KMMAH, 2020 WL 5088633, at *20 (D.N.J. Aug. 28, 2020).  While a conspiracy is possible between agents, officers, or employees of a corporation where they were acting as *individuals*, rather than representatives of the corporation, Plaintiff makes mere conclusory allegations that the Individual Defendants operated for personal gain.  *Id.*  The Amended Complaint states:

- o … In operating the Company Defendants and Fictitious Defendants, the Individual Defendants did and do not observe corporate formalities. The Company Defendants and Fictitious Defendants are the alter ego of one or more of the Individual Defendants. *See* ¶22, Amend Comp.

- o … the Company Defendants and in their personal capacity as private individuals looking to safeguard the individual financial interests of each of the Defendants. *See* ¶48, Amend Comp.

- o By acting in concert as they did, Defendants disregarded the corporate forms of each of the Company Defendants. The Individual Defendants also personally participated in the Company Defendants' actions, rendering themselves individually liable. *See* ¶51, Amend Comp.

There is not one alleged fact that even remotely supports that the Individual Defendants acted in their "personal capacity" or any allegations that would warrant the corporate veil to be

pierced.  *Internet Prod. LLC v. LLJ Enterprises, Inc.*, No. CV1815421RBKAMD, 2020 WL 6883430, at *8 (D.N.J. Nov. 24, 2020). Under New Jersey law, a court may pierce the corporate veil only if two elements are present: (1) that a parent corporation dominated its subsidiary to the extent that the subsidiary "had no separate existence but was merely a conduit for the parent" and (2) that the parent corporation "abused the privilege of incorporation by using the subsidiary to perpetrate a fraud or injustice, or otherwise to circumvent the law." See *Watson v. Sunrise Sr. Living Servs., Inc.,* No. CIV.A. 10-230 KM, 2013 WL 103966, at *13 (D.N.J. Jan. 8, 2013) citing *State, Dep't of Envtl. Prot. v. Ventron Corp.*, 94 N.J. 473, 468 A.2d 150 (1983).  Factors to be considered in determining whether to pierce the corporate veil include gross under capitalization ... failure to observe corporate formalities, non-payment of dividends, the insolvency of the debtor corporation at the time, siphoning of funds of the corporation by the dominant stockholder, non-functioning of other officers or directors, absence of corporate records, and the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders.  *Bd. of Trustees of Teamsters Local 863 v. Foodtown, Inc.*, 296 F.3d 164, 172 (3d Cir. 2002). Furthermore, "[w]hen a cause of action seeks to pierce the corporate veil on the basis of fraud, it is subject to Fed. R. Civ. P. 9(b)['s]" heightened pleading standards.  *Id.*  Rather, all Plaintiff alleges here is that "the Individual Defendants did and do not observe corporate formalities" and "Defendants disregarded the corporate forms of each of the Company Defendants." *See* ¶¶22 & 51, Amend Comp.  There is not a single fact to support such conclusory allegations.

For the reasons stated, Plaintiff's cause of action labeled as civil conspiracy should be dismissed in its entirety.

## CONCLUSION

For the reasons stated above, this action should be dismissed in all respects for failure of the Amended Complaint to state a claim on which relief can be granted pursuant to Fed.R.Civ.P. 12(b)(6).

Dated:  December 16, 2020                LAW FIRM OF TEDD S. LEVINE, LLC


By:   /s/Tedd S. Levine_____
     Tedd S. Levine, Esq.
     31 Dock Rd., Suite 162
     Remsenburg, NY 11960
     Tel:  (516) 770-3131
     email: lawofficesofteddslevine@ gmail.com

     *Attorneys for Defendants*